******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROGERS, C. J., dissenting. The majority concludes that the death penalty is unconstitutional under the state constitution. Every step of its analysis, however, is fundamentally flawed. First, the majority engages in an extensive discussion of the ancient history of the death penalty in this state pursuant to *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), and concludes that these "constitutional facts" are "unique and expansive." The majority identifies absolutely nothing in our state's distant past, however, that would remotely support the conclusion that there has *ever* been a societal consensus in this state that the death penalty is an inappropriate punishment for the most heinous murders. Thus, this history is entirely irrelevant to the question before the court. Indeed, in apparent acknowledgment of the complete absence of any historical support for the conclusion that the state constitution provides materially different protections from cruel and unusual punishments than does the eighth amendment to the federal constitution in this context, the majority ultimately concludes that the proper framework for evaluating the defendant's claim is the same as "the framework that the federal courts have used to evaluate eighth amendment challenges." See part I F of the majority opinion. Under that framework, the court is required to determine whether the death penalty is consistent with *contemporary* standards of decency. *Gregg* v. *Georgia*, 428 U.S. 153, 173, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) ("an assessment of contemporary values concerning the infliction of a challenged sanction is relevant to the application of the [e]ighth [a]mendment"); see also *Trop* v. *Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958) (eighth amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society"). Even assuming that the federal contemporary standards of decency rubric is the proper standard for evaluating a claim that the death penalty is categorically unconstitutional under the state constitution, however, this court rejected a claim that the death penalty is inconsistent with the contemporary societal mores of this state a mere four years ago, concluding that, as of 2011, "there remains powerful evidence of strong public support for the death penalty" in this state. *State* v. *Rizzo*, 303 Conn. 71, 198, 31 A.3d 1094 (2011), cert. denied, U.S. , 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012). Nevertheless, the majority concludes that, as the result of the enactment of No. 12-5 of the 2012 Public Acts (P.A. 12-5), in which the legislature abolished the death penalty for crimes committed after the effective date of the act, April 25, 2012, the death penalty is somehow now unconstitutional. In making this determination, the majority disregards the obvious: the legislature, which

represents the people of the state and is the best indicator of contemporary societal mores, expressly *retained* the death penalty for crimes committed before the effective date of P.A. 12-5. The majority's reasoning also contains a glaring contradiction that cannot be reconciled: at the same time that the majority concludes that the prospective repeal of the death penalty demonstrates that the people of this state have rejected the death penalty as an appropriate punishment for the most egregious murders, it concludes that the retention of the death penalty for capital offenses committed before April 25, 2012, evinces a constitutionally impermissible societal desire to wreak vengeance against the perpetrators of such crimes.[1] Moreover, in making its determination that the death penalty violates contemporary standards of decency in this state, the majority: (1) addresses societal factors affecting the constitutionality of the death penalty that the defendant, Eduardo Santiago, has not raised and that neither party has had an opportunity to address; (2) relies on contested and slanted extra-record materials that neither party has had an opportunity to review or respond to; and (3) improperly applies the governing legal standard. Thus, the majority's determination that the death penalty is unconstitutional under our state constitution is based on a house of cards, falling under the slightest breath of scrutiny.

I

Before addressing the merits of the majority's decision, it is important to clarify the procedural context in which these issues arose, in order to demonstrate the extent to which the majority has exceeded its authority as a court whose function it is to act as a "neutral arbiter of matters the parties present." (Internal quotation marks omitted.) *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 146, 84 A.3d 840 (2014). While the defendant's appeal in the present case was pending, the defendant filed a motion for permission to file a supplemental brief and for oral argument to address the impact of the passage of P.A. 12-5 on his appeal. Specifically, the defendant claimed that the passage of P.A. 12-5 raised serious questions about the continued constitutional validity of the death penalty.[2] On June 12, 2012, we issued our decision in the defendant's appeal. See *State* v. *Santiago*, 305 Conn. 101, 49 A.3d 566 (2012). In that decision, we "denied the defendant's motion [to file a supplemental brief and for oral argument] because . . . these constitutional issues would be more appropriately addressed in the context of post-judgment motions." Id., 308 n.167. We also rejected in *Santiago* the defendant's claim that the "the death penalty is per se unconstitutional under the Connecticut constitution, and that we should overrule our decisions holding to the contrary." Id., 306. The defendant then filed a motion for reconsideration and a renewed

motion to file a supplemental brief on the same issues that he had identified in his original motion, "as well as any others *relating to the impact of* [*P.A.*] *12-5 on the validity of* [*the defendant's*] *continued prosecution seeking a death sentence that are revealed by additional research.*" (Emphasis added.) This court granted both motions.

Thereafter, the defendant filed a supplemental brief in which he raised the following six claims for the court's consideration: (1) P.A. 12-5 renders the defendant's death sentence arbitrary under General Statutes § 53a-46b (b); (2) executing the defendant when P.A. 12-5 had abolished the death penalty for future offenses would be cruel and unusual punishment in violation of the eighth amendment to the United States constitution and article first, §§ 8 and 9, of the Connecticut constitution because, among other reasons, the act evinces a societal consensus against the death penalty; (3) carrying out an execution after the passage of P.A. 12-5 would violate the equal protection and substantive due process guarantees of the fourteenth amendment to the United States constitution and article first, §§ 1, 8, 9 and 20, of the state constitution; (4) the effective date provision of P.A. 12-5 violates the prohibition on bills of attainder and ex post facto laws contained in article one, § 10, of the federal constitution; (5) executing the defendant after the enactment of P.A. 12-5 would violate article first, § 9, of the state constitution because the death sentence is not " 'clearly warranted by law' "; and (6) the unconstitutional portion of P.A. 12-5 is severable under state law.

Thus, it is perfectly clear that the *sole* issue that is before this court is the effect of the passage of P.A. 12-5 on the continued constitutional validity of the state's death penalty statute, specifically, the defendant's claim that the death penalty became unconstitutional *after* the passage of P.A. 12-5, because the act reflects a legislative determination that the death penalty no longer comports with contemporary societal mores and it rendered the death penalty arbitrary. The defendant has not contested, for purposes of this appeal, the correctness of this court's previous decisions holding that the death penalty is not prohibited by the due process clauses of our state constitution, including our decision in *State* v. *Rizzo*, supra, 303 Conn. 201, and has asked us only to determine whether P.A. 12-5 reflects a *recently emerged* societal consensus that the death penalty is cruel and unusual. Thus, the defendant has made no claim that the death penalty is unconstitutional on the basis of the historical development of the death penalty in this state, the rarity of its imposition in this state in recent decades, the sentencing practices of other states in recent decades (other than the sentencing practices of states that have prospectively repealed the death penalty), the opinions and recommendations of professional associations, delays in executions in recent

decades, racial disparities in the imposition of the death penalty, the possibility of erroneous death sentences, or the "inherent conflict" between the requirement that the discretion of the jury to impose the death penalty must be cabined and the requirement that its discretion to accord mercy may not be constrained in any way. Because all of these factors relate to societal conditions and practices that existed before the passage of P.A. 12-5, the defendant has effectively conceded that they carry no weight here.[3]

## II

With this procedural history in mind, I turn to the merits of the majority's opinion. I begin with the majority's *Geisler* analysis.[4] After reviewing the *Geisler* factors, the majority concludes that: (1) the United States Supreme Court's repeated holdings that the death penalty "comports with contemporary American standards of decency, satisfies legitimate penological objectives, and is not imposed in an impermissibly arbitrary or discriminatory manner" carry no weight because that court has never considered whether the death penalty may be constitutionally imposed after a prospective repeal; (2) the silence of our state constitution on the question of cruel and unusual punishment reveals nothing about the intent of the constitutional framers; (3) the preconstitutional roots of the freedom from cruel and unusual punishment establish that "Connecticut citizens enjoyed a quasi-constitutional freedom from cruel punishment, one that reflected our unique social and political traditions and that far exceeded the protections recognized in England at the time" because, during the 1600s, 1700s and early 1800s, this state's (or the predecessor colony's) courts and public leaders were more "progressive" and less tolerant of harsh punishment than their English contemporaries and forebearers; and (4) this court's previous holdings that the due process provisions of the state constitution do not bar the imposition of the death penalty for the most heinous murders are now questionable because they have been overtaken by "new insights into the history of capital punishment in Connecticut, in tandem with the legislature's 2012 decision to abolish the death penalty prospectively";[5] and (5) precedents from other states support the conclusion that, in determining whether the death penalty comports with contemporary societal mores, the relevant societal mores are those of this state.

With respect to the first, fourth and fifth *Geisler* factors, relating to federal precedents, the precedents of this court and the precedents of other states, the majority appears to concede that these factors do not support the conclusion that the death penalty is now unconstitutional under the state constitution, and I would agree with that conclusion. I also agree with the majority that these precedents support the conclusion that a new

look at the constitutionality of the death penalty in this state under the state constitution is warranted in light of the legislature's enactment of P.A. 12-5 and I am willing to assume for purposes of this opinion that, in determining whether the death penalty is still constitutional under the state constitution, we must consider the current societal mores of this state. As I discuss in part III of this dissenting opinion, however, I believe that the majority misapplies the evolving standards of decency rubric and, under a proper application of that standard, the death penalty does not violate the state constitution. For the reasons that I have discussed in part I of this dissenting opinion, I also believe that the validity of this court's previous holdings that the death penalty is constitutional under the state constitution is not properly before the court here because the sole claim that the defendant has raised is that P.A. 12-5 evinces a *new* societal consensus that the death penalty is unconstitutional.

With respect to the second *Geisler* factor, the text of the respective constitutional provisions, the majority concludes that despite the fact that, unlike the eighth amendment to the federal constitution, article first, §§ 8 and 9, of our state constitution are *silent* with respect to the imposition of cruel and unusual punishments, this factor does not weigh in favor of the constitutionality of the death penalty under the state constitution. Surely, however, the fact that the framers of the state constitution, both in 1818 and in 1965, declined to adopt the "cruel and unusual" language of the eighth amendment as part of our state constitution suggests that they were *less*, or, at a minimum, that they were not *more*, concerned with this problem than the framers of the eighth amendment.[6] I fail to understand how the lesser or coextensive concern of the framers of the state constitution could possibly imply the existence of a broader right.[7] Moreover, there are, as Justice Zarella points out in his dissenting opinion, repeated textual references to capital offenses in the state constitution.[8] See Conn. Const., art. I, §§ 8 and 19, as amended by article four of the amendments. The 1818 constitution also expressly referred to the death penalty and capital offenses; see Conn. Const. (1818), art. I, §§ 9 and 14; and the death penalty was authorized by statute for numerous offenses, including nonhomicide offenses, when that constitution was adopted.[9] See General Statutes (1796 Rev.) p. 182; General Statutes (1808 Rev.) tit. LXVI, c. I. Thus, there can be no doubt that the framers of both the 1818 and 1965 constitutions believed that the death penalty for the most heinous crimes was entirely compatible with this state's fundamental law. See *State* v. *Rizzo*, supra, 303 Conn. 188 ("[W]e remain cognizant that our constitution contains explicit references to capital punishment . . . and, therefore, expressly sustains the constitutional validity of such a penalty in appropriate circumstances. . . . The defendant's

claim must be evaluated against this clear textual backdrop." [Citations omitted; internal quotation marks omitted.]). Indeed, the majority concedes as much.

With respect to the third prong of *Geisler*, historical insights into the intent of our constitutional forebearers, the majority undertakes an extensive review of the attitudes of this state's citizenry and public leaders toward criminal punishments before the adoption of the 1818 and 1965 state constitutions. It contends that, during the 1600s and 1700s, this state was increasingly intolerant of certain brutal forms of corporal punishment and "came to believe that the death penalty should be reserved for only the most heinous and universally condemned offenses." See part I B 1 of the majority opinion. I fail to perceive, however, why the fact that this state rejected brutal forms of corporal punishment and believed that the death penalty should be reserved for only the most heinous crimes supports the conclusion that imposing the death penalty for the most heinous crimes may now be *inconsistent* with the state constitutional prohibition on cruel and unusual punishments. Indeed, the majority's analysis is riddled with non sequiturs. Although to enumerate all of them would greatly and unnecessarily increase the length of this dissenting opinion, I offer the following glaring examples. First, the majority appears to suggest that the *execution* of Peter Lung in 1816 shows that this state had developed a broader conception of cruel and unusual punishment than that of the federal framers because the execution was not met with public celebration.[10] Second, the majority concludes in footnote 31 of its opinion that the fact that the state opened a new prison in 1964 that was " 'primarily devoted to preparing inmates for adjusting to community living and responsibility when they are released' " shows that "our state's understanding of the permissible nature and purposes of punishment had undergone a thorough transformation" from 1818 to 1965. The question that the majority is addressing, however, is not whether the underlying theory of punishment for *noncapital* crimes has changed in this state over the years, but whether our state constitution now bars *capital punishment* for the most heinous murders. Neither the opening of the Somers prison in 1964 nor anything else in the majority's review of the history of this state remotely supports the conclusion that it does. Indeed, in yet another glaring inconsistency, the majority itself concedes that the ancient history of this state and the historical attitudes of its citizens toward criminal punishment say "little about [the] legal status [of the death penalty] two centuries later."

Finally, although the majority refers to our "unique and expansive constitutional and preconstitutional history"; see part I F of the majority opinion; it makes no attempt to *compare* the history of this state with the history of the other states that were in existence when

the eighth amendment was proposed in 1789 and ratified in 1791. Accordingly, any suggestion that the "rapid evolution in penology" that had occurred in this country and its predecessor colonies from the early colonial days to the late 1700s was "especially pronounced in Connecticut" is pure speculation. For the same reason, the majority's reference to "our state's unique and expansive constitutional and preconstitutional history" is devoid of any substantive content. Finally, even if it were true that this state has a history that supports a unique and expansive interpretation of the protections afforded by the due process provisions of the state constitution, I must reiterate that there is absolutely nothing in the history of this state that supports the conclusion that its citizens have ever rejected capital punishment as an inappropriate punishment for the most heinous murders.

After reviewing these *Geisler* factors, the majority states that its review has led it to conclude that it should "broadly adopt the framework that the federal courts have used to evaluate eighth amendment challenges." See part I F of the majority opinion. At the same time, the majority makes it clear that it may "conclude that practices and punishments that the United States Supreme Court has expressly approved are nevertheless unconstitutionally cruel and unusual in Connecticut . . . either because our state's contemporary standards of decency differ from those of the nation as a whole, *or because this court simply reaches a different conclusion when applying to the relevant constitutional facts, as a matter of state constitutional law, standards similar or even identical to those that the United States Supreme Court has articulated.*" (Citation omitted; emphasis added.) See footnote 17 of the majority opinion. Thus, the majority again tries to have its cake and eat it too. First, the majority declines to conclude that the due process provisions of the state constitution provide broader protection from the death penalty for the most heinous murders than the eighth amendment does, presumably because it knows that any such conclusion would be simply unsupportable; then the majority declines to be bound by the Supreme Court's understanding of eighth amendment jurisprudence, presumably because it wants to ensure that its decision is insulated from any further review.[11]

In light of the majority's failure to reach any definitive conclusions as to the relative scopes of the right to be free from cruel and unusual punishments under the state and federal constitutions, I can only conclude that the majority has undertaken this extended analysis of the state's ancient history in the misguided belief that, if it can somehow imply that the attitude of this state's citizens toward *any* form of criminal punishment was ever ahead of the curve of broader societal attitudes, it must follow as the night follows the day that societal attitudes have been, are now and always will be "pro-

gressive" for *all* forms of punishment, including the death penalty for the most heinous murders.[12] The reality, however, is that neither the text of the state constitution nor our state's history in any way supports the view that Connecticut citizens were *ever* against the penalty of death for the most heinous crimes. Moreover, the majority's belief is entirely inconsistent with its ultimate conclusion that the constitutional standard for determining whether the death penalty is cruel and unusual under the state constitution is whether it comports with the *contemporary societal mores of this state*—not whether the death penalty comports with societal mores that existed hundreds of years ago, not whether the existing societal mores of this state continue to be ahead of the curve, and not whether the death penalty comports with the contemporary mores of certain members of this court.[13] Because they shed no light on the broad issue that the majority has taken upon itself to address, the second and third *Geisler* factors are irrelevant to its analysis. Indeed, the majority concedes as much when it concludes that it should apply the evolving standards of decency rubric that applies to eighth amendment claims, which requires the courts to consider *contemporary* standards of decency. Although those factors may be relevant to the extent that they shed light on the question of whether the death penalty was considered cruel and unusual punishment when the 1818 and 1965 constitutions were adopted, there is no dispute that it was not considered as such.

### III

I next address the majority's conclusion that the death penalty is incompatible with the current societal mores of this state. In making its determination that the death penalty violates the state constitution, the majority applies the "evolving standards of decency" rubric that is applied under the federal constitution. See *Trop* v. *Dulles*, supra, 356 U.S. 101 (eighth amendment "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society"). I would note that, although the United States Supreme Court has applied this rubric to determine the constitutionality of the death penalty for certain crimes and for certain classes of defendants, it is unclear whether that court would ever find that societal rejection of the death penalty rendered the death penalty categorically unconstitutional, despite the language of federal constitution expressly contemplating the death penalty and this country's historical acceptance of the death penalty as the appropriate punishment for the most heinous crimes. See *Glossip* v. *Gross*, U.S. , 135 S. Ct. 2726, 2747, 192 L. Ed. 2d 761 (2015) (Scalia, J., concurring) ("[N]ot once in the history of the American Republic has this [c]ourt ever suggested the death penalty is categorically impermissible. The reason is obvious: It is impossible to hold unconstitutional that which the [c]onstitution explicitly *contemplates*. The [f]ifth

[a]mendment provides that '[n]o person shall be held to answer for a capital . . . crime, unless on a present-ment or indictment of a [g]rand [j]ury,' and that no person shall be 'deprived of life . . . without due pro-cess of law.' " [Emphasis in original.]). Even assuming, however, that evolving standards of decency could ren-der the death penalty unconstitutional in this state under the *Trop* standard, despite the language of our constitution expressly contemplating the death penalty; see part II of this dissenting opinion; the majority has failed to establish that the death penalty for the most heinous murders is inconsistent with contemporary standards of decency in this state.[14]

In analyzing this issue, it is important to distinguish between the applicable standard for determining whether there has been a violation of the constitution and the scope of the right at issue. Specifically, it is clear to me that the standard applied under the state constitution is the same as under the eighth amend-ment: a punishment is unconstitutionally cruel and unusual under the state constitution if it violates con-temporary standards of decency in this state. Obviously, however, the societal mores of this state may be less (or more) tolerant of particular types of punishment than the societal mores of the nation as a whole and, accordingly, a punishment that is cruel and unusual under our state constitution will not necessarily violate the eighth amendment. Thus, to the extent that the societal mores of this state are less tolerant of harsh punishment than national mores, the *scope* of the right may be considered "broader" in this state, although the fundamental nature of the right is the same. Cf. *State* v. *Rizzo*, supra, 303 Conn. 188 ("[T]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. *The standard itself remains the same*, but its applicability must change as the basic mores of society change." [Emphasis added; internal quotation marks omitted.]).[15]

The majority identifies "five objective indicia of soci-ety's evolving standards of decency: (1) the historical development of the punishment at issue; (2) legislative enactments; (3) the current practice of prosecutors and sentencing juries; (4) the laws and practices of other jurisdictions; and (5) the opinions and recommenda-tions of professional associations. See, e.g., *Graham* v. *Florida*, [560 U.S. 48, 61–67, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010)]; *Atkins* v. *Virginia*, [536 U.S. 304, 311–16, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002)]; *Thompson* v. *Oklahoma*, [487 U.S. 815, 830, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988)]; *Enmund* v. *Florida*, [458 U.S. 782, 788–89, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982)]; *State* v. *Rizzo*, supra, 303 Conn. 187–96." (Footnote omitted.) In my view, this methodology misstates both the eighth amendment jurisprudence of the United State Supreme Court and the state constitutional jurisprudence of this court. In the four United States Supreme Court cases

that the majority cites, the court relied primarily on two objective factors to guide its determination as to whether a particular punishment violated contemporary standards of decency: (1) "legislation enacted by the country's legislatures," which provides the "clearest and most reliable objective evidence of contemporary values"; (internal quotation marks omitted) *Atkins* v. *Virginia*, supra, 312; *Graham* v. *Florida*, supra, 62; see also *Thompson* v. *Oklahoma*, supra, 822; and (2) "[a]ctual sentencing practices" in this country. *Graham* v. *Florida*, supra, 62; see also *Thompson* v. *Oklahoma*, supra, 822. The Supreme Court has also on occasion considered whether its determination "is consistent with the views that have been expressed by respected professional organizations, by other nations that share our Anglo-American heritage, and by the leading members of the Western European community." *Thompson* v. *Oklahoma*, supra, 830. The court, however, does not consider views of other nations and, by extension, professional organizations, to determine the contemporary societal consensus in this nation regarding a particular punishment. See *Graham* v. *Florida*, supra, 80 ("[t]he [c]ourt has looked beyond our [n]ation's borders for support for its independent conclusion that a particular punishment is cruel and unusual," but practices in other nations do "not control our decision"); *Stanford* v. *Kentucky*, 492 U.S. 361, 369 n.1, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989) ("We emphasize that it is *American* conceptions of decency that are dispositive, rejecting the contention of [the] petitioners and their various amici . . . that the sentencing practices of other countries are relevant. While [t]he practices of other nations, particularly other democracies, can be relevant to determining whether a practice uniform among our people is not merely a historical accident, but rather so implicit in the concept of ordered liberty that it occupies a place not merely in our mores, but, text permitting, in our [c]onstitution as well . . . they cannot serve to establish the first [e]ighth [a]mendment prerequisite, that the practice is accepted among our people." [Citations omitted; emphasis in original; internal quotation marks omitted.]), overruled on other grounds by *Roper* v. *Simmons*, 543 U.S. 551, 560, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *State* v. *Rizzo*, supra, 303 Conn. 195 ("the United States Supreme Court at times has referenced international norms as support for its own determinations, while at the same time making clear that the opinions prevalent in other nations could never control over a domestic legislative climate running decidedly counter to such opinions"). After determining the contemporary societal consensus, the United States Supreme Court has then exercised its independent judgment to consider "the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment . . . . In this inquiry the [c]ourt also considers whether the challenged sentencing practice serves legitimate penologi-

cal goals." (Citations omitted.) *Graham* v. *Florida*, supra, 67; see also *Atkins* v. *Virginia*, supra, 312–13; *Thompson* v. *Oklahoma*, supra, 833.

I would conclude that, in determining whether the death penalty comports with contemporary societal mores in this state, this court, as a general matter, should follow the United States Supreme Court's methodology for determining national societal mores, but on a state level. Thus, the primary factors that this court should consider are the actions of our state legislature, which provide the "clearest and most reliable objective evidence of contemporary values"; (internal quotation marks omitted) *Atkins* v. *Virginia*, supra, 536 U.S. 312; and the actual sentencing practices of Connecticut juries.[16] *Graham* v. *Florida*, supra, 560 U.S. 62; see also *Atkins* v. *Virginia*, supra, 312 (judgments regarding evolving standards of decency "should be informed by objective factors to the maximum possible extent" [internal quotation marks omitted]); *Stanford* v. *Kentucky*, supra, 492 U.S. 369 (same). After making a determination on the basis of these objective factors, the court may test its conclusions by looking at the views expressed by respected professional associations and the practices in other jurisdictions, but it may not use those views and practices as evidence of this state's societal mores. *Stanford* v. *Kentucky*, supra, 369 n.1. Finally, the court may exercise its independent judgment to consider whether "the challenged sentencing practice serves legitimate penological goals." *Graham* v. *Florida*, supra, 67.

With respect to the enactments of our legislature, which provide the clearest evidence of contemporary societal mores, the majority contends that the enactment of P.A. 12-5 reveals that "[o]ur elected representatives have determined that the machinery of death is irreparable or, at the least, unbecoming to a civilized modern state. . . . The prospective abolition of the death penalty thus provides strong support for the conclusion that capital punishment no longer comports with contemporary standards of decency and, therefore, constitutes cruel and unusual punishment."[17] (Citation omitted; footnotes omitted.) To the contrary, however, the legislature's enactment of P.A. 12-5 supports neither the conclusion that the legislature believes that support for the death penalty is uncivilized nor the conclusion that the death penalty does not actually enjoy public support. I start with the obvious. The legislature enacted legislation that still allows for the death penalty to be imposed, because the *minority* of legislators who opposed the death penalty in all cases were unable to convince a majority that it should be repealed retroactively.[18] Moreover, the legislative history of P.A. 12-5 strongly supports the conclusion that the reason for the prospective repeal was not that a majority of legislators found the death penalty morally repugnant even for the worst crimes, or that they found life impris-

onment an adequate substitute for the death penalty, but that they had determined that the death penalty simply had become impracticable.[19] Cf. *State* v. *Rizzo*, supra, 303 Conn. 190 n.88 (prospective repeal of death penalty does not establish that "legislature was convinced that the death penalty is intolerable under any and all circumstances"); id., 199 n.101 (legislative history of prospective repeal by legislature that governor later vetoed showed that repeal "was motivated by practical rather than moral concerns"). I further note that the vote in the Senate was twenty in favor of passing the proposed legislation and sixteen against passage; 55 S. Proc., Pt. 3, 2012 Sess., p. 814; and the vote in the House of Representatives was eighty-six in favor of passage, sixty-two against passage and three not voting. 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1390. Thus, there was significant opposition to any form of repeal. Accordingly, it is simply untenable to conclude that the passage of P.A. 12-5 evinces a legislative determination or societal consensus that the death penalty is immoral in all cases. Rather, the evidence strongly supports the conclusion that, *despite the legislature's belief that the death penalty is the appropriate punishment for certain crimes*, after considering all of the societal costs of imposing the death penalty for *future* crimes of this type, the legislature's acceptance of a less severe form of punishment for those future crimes was a necessary and tolerable legislative compromise. This belief that the death penalty is appropriate for certain crimes is evinced by the fact that the legislature left the death penalty in place for all capital crimes committed before the effective date of P.A. 12-5, which provides the clearest evidence of contemporary societal mores in this state.

The majority states that, to the contrary, "[d]uring the legislative debates, of the three dozen senators and representatives who rose to speak in favor of P.A. 12-5, nearly every one stated that they had come to oppose capital punishment as a matter of conscience or principle."[20] Of course, there is no dispute that some legislators who were considering P.A. 12-5 believed that the death penalty is immoral under any circumstances and would have repealed it retroactively if they had been able to muster the votes to do so. The majority simply ignores the fact, however, that these legislators constituted a small minority. Even assuming that all of the "three dozen" legislators cited by the majority opposed the death penalty on moral grounds, that would mean that seventy legislators voted in favor of P.A. 12-5 without expressing any moral objections to the death penalty. In addition, seventy-eight legislators voted against P.A. 12-5, thereby indicating that they had *no* objections to the death penalty, moral or otherwise. See 55 S. Proc., supra, p. 814; 55 H.R. Proc., supra, p. 1390. Thus, for a large majority of legislators—148 out of 184, or 80 percent—there is no evidence that they had any

moral qualms about the appropriateness of the death penalty for the most heinous murders.[21]

Indeed, it is the majority's improper and illogical *assumption* that those who opposed retroactive repeal but voted for prospective repeal had moral objections to the death penalty that *creates* the troubling specter of moral incoherence.[22] In my view, this court should not lightly assume that our legislators voted to retain what they believed to be an immoral punishment for improper reasons. Rather, the constitutional principle that this court must presume that the legislature has acted for legitimate reasons[23] compels the following conclusions: (1) The legislature voted to retain the death penalty for crimes occurring before the effective date of P.A. 12-5 for the simple reason that a majority of legislators had no moral objection to imposing the death penalty on defendants who committed heinous murders when such crimes were punishable by death; and (2) the legislature voted to repeal the death penalty prospectively for the simple reason that many of the legislators who found the death penalty morally unobjectionable had come to believe that it is simply unworkable in this state.[24] Unlike the reasons proposed by the majority, these reasons are mutually consistent and they find ample support in the legislative history of P.A. 12-5.[25] See footnote 19 of this opinion. Moreover, contrary to the majority's suggestion, these reasons are consistent with the statements by various legislators that P.A. 12-5 involved a matter of conscience.[26] No moral principle would compel a legislator who believed that the death penalty is moral but unworkable to retain the death penalty going forward. Indeed, the state's commitment to the families of the victims who already had endured the agony of the lengthy litigation and appeal procedures required in death penalty cases would provide a perfectly legitimate reason to differentiate between defendants who already had been sentenced to death and those who will commit such crimes in the future for legislators who believed that the death penalty is the appropriate punishment for the worst crimes, but who wanted to avoid the societal costs of capital punishment in future cases.[27]

Finally, I would point out that the majority has chosen to remain deliberately vague on the question of whether a majority of this state's *citizens* oppose the death penalty on moral grounds. Although the majority attempts to point at purported evidence that the death penalty is inconsistent with the contemporary societal mores of this state's citizenry,[28] it ultimately states that "[s]ome legislators . . . may have seen a prospective repeal as an opportunity to retain the support of constituents committed to the execution of particular residents of death row, while leaving to this court the task of abolishing capital punishment retroactively." Thus, the majority appears to acknowledge that the death penalty continues to enjoy strong public support. If that

were the case, however—and I see no evidence to the contrary—then, even if the majority were correct that the legislature retained the death penalty for crimes committed before the effective date of P.A. 12-5 in the hope that this court would invalidate it, the legislature would have been attempting to delegate to this court a difficult *legislative decision*.[29] Any such attempt should be firmly rejected as a blatant violation of the constitutional principle of separation of powers.

With respect to the current sentencing practices of this state, the majority suggests that the death penalty is now so rarely imposed that it no longer comports with our state's evolving standards of decency. This is a fact bound issue, however, that the defendant did not raise, that the parties have not had an opportunity to brief and on which the trial court made no factual findings. Thus, the record is clearly inadequate for review.[30] Accordingly, as I have explained in part I of this dissenting opinion, it is entirely inappropriate for the majority to consider that issue in this case.

Moreover, even if the majority were correct that juries in this state are reluctant to impose the death penalty, its conclusion that that reluctance is the result of a societal consensus that the death penalty is immoral is nothing more than an unsupported assumption. As this court recognized in *State* v. *Rizzo*, supra, 303 Conn. 194 n.94, "declining imposition of capital punishment may indicate that the death penalty is being employed precisely as was intended, to punish only the very worst of society's criminals, and only after a vigorous legal process has ensured that the defendant has been found guilty after a fair trial with demanding procedural safeguards. As the United States Supreme Court has observed, the relative infrequency of jury verdicts imposing the death sentence does not indicate rejection of capital punishment per se. Rather, [it] . . . may well reflect the humane feeling that this most irrevocable of sanctions should be reserved for a small number of extreme cases. *Gregg* v. *Georgia*, supra, 428 U.S. 182." (Internal quotation marks omitted.) In addition, although this court has recognized "the weaknesses inherent in public opinion polls as objective measures of the popular psyche"; *State* v. *Rizzo*, supra, 195; public opinion polls certainly lend no support to the majority's conclusion that the infrequent imposition of the death penalty in this state reveals a moral repugnance against the death penalty in all cases. According to a Quinnipiac University poll released in March, 2013, 59 percent of Connecticut registered voters supported the death penalty for persons convicted of murder, while only 35 percent were opposed to it.[31] Thus, there is no factual or legal support for a conclusion that the citizens of this state find the death penalty to be morally repugnant, even for the most horrific crimes.

The majority has cited no case in which the United

States Supreme Court, or any other court, has concluded that there is no societal consensus against a particular punishment in a particular jurisdiction and then has gone on to determine that the punishment is unconstitutional on the basis of the views of other jurisdictions or professional organizations. Indeed, the majority itself has started with the premise that "the pertinent standards by which we judge the fairness, decency, and efficacy of a punishment are *those of Connecticut*." (Emphasis added.) See part I E of the majority opinion. Accordingly, having concluded on the basis of these objective factors that there is no consensus against the death penalty in this state, I would conclude that the views of other states and professional organizations have little if any relevance to the constitutional question. Even if those factors were relevant, however, the majority's analysis is still flawed. Again, the defendant has made no claims and presented no evidence regarding the general sentencing trends or societal mores of other jurisdictions.[32] Accordingly, this issue is not properly before us. Moreover, in making its determination, the majority again relies on slanted and untested sources that neither party has had the opportunity to review or to respond to. See footnote 30 of this dissenting opinion. For similar reasons, the majority's reliance on the opinions and recommendations of professional associations is improper. Once again, the majority has addressed an issue that the defendant did not raise and, once again, neither party has had an opportunity to review or respond to the extra-record sources relied on by the majority or to test them in the trial court.

Finally, exercising its independent judgment to determine whether the death penalty serves any legitimate penological goals; see *Graham* v. *Florida*, supra, 560 U.S. 67; the majority concludes that it no longer has any deterrent or retributive value.[33] As the majority recognizes, however, it is well established that "the value of [capital punishment], and its contribution to acceptable penological goals, typically is a complex factual issue the resolution of which properly rests with the legislatures . . . . *Kennedy* v. *Louisiana*, [554 U.S. 407, 441, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008)]; see also *Roper* v. *Simmons*, supra, 543 U.S. 571 ([i]n general we leave to the legislatures the assessment of the efficacy of various criminal penalty schemes); *Gregg* v. *Georgia*, supra, 428 U.S. 175 ([i]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people . . .) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Rizzo*, supra, 303 Conn. 197–98. Thus, courts "cannot invalidate a category of penalties because [they] deem less severe penalties adequate to serve the ends of penology," although "the sanction imposed cannot be so "totally without penological justification that it results in the gratuitous infliction of

suffering." (Internal quotation marks omitted.) *Gregg* v. *Georgia*, supra, 182–83.

The United States Supreme Court has held that "punishment is justified under one or more of three principal rationales: rehabilitation, deterrence, and retribution." *Kennedy* v. *Louisiana*, supra, 554 U.S. 420. With respect to deterrence, the majority in the present case relies on Justice Harper's conclusory statement in his concurring and dissenting opinion in *State* v. *Santiago*, supra, 305 Conn. 321, that, "[f]ollowing the abolition of the death penalty for all future offenses committed in Connecticut . . . it is possible to determine the *exact* number of potential crimes that will be deterred by executing the defendant in this case. That number is zero." (Emphasis in original.) No one, however, has revealed the source of this oracle. I believe that, to the contrary, the legislature reasonably could have concluded that its refusal to enforce the laws in effect when the crime was committed would send the message to potential offenders that the laws are unstable and that the state ultimately may be unwilling to enforce them, thereby weakening their force. *People* v. *Floyd*, 31 Cal. 4th 179, 191, 72 P.3d 820, 1 Cal. Rptr. 3d 885 (2003) ("penal laws will maintain their desired deterrent effect by carrying out the original prescribed punishment as written" [internal quotation marks omitted]). Indeed, that very argument was made during the legislative debate on P.A. 12-5. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., p. 2781, remarks of Kevin Barry ("It is perfectly proper for the [l]egislature to create a new sentencing procedure which operates prospectively only despite the disparity created by rendering different sentences after an admittedly arbitrarily chosen date . . . because of the legitimate public purpose of assuring that penal laws will maintain their desired deterrent effect by carrying out the original prescribed punishment as written. You would be sending a message . . . that you will carry out what you said you would do [and] there is deterrence in that . . . ."). Thus, although I acknowledge that the prospective repeal of the death penalty has certainly diminished its deterrent value, imposing the punishment that was authorized at the time that the crime was committed still "serves an important purpose in promoting the stability of a society governed by law." (Internal quotation marks omitted.) *Gregg* v. *Georgia*, supra, 428 U.S. 183.

Even if the majority were correct that the enactment of P.A. 12-5 has eliminated the deterrent value of the death penalty, however, a penalty need not have *both* a deterrent *and* a retributive purpose to be penologically justified. "The truth is that some crimes are so outrageous that society insists on adequate punishment, because the wrong-doer deserves it, irrespective of whether it is a deterrent or not." Id., 184 n.30. The majority concludes that the death penalty no longer serves a legitimate retributive purpose because, by

enacting P.A. 12-5, "the legislature necessarily has made a determination . . . that life imprisonment without the possibility of release is an adequate and sufficient penalty even for the most horrific of crimes; that we can express our moral outrage, mete out justice, bring some measure of solace to the victims, and purge the blemish of murder on our community whilst the offender yet lives. If this is true, then, although the death penalty still might serve some minimal retributive *function* in Connecticut, it lacks any retributive *justification*."[34] (Emphasis in original.) Clearly, however, the premise that the legislature has determined that life imprisonment is an adequate punishment for the most horrific crimes is *not* true. Rather, as I have explained, the prospective repeal most reasonably is understood as representing a legislative compromise based on a determination that, although the death penalty is the appropriate punishment for the most egregious murders, it has become impracticable.

The majority also contends that the legislature left the death penalty in place for crimes committed before the effective date of P.A. 12-5 "primarily to maintain the possibility of executing two particular offenders— the much reviled perpetrators of the widely publicized 2007 home invasion and murder of three members of Cheshire's Petit family" and, therefore, the legislature did not have a proper retributive purpose, but was improperly motivated by vengeance. I agree with the majority that a majority of legislators, as well as a majority of the citizens of this state, believe that the death penalty is the appropriate penalty for the defendants who committed the Cheshire crimes. The majority has failed to establish, however, that these legislators and citizens do *not* believe that the death penalty is also the appropriate punishment for the crimes committed by the other defendants who are on death row, which involved the beating to death of a thirteen year old boy in order to experience what it was like to kill someone; *State* v. *Rizzo*, supra, 303 Conn. 147–49; the heinous and cruel beating and stabbing to death of a teenaged son and former wife; *State* v. *Breton*, 264 Conn. 327, 345–48, 824 A.2d 778, cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 159 L. Ed. 2d 708 (2003); the shooting of a policeman by a convicted felon; *State* v. *Reynolds*, 264 Conn. 1, 18–21, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 159 L. Ed. 2d 254 (2004); the kidnapping, robbery, rape, binding and heinous and cruel murder of the victim by drowning or strangling; *State* v. *Cobb*, 251 Conn. 285, 302–304, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); and the kidnapping, rape, and heinous and cruel murder of the victim by repeatedly shooting her as she tried to escape and screamed for help; *State* v. *Webb*, 238 Conn. 389, 397–99, 680 A.2d 147 (1996), aff'd on remand, 252 Conn. 128, 750 A.2d 448, cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000); and

for all particularly horrendous murders.[35] Indeed, it is reasonable to conclude that the Cheshire case weighed particularly heavily on the minds of the public and of the legislators during the debates on P.A. 12-5, merely because it provided the most recent—and, admittedly, a most tragic and pointed—example of the *type* of crime for which the public and the legislature believed the death penalty to be an appropriate punishment. The conclusion that a majority of legislators believed that *all* heinous murders deserve the death penalty finds ample support in the legislative history of P.A. 12-5. See 55 H.R. Proc., supra, pp. 1103–10, remarks of Representative Jeffrey J. Berger (discussing details of crimes committed by defendants in *Breton, Cobb, Rizzo* and *Reynolds*, and arguing that people of state "scream out for justice" in form of death penalty); id., p. 1151, remarks of Representative Al Adinolfi (arguing that defendants who committed Cheshire murders deserve death penalty, "and so do many of the others"); id., pp. 1178–80, remarks of Representative Christopher Davis (discussing details of crime committed by defendant in *Reynolds* and arguing that defendant deserves death penalty); id., pp. 1183–86, remarks of Representative Anthony J. D'Amelio (same); id., pp. 1190–92, remarks of Representative Selim G. Noujaim (same); id., p. 1209, remarks of Representative Themis Klarides ("I feel terrible for the . . . family [of the victims of the Cheshire murders] . . . but there are nine other people on death row. And their families, the victims in those cases, I feel just as badly for."); id., pp. 1236–37, remarks of Representative Larry B. Butler (discussing details of crimes committed by defendants in *State* v. *Peeler*, 271 Conn. 338, 857 A.2d 808 [2004], *Rizzo* and *Reynolds*, and arguing that defendants deserve death penalty); 55 H.R. Proc., supra, p. 1300, remarks of Representative Jason D. Perillo (discussing details of crime committed by defendant in *Webb* and arguing that defendant deserved death penalty); 55 H.R. Proc., supra, p. 1304, remarks of Representative Ernest Hewett (discussing details of crime committed by defendant in *Peeler* and arguing that defendant deserved death penalty); 55 S. Proc., supra, pp. 726–28, remarks of Senator Robert J. Kane (discussing details of crimes committed by defendants in *Rizzo, State* v. *Colon*, 272 Conn. 106, 864 A.2d 666 [2004], *Peeler* and *Breton*, and arguing that defendants deserved death penalty); Conn. Joint Standing Committee Hearings, supra, pp. 2807–2809, remarks of Sergeant Richard Holton of the Hartford Police Department (referring to crime committed by defendant in *Reynolds* and arguing in favor of death penalty); Conn. Joint Standing Committee Hearings, supra, p. 2823 (referring to crimes committed by defendants in Cheshire case, *Webb* and *Rizzo*).[36] Accordingly, I would conclude that a majority of legislators have determined that the death penalty has a legitimate retributive purpose in this state, and I would defer to that legislative determination.

In summary, the majority has not based its determination that the death penalty violates the state constitutional ban on cruel and unusual punishment on an objective determination that the death penalty is inconsistent with contemporary societal mores in this state or a properly deferential determination that it lacks any penological justification. Rather, because there is no legitimate legal basis for finding the death penalty unconstitutional under either the federal or the state constitution, I can only conclude that the majority has improperly decided that the death penalty must be struck down because it offends the majority's subjective sense of morality. See *Stanford* v. *Kentucky*, supra, 492 U.S. 369 ("In determining what standards have evolved . . . we have looked not to our own conceptions of decency, but to those of modern American society as a whole. As we have said, [e]ighth [a]mendment judgments should not be, or appear to be, merely the subjective views of individual [j]ustices; judgment should be informed by objective factors to the maximum possible extent." [Footnote omitted; internal quotation marks omitted.]).[37] This court repeatedly has recognized that the constitutional authority to define crimes and to fix the degree and method of punishment belongs to the legislature, not to this court, and "we leave to [the legislature] the assessment of the efficacy of various criminal penalty schemes" that it has enacted in achieving its chosen penological goals. (Internal quotation marks omitted.) *State* v. *Rizzo*, supra, 303 Conn. 197–98, quoting *Roper* v. *Simmons*, supra, 543 U.S. 571. Indeed, the primary right that our state constitution guarantees is the right to self-government. See Conn. Const., preamble; Conn. Const., art. I, § 2.[38] The majority's decision to strike down the death penalty in its entirety is a judicial invalidation, without constitutional basis, of the political will of the people. It is this usurpation of the legislative power—not the death penalty—that violates the societal mores of this state as expressed in its fundamental law.

Finally, I emphasize that, in reaching this conclusion, I do not in any way disparage the majority's personal views about the death penalty. Indeed, the lack of consistency in the way that it is sought and imposed in various jurisdictions around the state, the infrequency with which it is imposed, the interminable delays in its execution, legal standards that are designed simultaneously to limit and to remove limits on the jury' discretion in determining whether a particular defendant deserves death,[39] and, perhaps most troubling, the growing concern that race and class have been and continue to be significant factors in charging and sentencing decisions, all point to the conclusion that the death penalty may very well have no place in a society that demands decency, fairness, consistency and efficiency from its system of criminal justice. These issues have not been raised, adjudicated or briefed, however, in the present

case. Rather, the sole claims made by the defendant are that P.A. 12-5 evinces a rejection by the citizens of this state of the death penalty as the appropriate sentence for the most egregious murders and that the effective date provision of this legislation is arbitrary. Because I strongly disagree with both of these claims, I can reach no conclusion except that the death penalty is constitutional.

IV

I next address the concurring opinion authored by Justice Norcott and Justice McDonald concluding that the death penalty is arbitrary and discriminatory in violation of article first, §§ 8 and 9, of the Connecticut constitution because it is imposed in a racially disparate manner. As those justices acknowledge, this is an issue that the majority cannot properly address because the defendant has not raised it and the parties have not briefed it. They further acknowledge that this issue has been litigated for more than ten years in a different case involving different parties that is currently pending on appeal to this court. See *In re Death Penalty Disparity Claims*, Connecticut Supreme Court, Docket No. SC 19252 (filed November 6, 2013). I recognize that this issue has been raised and discussed by various justices in dissenting and concurring opinions in the past. In my view, this was appropriate because it flagged the issue for future cases. As Justices Norcott and McDonald themselves point out, however, this "issue of substantial public importance . . . will never be resolved by this court in light of the majority's determination that the imposition of the death penalty is an unconstitutionally excessive and disproportionate punishment." I believe that it undermines the institutional integrity of this court for Justices Norcott and McDonald to express their views on such an important issue when the court as a whole, which might well have agreed with those concurring justices' analysis if the court had been able to address the issue in the case in which it was actually litigated, is now barred from considering it.[40]

This is especially so when the dicta in the concurring opinion by Justices Norcott and McDonald is based almost entirely on legislative fact-finding that, in turn, is premised on extra-record scientific studies and scholarly articles that the parties did not cite and have had no opportunity to review. As one commentator has aptly stated, the "lack of party participation [in the identification and evaluation of scientific studies supporting legislative facts] is flatly inconsistent with the goals of the adversarial process." A. Larsen, "Confronting Supreme Court Fact Finding," 98 Va. L. Rev. 1255, 1302 (2012). Larsen further observed that "[o]ur system is designed so that the litigants have meaningfully participated in the adjudication of their disputes for another reason: this participation also infuses democratic legitimacy into court decisions."[41] Id., 1303; see also *Blumberg*

*Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 147 ("[t]he litigants' control of case presentation is thought to promote dignitary and participation values by affirm[ing] human individuality and showing respect for the opinions of each party, producing an outcome more satisfying to winners and losers alike" [internal quotation marks omitted]). In the case of legislative fact-finding, these legitimacy concerns are heightened because the court's factual findings affect not only the parties to the case, but also the public at large. See A. Larsen, supra, 1304 ("It is important to remember, of course, that the [United States] Supreme Court is more than just a court. Its explanatory obligations extend further than just to the litigants who bring the case and want their dispute resolved. When the Supreme Court relies on facts to issue a ruling—particularly a ruling with significant social implications for the entire country—it is speaking to the public at large and in particular to those people who care about the issue of fact under review."); see also id., 1292 ("[t]he safety net of the adversary system . . . is useless when the parties do not see the factual sources before the [j]ustices rely upon them as authorities and enshrine them in the [official reports]"). In addition to undermining democratic legitimacy of judicial opinions, independent fact-finding by a reviewing court can lead to bias, mistakes and the permanent entrenchment of the current best understanding of an issue as a "fact," when that understanding may well be subject to change.[42]

In the present case, any suggestion that the truth content of the studies on which Justices Norcott and McDonald rely is so noncontroversial that it is a proper subject of judicial notice is easily refuted by a single example. The petitioners' expert in the consolidated habeas proceeding, John J. Donohue III, has now published the findings that he submitted to the habeas court in a legal journal. See J. Donohue, "An Empirical Evaluation of the Connecticut Death Penalty System Since 1973: Are There Unlawful Racial, Gender, and Geographic Disparities?," 11 J. Empirical Legal Stud. 637 (2014).[43] Justices Norcott and McDonald have relied on this study to support their determination that the death penalty is fatally infected with racial bias. The state has already indicated *in this very case*, however, that it disagrees with Donohue's study. After this court released its initial decision in the present case; see *State* v. *Santiago*, supra, 305 Conn. 101; the state filed a motion to correct arguing that, in his concurring and dissenting opinion, Justice Harper had improperly relied on Donohue's statistical findings in the habeas proceeding to support Justice Harper's conclusion that the death penalty is imposed in a racially discriminatory manner. The state pointed out that the Commissioner of Correction's expert in the habeas proceeding, Stephan Michelson, "strongly disagrees with everything about

the Donohue study, from its conception, to its execution, to its data, to its statistical analysis, and to its conclusions. Moreover, Michelson has concluded that Donohue's data, when investigated and analyzed thoroughly and correctly, provides no evidence that the system is biased or arbitrary." (Footnote omitted.) In response to this motion, Justice Harper appropriately revised his concurring and dissenting opinion to make it clear that he was not assuming the validity of Donohue's study, but was pointing to it only "as a provocation to critical inquiry." *State* v. *Santiago*, supra, 325 n.11 (*Harper*, *J.*, concurring and dissenting). Justice Harper also recognized that it should be left "to the course of judicial process to pass definitive judgment on the soundness of the study's data and its ultimate conclusions regarding the impact of race on the death penalty in Connecticut." Id. He obviously was referring to the ordinary judicial process of adversarial proceedings in the habeas court, with the assistance of qualified experts, and appellate review of the habeas court's conclusions. I strongly agree.

Justices Norcott and McDonald disregard this procedural history, and contend that Chief State's Attorney Kevin Kane conceded during the legislative debate on P.A. 12-5 "that there are 'obvious' facial disparities in Connecticut's capital punishment system." See Conn. Joint Standing Committee, Judiciary, Pt. 8, 2012 Sess., p. 2651. This characterization of the legislative history of P.A. 12-5 is extremely misleading. Kane stated: "We've seen [racial] disparity. It's obvious. There's disparity in . . . the percentages of people in prison." Id. Thus, Kane said nothing about facial racial disparities in the imposition of the death penalty. Moreover, Kane denied that "the justice system consciously [is] discriminating or treating people differently because of their race or ethnicity or religion or any other reasons." Id. In addition, Kane testified that the state had "hired another expert to do a study [that] . . . eviscerates Donohue's study" purporting to show racial disparities in the imposition of the death penalty in this state, and pointed out that the validity of both studies "are going to be litigated" in court. Id., p. 2612; see also id., p. 2625 ("As a matter of who's going to determine the validity of [Donohue's report] . . . that is a decision that really ought to be made in court, in an adversary system where a court can focus on that report and the detail and the manner in which this legislature or the public could never focus on it. . . . [T]hat's why we have courts to decide that kind of issue and that's why we have lawyers on both sides of cases."). Kane did not "believe that . . . the petitioners . . . can prove that . . . there's disparity in the manner in which the death penalty process is carried out." Id., p. 2651. Rather, he was "confident that when the court looks at that [issue] it'll decide . . . that the death penalty is not sought or . . . obtained because of any inappropriate—and by inap-

propriate I mean going beyond . . . the law—but for any inappropriate reasons." Id. Kane further urged the legislators not to "draw conclusions from the Donohue report. . . . There's opposing evidence, strongly opposing evidence that I think if you were a judge my feeling is you'd agree with the evidence opposing the Donohue report if you really looked at it and heard the arguments on both sides. But that's for a court to decide . . . ." Id., p. 2655.

Finally, any suggestion that Justices Norcott and McDonald may rely on the truth content of these extra-record materials without any fact-finding by the trial court or assistance from the parties and their experts because they are self-evidently true is belied *by Donohue himself.* In the very study on which those justices rely, Donohue states that "a nonexpert's understanding of econometrics and capacity to differentiate between valid and flawed statistical findings is necessarily limited. These concerns regarding the effective use of empirical evidence by courts are not unique to the administration of the death penalty, but are broadly relevant to all domains of litigation involving complex quantitative issues."[44] J. Donohue, supra, 11 J. Empirical Legal Stud. 640; see also id., 689 ("judges involved in trials with statistical expert testimony should either have a special master to consult with them throughout or at least to review their opinions prior to publication"); id. (noting "the difficulty that nonexperts have in assessing statistical results"); see also A. Larsen, supra, 98 Va. L. Rev. 1299 ("even though anyone can sort through [science] studies now with just a click of a mouse, we should not be confident that judges—or anyone without the relevant expertise—can sort through the data on their own without making a mistake").

Unlike Justices Norcott and McDonald, Donohue also acknowledged that other scholars disagreed with his findings. J. Donohue, supra, 639 ("[t]he state's expert contested my finding that cases in which minority defendants killed white victims were capitally charged and sentenced at substantially higher rates"); id., 656 (noting that Kent Scheidegger submitted report to legislature in which he contended that there is "no reason to doubt that the situation in Connecticut is consistent with the overall national picture, i.e, that claimed racial disparities would shrink to insignificance if legitimate factors, including jurisdiction, could properly be taken into account" [emphasis omitted]);[45] see also K. Scheidegger, "Rebutting the Myths About Race and the Death Penalty," 10 Ohio St. J. Crim. L. 147, 154 (2012–2013) (noting that trial court in *McCleskey* v. *Kemp,* 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 [1987], had found that study by David Baldus and others, which United States Supreme Court assumed to have established facial racial disparities for purposes of resolving issue on appeal, had produced "no statistically signifi-

cant evidence that race plays a part in either [the prose-cutor's or the jury's death penalty] decisions in the [s]tate of Georgia" [emphasis omitted; internal quotation marks omitted]); K. Scheidegger, supra, 147 (findings of racial disparities in death penalty are publicly "trumpeted" while "contrary indications from other studies, or sometimes even within the same study, are buried and never brought to the public's attention"); K. Scheidegger, supra, 147 (although "[t]he subject of what these studies show and do not show is a complex one . . . the truth, to the extent we can know it, is quite different from the common perception" that such disparities exist).[46] Again, contrary to the suggestion by Justices Norcott and McDonald that I am somehow relying on or vouching for the validity of these studies, I must emphasize that I cite these studies not because I believe they are accurate, but only to point out that the opinion of Justices Norcott and McDonald on this question is based on unfounded assumptions and cherry picked opinions rather than facts found by the trial court after the two sides had a fair opportunity to present their cases. Although they point to *evidence* of racial disparities in this state—evidence that clearly would be sufficient to provide fodder for a *legislative* discussion about the continuing value of the death penalty in this state—such evidence, even if strong, simply does not amount to the type of factual findings by a trial court, where evidence is disputed, that this court has demanded for the last twenty years.[47]

I would also note that most of the materials on which Justices Norcott and McDonald rely do not speak to the question of whether racial disparities in the imposition of the death penalty exist *in this state* and *at this time*, which is the question that they purport to answer. Thus, not only has the truth content of the materials not been subject to the crucible of the adversarial process, many of the materials have nothing to do with the specific issue that they address. Accordingly, even if I believed that Justices Norcott and McDonald properly could address this issue in their concurring opinion— which I do not—because they have made factual findings on the basis of extra-record and irrelevant evidence, their opinion unfortunately carries no weight.

V

Because I disagree with the majority's conclusion that the death penalty is unconstitutional under our state constitution on the ground that it is inconsistent with contemporary societal norms and the conclusion of Justices Norcott and McDonald that it is imposed in a racially disparate manner, and because Justice Eveleigh has addressed them in his separate concurrence, I must address the other claims that the defendant raised on appeal.

As the majority states, the defendant was charged with, inter alia, the capital felony of "murder committed

by a defendant who is hired to commit the same for pecuniary gain" in violation of General Statutes (Rev. to 1999) § 53a-54b[48] after he shot and killed the victim, Joseph Niwinski, in exchange for a snowmobile. *State* v. *Santiago*, supra, 305 Conn. 114. The defendant committed the murder on December 13, 2000. Id., 121–22. In his original appeal to this court, the defendant raised numerous claims challenging his conviction on the murder for hire charge and other charges, as well as his death sentence. Id., 142–46. This court affirmed the defendant's convictions; id., 118; but concluded that the trial court, *Solomon, J.*, improperly had failed to disclose to the defendant certain confidential records in the possession of the Department of Children and Families that were mitigating in nature. Id., 118–19. Accordingly, we reversed the sentence of death and remanded the case to the trial court for a new penalty phase hearing. Id., 241.

While the defendant's appeal was pending in this court, the legislature passed P.A. 12-5, which, as I have discussed, repealed the death penalty effective from the date of passage, April 25, 2012. See generally P.A. 12-5. The act specified that the repeal was applicable only to crimes committed on or after its effective date. P.A. 12-5, § 1. In addition, the act expressly incorporated the savings provisions set forth in General Statutes §§ 1-1 (t)[49] and 54-194.[50] P.A. 12-5, § 38.[51]

The defendant concedes in his supplemental brief to this court that the legislature clearly intended that P.A. 12-5 would abolish the death penalty prospectively. In addition, he does not dispute that the repeal of the death penalty was not intended to apply to him because he committed his crime before the effective date of P.A. 12-5. See *In re Daniel H.*, 237 Conn. 364, 378, 678 A.2d 462 (1996) (to determine whether change in law is retroactive as applied to specific crime, court looks to date of crime). The defendant also does not dispute that the statutory savings provisions would operate to preserve eligibility for the death sentence for all persons who committed a capital felony before the enactment of P.A. 12-5 if the operation of the savings provisions were not otherwise barred. See *State* v. *Carbone*, 172 Conn. 242, 256, 374 A.2d 215 ("[§] 1-1 [t] preserves punishments incurred and prosecutions pending" at time that criminal statute is repealed), cert. denied, 431 U.S. 967, 97 S. Ct. 2925, 53 L. Ed. 2d 1063 (1977); id. (when criminal statute was repealed after defendants committed offense but before they were charged, "defendants were liable to prosecution at the date of the repeal [and ] § 54-194 preserves that liability"). The defendant claims for a variety of reasons, however, that, as the result of the enactment of P.A. 12-5, the state is barred from imposing the death penalty on any person, regardless of the date of the crime. Specifically, as I noted in part I of this dissenting opinion, he claims that, in light of the prospective repeal, imposing the death penalty on

a person who committed a capital felony before April 25, 2012, would: (1) be arbitrary in violation of § 53a-46b (b); (2) constitute cruel and unusual punishment in violation of the eighth amendment to the federal constitution and of article first, §§ 8 and 9, of the constitution of Connecticut; (3) violate the equal protection guarantees of the federal and state constitutions; (4) violate the substantive due process guarantees of the federal and state constitutions; (5) violate the federal constitutional prohibition against bills of attainder; (6) violate the federal constitutional prohibition against ex post facto laws; and (7) violate the provision of article first, § 9, of the constitution of Connecticut barring punishments unless "clearly warranted by law." I would reject each of these claims.

## VI

I first consider the defendant's claim that the imposition of the death penalty on him is barred by § 53a-46b (b).[52] That statute provides for mandatory review by this court of every death sentence; see *In re Application for Petition for Writ of Habeas Corpus by Dan Ross*, 272 Conn. 676, 685, 866 A.2d 554 (2005); and directs the court to affirm the sentence of death unless it determines that the sentence was "the product of passion, prejudice or any other arbitrary factor . . . ." General Statutes § 53a-46b (b) (1). The defendant contends that it is inherently arbitrary, as that word is used in § 53a-46b (b) (1), to impose the death penalty on the basis of the date on which the defendant committed the crime, as provided by P.A. 12-5. I disagree.

The meaning of the word "arbitrary" as used in § 53a-46b and the applicability of that word to the sentence of death authorized by P.A. 12-5 are questions of statutory interpretation subject to plenary review. See *State ex rel. Gregan* v. *Koczur*, 287 Conn. 145, 152, 947 A.2d 282 (2008). "In making such determinations, we are guided by fundamental principles of statutory construction. See General Statutes § 1-2z;[53] *Testa* v. *Geressy*, 286 Conn. 291, 308, 943 A.2d 1075 (2008) ([o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature . . .)." (Footnote altered; internal quotation marks omitted.) *In re Matthew F.*, 297 Conn. 673, 688, 4 A.3d 248 (2010).

This court previously has recognized that "§ 53a-46b can be properly understood only in light of its jurisprudential background." *State* v. *Webb*, supra, 238 Conn. 494. "In 1972, the [United States] Supreme Court invalidated all of the death penalty statutes of the states and the federal government because it determined that those statutes violated the eighth amendment's proscription against cruel and unusual punishment.[54] Justice Stewart stated 'that the [e]ighth and [f]ourteenth [a]mendments cannot tolerate the infliction of a sentence of death *under legal systems that permit this unique penalty to be so wantonly and so freakishly*

*imposed.*' . . . *Furman* v. *Georgia*, [408 U.S. 238, 310, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972)] (Stewart, J., concurring)." (Footnote added; emphasis in original.) *State* v. *Webb*, supra, 494.

The United States Supreme Court's constitutional concerns about arbitrariness in the imposition of the death sentence stemmed largely from the existence of "statutes that left juries with untrammeled discretion to impose or withhold the death penalty . . . ." *Gregg* v. *Georgia*, supra, 428 U.S. 196 n.47; see also *State* v. *Webb*, supra, 238 Conn. 494–96. In *State* v. *Ross*, 230 Conn. 183, 231–32, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), this court recognized that the state could overcome these constitutional concerns by "defin[ing] the crimes for which death may be the sentence in a way that obviates standardless sentencing discretion." (Internal quotation marks omitted.) In addition, "[a] statutory requirement that, before death may be imposed, the sentencer must find at least one statutorily mandated aggravating circumstance is a constitutionally permissible response to the need to avoid standardless sentencing discretion and to narrow the class of persons eligible for the death penalty. *Blystone* v. *Pennsylvania*, 494 U.S. 299, 302, 110 S. Ct. 1078, 108 L. Ed. 2d 255 (1990); *Lowenfield* v. *Phelps*, 484 U.S. 231, 244, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988); *Jurek* v. *Texas*, [428 U.S. 262, 270–71, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976)]; *Proffitt* v. *Florida*, [428 U.S. 242, 251–53, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976)]; *Gregg* v. *Georgia*, supra, [198]." *State* v. *Ross*, supra, 232. This court concluded in *Ross* that the provisions of this state's capital sentencing scheme defining specific capital crimes and requiring proof of an aggravating factor satisfied these constitutional requirements. Id., 238–39.

Once the constitutional requirement for a capital sentencing scheme that channels the sentencing authority's discretion has been satisfied, mandatory appellate review of death sentences provides an additional method of implementing the constitutional requirement that "each defendant [has received] an individualized and reliable sentencing determination based on the defendant's circumstances, his background, and the crime." *Clemons* v. *Mississippi*, 494 U.S. 738, 749, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990); see also *Parker* v. *Dugger*, 498 U.S. 308, 321, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991) ("meaningful appellate review [of a death sentence] requires that the appellate court consider the defendant's actual record"); *Jurek* v. *Texas*, supra, 428 U.S. 276 ("prompt judicial review of the jury's decision in a court with statewide jurisdiction . . . provide[s] a means to promote the evenhanded, rational, and consistent imposition of death sentences under law"). This court previously has recognized that § 53a-46b was intended to implement this eighth amendment requirement. *In re Application for Petition for Writ of Habeas*

*Corpus by Dan Ross*, supra, 272 Conn. 689 n.8; see also *State* v. *Webb*, supra, 238 Conn. 497. Indeed, "the appellate review language of § 53a-46b [requiring the reviewing court to determine whether the death penalty was imposed under the influence of passion, prejudice, or any other arbitrary factor] tracks almost precisely the . . . language . . . that the United States Supreme Court had declared constitutional in *Gregg*."[55] *State* v. *Webb*, supra, 503, citing *Gregg* v. *Georgia*, supra, 428 U.S. 198; *Gregg* v. *Georgia*, supra, 198 ("As an important additional safeguard against arbitrariness and caprice, the Georgia statutory scheme provides for automatic appeal of all death sentences to the [s]tate's Supreme Court. That court is required by statute to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, [and] whether the evidence supports the jury's finding of a statutory aggravating circumstance . . . .").

This court has held that, after it has conducted an "independent and scrupulous examination of the entire record"; (internal quotation marks omitted) *State* v. *Santiago*, supra, 305 Conn. 243; a determination that the evidence supports the imposition of the death penalty under our facially valid capital sentencing scheme ordinarily will be sufficient to support a conclusion that the sentence of death was not arbitrary in violation of the eighth amendment and § 53a-46b (b). See id., 247–48 n.124 (declining to engage in further review of defendant's claim that death sentence was arbitrary after determining that evidence supported jury's weighing of aggravating and mitigating factors); *State* v. *Courchesne*, 296 Conn. 622, 786 n.105, 998 A.2d 1 (2010) (rejecting claim that death sentence was arbitrary for "the same essential reasons that we conclude that the evidence was sufficient to support the imposition of the death penalty under our capital sentencing scheme"); see also *McCleskey* v. *Kemp*, supra, 481 U.S. 308 (when death sentence was imposed under capital sentencing scheme that focuses "on the particularized nature of the crime and the particularized characteristics of the individual defendant . . . [the reviewing court] lawfully may presume that [the defendant's] death sentence was not wantonly and freakishly imposed" [citation omitted; internal quotation marks omitted]). This court also has recognized, however, that, if a defendant could show that a sentencing authority's decision to impose the death sentence was influenced by an improper consideration, such as the race of the defendant or the victim, the sentence might be vacated as arbitrary, in violation of § 53a-46b (b) (1) and the eighth amendment, notwithstanding the fact that the sentence was imposed pursuant to a facially constitutional capital sentencing scheme and was supported by the evidence.[56] See *State* v. *Cobb*, supra, 234 Conn. 761–62, 762 n.20; see also *McCleskey* v. *Kemp*,

supra, 308–309 (indicating that proof that race was factor in specific sentencing decision would invalidate sentence imposed pursuant to facially valid capital sentencing scheme); cf. *McCleskey* v. *Kemp*, supra, 312–13 (unexplained statistical discrepancy in imposition of death penalty that correlates with race does not render death penalty facially invalid).

As the foregoing analysis shows, § 53a-46b was intended to implement the United States Supreme Court's eighth amendment jurisprudence, under which the word "arbitrary" refers to unprincipled and irrational decisions made by *sentencing authorities*, either because the state's capital sentencing scheme had given the sentencing authority "untrammeled discretion to impose or withhold the death penalty"; *Gregg* v. *Georgia*, supra, 428 U.S. 196 n.47; or because, despite the existence of a statutory scheme that properly channeled the sentencing authority's discretion, the sentencing authority misapplied the law or based its decision on improper factors. In the present case, the legislature's enactment of P.A. 12-5 implicates neither of these eighth amendment concerns. Public Act 12-5 had no effect on the provisions of our capital sentencing scheme that are designed to ensure that the *sentencing authority* has given "each defendant an individualized and reliable sentencing determination based on the defendant's circumstances, his background, and the crime"; *Clemons* v. *Mississippi*, supra, 494 U.S. 749; and there is no claim that, as a result of the legislation, the *sentencing authority* will consider any factor other than those that it is statutorily and constitutionally authorized to consider. Indeed, the *only* effect of P.A. 12-5 is to reduce the class of defendants who may be subjected to a sentencing authority's discretion to impose the death penalty in the first instance. As I have explained, that effect cannot render the statutory scheme unconstitutional because the eighth amendment is concerned only with ensuring that the sentence that the defendant actually received is nonarbitrary, not with whether or in what manner other defendants will be spared the death penalty. In short, under this state's capital sentencing scheme as amended by P.A. 12-5, death sentences are simply not "cruel and unusual in the same way that being struck by lightning is cruel and unusual"; *Furman* v. *Georgia*, supra, 408 U.S. 309 (Stewart, J., concurring); because the scheme does not permit the sentencing authority to impose the death penalty on a class of "capriciously selected" defendants.[57] Id., 309–10 (Stewart, J., concurring).

Instead, the defendant claims that the *legislature*, as opposed to the sentencing authority, has acted arbitrarily by "exposing a defendant who commits his crime on April 24, 2012, to a death sentence, while not exposing a defendant who commits the same crime on April 25, 2012, to a death sentence." Claims involving arbitrary *legislative* classifications implicate constitu-

tional equal protection principles, however, not the eighth amendment principles that § 53a-46b was intended to implement. See, e.g., *State* v. *Higgins*, 265 Conn. 35, 65, 826 A.2d 1126 (2003) (addressing claim that General Statutes [Rev. to 2003] § 53a-54b (8), providing that murder of person under age of sixteen years is capital felony, "violates constitutional equal protection principles because it treats the class of defendants who have murdered children under the age of sixteen differently than the class of defendants who have murdered adults"). Thus, the defendant is effectively invoking § 53a-46b, which was intended to implement eighth amendment principles, in an attempt to raise an equal protection claim. I would reject this attempt because, first, even if P.A. 12-5 violated equal protection principles, the United States Supreme Court has never "held it to be cruel and unusual punishment to impose a sentence in violation of some *other* constitutional imperative." (Emphasis in original.) *Atkins* v. *Virginia*, supra, 536 U.S. 352 (Scalia, J., dissenting). In other words, a statutory death penalty provision that violated equal protection principles would not, for that reason alone, violate the eighth amendment prohibition on arbitrary sentencing. Second, I conclude in part VIII of this dissenting opinion that P.A. 12-5 does *not* violate the equal protection provisions of the state or federal constitution, and the defendant has cited no authority for the proposition that a legislative classification that satisfies equal protection principles can violate the eighth amendment merely because the line drawn by the legislature, "[l]ooked at by itself without regard to the necessity behind it . . . seems arbitrary."[58] (Internal quotation marks omitted.) *State* v. *Higgins*, supra, 68; see also id., 68–69 (rejecting claim that General Statutes [Rev. to 2003] § 53a-54b [8] is irrational merely because legislature could have drawn line between children and adults in any number of places). Accordingly, I would conclude that imposing the death sentence on the defendant would not be arbitrary in violation of § 53a-46b.[59]

## VII

I next address the defendant's claim that imposing the death penalty against him when it cannot be imposed on defendants who committed their crimes after the effective date of P.A. 12-5 would be cruel and unusual punishment in violation of the eighth amendment to the United States constitution and article first, §§ 8 and 9, of the Connecticut constitution. I disagree.

## A

I first address the defendant's claims under the eighth amendment. He claims that: (1) executing a person in a state that has prospectively repealed the death penalty is inconsistent with contemporary standards of decency; and (2) P.A. 12-5 eliminates any legitimate penological objective for the death penalty.[60]

1

In support of his claim that executing a death sentence in a state that has prospectively repealed the death penalty is inconsistent with contemporary standards of decency and, therefore, violates the eighth amendment to the federal constitution, the defendant contends both that there is a societal consensus *in this state* against the imposition of the death penalty and that there is a *national* consensus against *postrepeal* executions.[61] I have already concluded in part III of this dissenting opinion that there is no consensus in this state against the death penalty.[62] See also part VII B of this dissenting opinion. For the following reasons, I would also reject the defendant's contention that imposing the death sentence on him would violate the eighth amendment because there is a national consensus against postrepeal executions.

"The [c]ruel and [u]nusual [p]unishments [c]lause prohibits the imposition of inherently barbaric punishments under all circumstances." *Graham* v. *Florida*, supra, 560 U.S. 59. "For the most part, however, the [United States Supreme] Court's precedents consider punishments challenged not as inherently barbaric but as disproportionate to the crime." Id. "The [c]ourt's cases addressing the proportionality of sentences fall within two general classifications. The first involves challenges to the length of term-of-years sentences given all the circumstances in a particular case. The second comprises cases in which the [c]ourt implements the proportionality standard by certain categorical restrictions on the death penalty." Id.

"The second classification of cases has used categorical rules to define [e]ighth [a]mendment standards. The previous cases in this classification involved the death penalty. The classification in turn consists of two subsets, one considering the nature of the offense, the other considering the characteristics of the offender. With respect to the nature of the offense, the [c]ourt has concluded that capital punishment is impermissible for nonhomicide crimes against individuals. *Kennedy* [v. *Louisiana*, supra, 554 U.S. 437–38 (death penalty for rape of child violates eighth amendment)]; see also *Enmund* v. *Florida*, [supra, 458 U.S. 782] [death penalty for felony murder violates eighth amendment when defendant did not kill, attempt to kill or intend to kill victim]; *Coker* v. *Georgia*, 433 U.S. 584 [97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977) (death penalty for rape of adult woman violates eighth amendment)]. In cases turning on the characteristics of the offender, the [c]ourt has adopted categorical rules prohibiting the death penalty for defendants who committed their crimes before the age of [eighteen], *Roper* v. *Simmons*, [supra, 543 U.S. 551], or whose intellectual functioning is in a low range, *Atkins* v. *Virginia*, [supra, 536 U.S. 304]. See also *Thompson* v. *Oklahoma*, [supra, 487 U.S. 815]." *Graham*

v. *Florida*, supra, 560 U.S. 60–61.

Thus, in cases involving the death penalty, the United States Supreme Court has applied the " 'evolving' standards of decency" rubric in two situations: (1) when the defendant claimed that the death penalty was categorically disproportionate for a particular crime; and (2) when the defendant claimed that the death penalty was categorically disproportionate for defendants with a particular characteristic that reduces their moral culpability, such as youth or mental disability. In other words, when society has reached a consensus that the death penalty for a particular crime or a particular class of defendants is cruel and unusual, *no* person who commits such a crime or falls within the protected class may be executed. In the present case, the defendant makes no claim that the death penalty is disproportionate for a particular crime or for a particular class of defendants whose moral culpability is reduced. Rather, he claims only that it violates contemporary standards of decency to impose the death penalty on him when the death penalty cannot be imposed on a defendant who commits a similar crime after the date of repeal. Thus, his claim under the evolving standards of decency rubric is essentially a reiteration of his claim that imposing the death sentence on him would be the result of an arbitrary legislative classification based on the date of the crime, which, as I have explained, is the type of claim that this court historically has subjected to an equal protection analysis, not to an eighth amendment analysis. See part VI of this dissenting opinion.

Moreover, even if I were to assume that the " 'evolving' standards of decency" rubric may be applied to this type of claim, it is unclear to me how a national consensus against imposing the death penalty after it has been prospectively repealed could emerge when only a small minority of states have repealed the death penalty prospectively.[63] As of the date of this opinion, of the states that have no death penalty, the twelve states that have prospectively repealed it are: Connecticut, Hawaii,[64] Illinois,[65] Iowa,[66] Maine,[67] Maryland,[68] Michigan,[69] Minnesota,[70] New Jersey,[71] New Mexico,[72] Vermont[73] and Wisconsin.[74] In states where there has been no prospective repeal, which constitute the great majority, the practices of the state can reveal nothing about their citizens' beliefs on this issue and, indeed, there is little call for those citizens to have an opinion one way or the other. Accordingly, there is no discernible "national" consensus on this question.

Finally, even if I were to assume that we may determine a societal consensus based on the practices of the small minority of states that have enacted a prospective repeal of the death penalty, I am not persuaded that the practices of those states reveal any societal trend. I acknowledge that there has not been an execution in a state where the death penalty had been prospectively

repealed and not reinstated.[75] This fact does not establish convincingly, however, that there is a societal consensus among those states against the postrepeal imposition of the death penalty for crimes committed prior to the repeal. In Illinois and New Jersey, the governor granted clemency to every defendant who had been sentenced to death before the prospective repeal.[76] In addition, according to the amicus, group of legal historians and scholars, the governor of Hawaii commuted the death sentences of two death row inmates when the Hawaii legislature prospectively repealed the death penalty in 1957 and, when the death penalty was prospectively repealed in Minnesota in 1911, the Minnesota Board of Pardons commuted the death sentences of the two remaining inmates on death row. While this appeal was pending, the governor of Maryland also commuted the sentences of that state's death row inmates.[77] Thus, although a governor's response to legislation may reflect societal standards of decency; *State* v. *Rizzo*, supra, 303 Conn. 199–201; in only five out of the twelve states that have prospectively repealed the death penalty did the governor or the board of pardons grant clemency to the inmates who were on death row when the death penalty was prospectively repealed.[78] In New Mexico, there were two prisoners on death row at the time of repeal and the governor declined to grant clemency.[79] See id., 190 n.88 ("the New Mexico ban is prospective only and no clemency has been granted to convicted capital offenders"). While those defendants have not yet been executed, they remain on death row.[80] Similarly, there are eleven prisoners on death row in this state, and, while there have been no executions since the death penalty's prospective repeal, the prisoners also have not had their sentences commuted.[81] Thus, in these states, societal approval of postrepeal executions can be inferred from the legislature's choice of prospective repeal and the failure of the authorized governmental entity to commute the death sentences of those on death row.[82] See id., 191 ("the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures" [internal quotation marks omitted]). For four of the twelve states that have prospectively repealed the death penalty—Maine, Michigan, Vermont and Wisconsin—neither the defendant nor the amicus group of legal historians and scholars has provided any explanation for the fact that no prisoners were executed after the effective date of the repeal.[83] Thus, I can only speculate whether there were no prisoners on death row in those states at the time of the repeal, or whether some or all of the prisoners pursued successful appeals of their death sentences. Accordingly, I am unable to derive any particular societal consensus from the practices of those states beyond the approval implicit in the prospective repeal itself.[84]

The amicus group of legal historians and scholars

also points out that a number of states have repealed the death penalty and then reinstated it, and claims that no death row inmate convicted under a statute that was repealed was executed after the repeal.[85] With respect to these states, although it appears from the information provided by the amicus that no prisoner was executed in any of these states during the period after repeal and *before* reinstatement, I am unable to discern from the information provided whether any prisoner was executed pursuant to a repealed statute *after* reinstatement. Nevertheless, even if the amicus group of legal historians and scholars is correct that no defendant who had been sentenced to death at the time of a temporary repeal was ever executed, I am not persuaded that that fact would establish that there is a societal consensus against the postrepeal imposition of the death penalty for crimes committed prior to the repeal. I can perceive no reason why the citizenry of a state would be in favor of the death penalty for an offense that was committed after reinstatement but, at the same time, would believe that executing a prisoner who committed a similarly egregious offense before a *prospective* repeal would be beyond the pale of decency, unless there were procedural flaws in the repealed statute that cast doubt on the fairness of the prisoner's conviction.[86] In that case, however, societal reluctance to impose the death penalty pursuant to the repealed statute would not be the result of any qualms about the morality of doing so. Moreover, the fact that the death penalty was reinstated in these states suggests that repeal does not necessarily reveal an emergent societal consensus that the death penalty is immoral or disproportionate. Accordingly, I would conclude that the fact that no state has executed a prisoner after repealing the death penalty prospectively does not establish that there is a national societal consensus that it would be immoral or disproportionate to do so.

2

The defendant also claims that imposing the death penalty on him would violate the eighth amendment because the enactment of P.A. 12-5 eliminated any penological objective for the death penalty. Specifically, he claims that the death penalty no longer has any deterrent effect because the punishment can no longer be imposed and retribution justifies a punishment only if the punishment is imposed uniformly on all defendants who commit a specific type of crime. I would reject this claim for the reasons that I have already discussed in part III of this dissenting opinion.

B

I next address the defendant's claim that imposing the death penalty on him after the enactment of P.A. 12-5 violates article first, §§ 8 (a) and 9, of the Connecticut constitution. As I have indicated, the majority has addressed this question, but on broader grounds than

the sole ground raised by the defendant. Specifically, the defendant contends that "the basic mores of society in Connecticut today, *as evidenced by passage of* [*P.A. 12-5*], should be this court's primary consideration when determining whether an execution in the state today" would violate the state constitution. (Emphasis added; internal quotation marks omitted.) For all of the reasons that I disagree with the majority's broader conclusion that the death penalty violates these provisions of the state constitution, however; see part III of this dissenting opinion; I would also reject this narrower claim.

I note, however, that, in addition to the arguments that I have previously addressed, the defendant also points out that the legislative history of P.A. 12-5 reveals that, when the legislators "had the opportunity to vote for an amendment that would 'send a message' that carrying out existing death sentences took priority over abolishing capital punishment, a majority of them chose instead to send the message that abolition was their paramount goal." Specifically, he points out that legislators in both the House of Representatives and in the Senate introduced unsuccessful amendments to the proposed legislation that would have rescinded the repeal if the death sentence of any of the eleven prisoners then on death row were invalidated by the courts as the result of the passage of the proposed legislation. See Substitute Senate Bill No. 280, House Amendment, Schedule A, LCO No. 3120, 2012 Sess., offered by Representatives Lawrence F. Cafero, Jr., and John W. Hetherington; id., Senate Schedule D, LCO No. 3058, offered by Senators John McKinney and Leonard A. Fasano. The amendment was voted down in both chambers. See 55 H.R. Proc., supra, p. 1066; 55 S. Proc., supra, pp. 669–70. The defendant contends that the failure to adopt this amendment shows that the legislature's primary purpose in enacting P.A. 12-5 was to eliminate a penalty that it no longer believes comports with contemporary standards of decency.

The defendant, however, has cherry picked the portions of the legislative history that support his position and simply ignores the portion of the legislative history that shows that a number of legislators believed that, if a death sentence were found to be unconstitutional as the result of the passage of P.A. 12-5, the death penalty would be *reinstated* for all defendants. In the House of Representatives, one legislator argued that the amendment would not affect the substance of the bill, but simply would make the legislature's intent abundantly clear to the courts and prevent them from "making law." 55 H.R. Proc., supra, p. 1064, remarks of Representative Pamela Z. Sawyer; id. ("When we look at the courts and the expectations that we have of them, it is to evaluate a question of law. We . . . particularly get rankled if we think that they are making law. . . . That's why this amendment is very important because

it's very clear to the courts when they make their determination what will happen."). Thus, Representative Sawyer contended that the amendment should be adopted under a "belt and suspenders" rationale, and that, even without it, the intent of the legislature was that the death penalty would be reinstated if the proposed legislation were invalidated. Similarly, in the Senate, a legislator who opposed the death penalty argued against adopting the amendment on the ground that it was unnecessary because, if the courts found any portion of the proposed legislation to be unconstitutional, the entire act would be voided, resulting in the reinstatement of the death penalty. See 55 S. Proc., supra, p. 667, remarks of Senator Eric D. Coleman ("[E]ven assuming that [the proposed legislation would be found unconstitutional], I don't know what else would happen except that the people that are on death row would remain on death row and the bill as amended, if it were to become law, would be voided. And consequently . . . I just don't think that it's something that's necessary to adopt."); see also id., p. 668, remarks of Senator Fasano ("I guess I look at [the amendment] as a spare tire in your trunk. You may not need it. But if it is unconstitutional, you have it. And you've protected the intent of the [l]egislature, which is not, clearly not to let the [eleven prisoners] currently on death row to get a different sentence.").

In any event, as the defendant concedes, the legislature clearly intended that the repeal of the death penalty would be prospective only and that the statutory savings clauses would operate to preserve the death penalty for defendants who committed their crimes before the repeal. Accordingly, even if I were to assume that the legislature preferred that, if the different treatment of defendants who committed their crimes before the repeal were found to be unconstitutional, the death penalty would be struck down in its entirety—a preference for which there is no evidence in the legislative history—that would not reflect a belief that the death penalty is immoral. Rather, in light of the fact that there were not enough votes in the legislature to repeal the death penalty retroactively, it would be just as reasonable to conclude that the legislature believed only that, if prospective repeal were not an option, the practical costs of imposing the death penalty on future defendants would outweigh the penologically legitimate benefits of imposing the death penalty on those already on death row. Accordingly, I would reject the defendant's claim that the enactment of P.A. 12-5 and the legislative history of the act reflect a societal consensus against the death penalty.

In support of his conclusion that P.A. 12-5 violates the constitutional prohibition on cruel and unusual punishment, Justice Eveleigh, in his concurring opinion, relies on *Fleming* v. *Zant*, 259 Ga. 687, 690, 386 S.E.2d 339 (1989), *Cooper* v. *State*, 540 N.E.2d 1216, 1220 (Ind.

1989), *State* v. *Bey*, 112 N.J. 45, 98, 548 A.2d 846 (1998), and *Van Tran* v. *State*, 66 S.W.3d 790, 811 (Tenn. 2001). Justice Eveleigh states conclusorily that, contrary to my conclusion, these cases "were not all solely grounded on the fact that the legislative enactments addressed offenders who, in general, are less culpable than the average adult offender . . . . Rather, these decisions aptly highlighted the fundamental unfairness inherent in executing a defendant when, due to a legislative enactment either prospectively repealing the death penalty or substantially altering the way in which the death penalty may be imposed in the future, that defendant would not have been eligible for the death penalty if he or she had been sentenced after the enactment took effect." Justice Eveleigh has not cited a single case, however, in which a court has concluded that a legislative classification that is based on the date of the offense *alone*, and that does not implicate the culpability of a class of offenders or the seriousness of a class of offenses, violates any constitutional provision. Moreover, even if the cases relied on by Justice Eveleigh supported the proposition that a classification based on the date of the offense *in and of itself* violates the eighth amendment, I would disagree with them. It would necessarily follow from such a conclusion that: (1) although the death penalty was constitutional when imposed on the defendants who are on death row in this state, it became unconstitutional upon the enactment of P.A. 12-5; and (2) if the legislature decided to repeal P.A. 12-5 and to reinstate the death penalty, the death sentences for those defendants would no longer be cruel and unusual punishment. I fail to see how a death sentence that was constitutional when imposed on a class of offenders could become cruel and unusual punishment merely because the legislature has determined for legitimate reasons that it will not seek the death penalty for another class of defendants who also may constitutionally be subject to the death penalty. None of the concerns underlying traditional eighth amendment jurisprudence are implicated under these circumstances.[87] Moreover, it would be absurd to conclude that it is unconstitutional to impose the death penalty on offenders who committed their offenses before the effective date of P.A. 12-5, but that imposing the death penalty on those offenders could be rendered constitutional by repealing the act and imposing the death penalty on another class of offenders, namely, those who commit crimes after April 25, 2012.

Implicitly recognizing the weakness of the defendant's argument that the legislative classification created by P.A. 12-5, in and of itself, renders the act unconstitutional, Justice Eveleigh ultimately is required to rely on the proposition that the legislature has declared "that the death penalty is no longer an acceptable punishment for *any* crime committed today." (Emphasis in original.) Accordingly, he concludes that

"the question is not whether Connecticut may create an exception to an otherwise acceptable punishment, but whether Connecticut may inflict an otherwise *unacceptable punishment* on the defendant." (Emphasis added.) It is clear, therefore, that Justice Eveleigh does not believe that the different treatment of defendants who commit similar crimes renders P.A. 12-5 unconstitutional; rather, his entire analysis is driven by his newfound belief that the death penalty is unconstitutional in this state because it no longer comports with contemporary standards of decency—a view that is hard to reconcile with the view that Justice Eveleigh previously has taken in this very case. See *State* v. *Santiago*, supra, 305 Conn. 307 (rejecting defendant's claim that death penalty is unconstitutional under state constitution). As I have indicated repeatedly, however, the legislative history of P.A. 12-5 supports the conclusion that the legislature has not determined that the death penalty is an unacceptable punishment. Rather, the legislature has determined only that, even though defendants who commit murder with special circumstances after the effective date of the act are equally as culpable as those who committed capital offenses before the effective date, and are equally deserving of the death penalty, the costs of seeking the death penalty are no longer tolerable.[88] Accordingly, contrary to Justice Eveleigh's opinion, the question that this court must answer is *precisely* whether our legislature "may create an exception to an otherwise acceptable punishment" for defendants who committed their crimes after the effective date of the act on the ground that the death penalty is no longer workable, and *not* "whether [it] may inflict an otherwise unacceptable punishment on the defendant." As long as the exception satisfies equal protection principles—which I conclude in part VIII of this dissenting opinion that it does—I would conclude that the answer to that question is "yes."

VIII

I next address the defendant's claim that imposing the death penalty on him would violate the equal protection clauses of the state and federal constitutions. I disagree.

A

I first address the defendant's claim under the federal constitution.[89] "To prevail on an equal protection claim, a plaintiff first must establish that the state is affording different treatment to similarly situated groups of individuals. . . . [I]t is only after this threshold requirement is met that the court will consider whether the statute survives scrutiny under the equal protection clause." (Citation omitted; internal quotation marks omitted.) *Keane* v. *Fischetti*, 300 Conn. 395, 403, 13 A.3d 1089 (2011); see also *State* v. *Higgins*, supra, 265 Conn. 65 n.27 ("[t]he analytical predicate [for consideration of an equal protection claim] is a determination of whether the allegedly disparately treated groups are

similarly situated" [internal quotation marks omitted]).

In *Dortch* v. *State*, 142 Conn. 18, 27–28, 110 A.2d 471 (1954), the defendant, who had been convicted of first degree murder and sentenced to death, claimed that an amendment to the state's capital sentencing scheme that was enacted after he committed his crime and that, for the first time, allowed the jury to recommend "imprisonment for life without pardon" as a punishment for first degree murder, must apply to him under constitutional equal protection principles.[90] This court concluded that, as a matter of statutory interpretation, the statute was not retroactive because of the operation of the statutory savings provisions set forth in General Statutes (1949 Rev.) §§ 8872 and 8890, now codified as, respectively, General Statutes §§ 54-194 and 1-1 (t). Id., 29. The court then concluded that, "[a]s the law now stands, the penalty for all first degree murders committed prior to October 1, 1951, is death; for all first degree murders committed thereafter, the penalty is either death or life imprisonment. It follows that the plaintiff is being treated in exactly the same manner as all others who committed murder in the first degree prior to October 1, 1951." Id., 30. Thus, this court implicitly held that the defendant was not similarly situated to defendants who committed first degree murder after October 1, 1951.[91] See also *Comerford* v. *Commonwealth*, 233 F.2d 294, 295 (1st Cir.) (Disparate treatment of prisoners "might arise when a legislature prospectively reduced the maximum penalty for a crime, for then a prisoner sentenced to the maximum penalty before the effective date of the act would serve a longer [term of] imprisonment than one sentenced to the maximum term thereafter. Yet we are not aware of any violation of the constitutional rights of either group of prisoners in that situation . . . provided . . . that all prisoners in each group are treated alike . . . ."), cert. denied, 352 U.S. 899, 77 S. Ct. 141, 1 L. Ed. 2d 90 (1956); *People* v. *Brown*, 54 Cal. 4th 314, 329, 278 P.3d 1182, 142 Cal. Rptr. 3d 824 (2012) ("inmates [are] only similarly situated with respect to the purpose of [the new law] on [its effective date], when they were all aware that it was in effect and could choose to modify their behavior accordingly" [internal quotation marks omitted]); *People* v. *Floyd*, supra, 31 Cal. 4th 189–90 (citing cases); *People* v. *Grant*, 71 Ill. 2d 551, 561, 377 N.E.2d 4 (1978) ("[T]he ability to elect to be sentenced under a law enacted after the date of the commission of a crime is not a constitutional right but a benefit conferred solely by statute. It is not unconstitutional for the legislature to confer such benefit only prospectively, neither is it unconstitutional for the legislature to specify a classification between groups differently situated, so long as a reasonable basis for the distinction exists." [Internal quotation marks omitted.]); *Rondon* v. *State*, 711 N.E.2d 506, 513 (Ind. 1999) ("Criminal statutes apply exclusively to one class of people, those who violate the law, and they relate

to the specific point in time that a violation occurs. Upon alteration of the criminal law, individuals subsequently convicted are not similarly situated and cannot be equated to those previously convicted." [Internal quotation marks omitted.]); *State* v. *Roseborough*, 263 Kan. 378, 386, 951 P.2d 532 (1997) ("[a]s long as [the defendant] is treated the same as other offenders who were sentenced under the applicable law in effect at the time they committed their crimes, there is no constitutional violation"); *Sonnier* v. *State*, 913 S.W.2d 511, 520–21 (Tex. Crim. App. 1995) ("appellant was treated in the same manner as all those who committed a capital murder after September 1, 1991; that is, he is treated the same as all those 'similarly situated' "); cf. *Meeks* v. *Jago*, 548 F.2d 134, 138 (6th Cir. 1976) (defendant "was not denied [e]qual [p]rotection of the [l]aws or [d]ue [p]rocess of [l]aw as long as sentence was imposed according to the statute applicable at the time of sentence"), cert. denied, 434 U.S. 844, 98 S. Ct. 145, 54 L. Ed. 2d 109 (1977); *State* v. *Ferrell*, 126 Ariz. 1, 2, 612 P.2d 42 (1980) (applying more severe law in force at time defendant committed offense does not deny equal protection of law); cf. *Dobbert* v. *Florida*, 432 U.S. 282, 301, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977) (defendant who was sentenced to death under statute enacted after he committed crime was not similarly situated to defendants who were sentenced to death before effective date of new statute and had sentences commuted).[92] It is clear, therefore, that, under *Dortch* and the great weight of authority from other jurisdictions, the defendant in the present case is not similarly situated to defendants who commit similarly egregious crimes after the effective date of P.A. 12-5.

Moreover, even if I were to assume that the defendant is similarly situated to defendants who committed their crimes after the effective date of P.A. 12-5, he has not established beyond a reasonable doubt that imposing the death penalty on him would constitute a denial of the equal protection of the laws under the federal constitution. First, when a person is on notice that a specific crime is punishable by a specific penalty, and the person chooses to commit that crime, there simply is nothing unfair about imposing the penalty in effect at the time of the offense; *State* v. *Kane*, 101 Wn. App. 607, 618, 5 P.3d 741 (2000) ("there is nothing fundamentally unfair in sentencing offenders in accordance with the law they presumably were aware of at the time they committed their offenses"); at least when the law imposes the penalty in effect at the time of the offense on *all* persons who commit similar offenses during the same period, which P.A. 12-5 does; see part V of this dissenting opinion; and the law in effect at the time of the offense is not otherwise unconstitutional. In other words, even if I were to assume that defendants who violate a statutory scheme that is later amended or repealed are similarly situated to defendants who

engage in the same conduct after amendment or repeal, when all defendants are subject to the law in effect at the time of their crimes, *all are being treated the same.* See *United States* v. *Santana*, 761 F. Supp. 2d 131, 162 (S.D.N.Y. 2011) ("[T]he result of prospective application of the [Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010)] is . . . that similarly situated defendants will be treated similarly. . . . All those who committed their offenses before the enactment of [that act] will be sentenced according to the statutory scheme in place at the time the offenses were committed, while all those who commit crack-related offenses after [the effective date] will be subject to the [Fair Sentencing Act of 2010]." [Citation omitted.]).

Second, even if I were to assume that P.A. 12-5 does not treat all defendants the same because it imposes a different penalty depending on the date of the crime, it is well established that "a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.[93] . . . The test . . . is whether this court can conceive of a rational basis for sustaining the legislation; we need not have evidence that the legislature actually acted upon that basis. . . . Further, the [e]qual [p]rotection [c]lause does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification." (Footnote added; internal quotation marks omitted.) *Harris* v. *Commissioner of Correction*, 271 Conn. 808, 834, 860 A.2d 715 (2004); see also *State* v. *Higgins*, supra, 265 Conn. 68 ("When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark. . . . [I]n every instance where a line must be drawn or a cutoff established there are those who fall directly on either side. . . . [W]e cannot, for this reason, find the [legislation] unreasonable in its purpose and overall effect. . . . If a conceivable rational basis exists for the distinction, then the classification passes constitutional muster." [Citation omitted; internal quotation marks omitted.]).

I would conclude that there is a legitimate rational basis for the classification created by P.A. 12-5. As I

have indicated, with respect to defendants who committed their crimes before the effective date of P.A. 12-5, the legislature reasonably could have concluded that its refusal to enforce the laws in place when the crime was committed would send the message to potential offenders that the laws are unstable and that the state ultimately may be unwilling to enforce them, thereby weakening their force. See *People* v. *Floyd*, supra, 31 Cal. 4th 191. In addition, the legislature reasonably could have concluded that, because the defendants on death row already have been subject to many of the expensive, time-consuming and emotionally wrenching procedures that the prospective repeal was intended to avoid, those societal costs do not outweigh the deterrent and retributive benefits of imposing the death penalty on these defendants.[94] Cf. id., 189–90 (citing cases for proposition that "[a] reduction of sentences only prospectively from the date a new sentencing statute takes effect is not a denial of equal protection" [internal quotation marks omitted]); *People* v. *Grant*, supra, 71 Ill. 2d 561–62 ("[T]he legislature distinguished between those defendants, on the one hand, who had not yet been accorded any sentencing hearings prior to the cut-off date, and those, on the other hand, whose sentences, already imposed, would require remandments for additional sentencing hearings. We find this to be a reasonable basis for distinction and, therefore, no constitutional denial of equal protection."); see also *State* v. *Higgins*, supra, 265 Conn. 69 (rejecting defendant's claim that statute authorizing death penalty for murder of child under age of sixteen years violated equal protection principles because legislature could have defined protected class in any number of ways). Finally, as I previously have explained in part III of this dissenting opinion, the legislature rationally could have believed that its decision not to repeal the death penalty retroactively was justified by the legitimate expectations of the families of the victims of the capital felonies that were committed before the enactment of P.A. 12-5 who already have been subjected to the trauma of capital felony litigation.

Indeed, the defendant has not cited, and my research has not revealed, a single case in which a court has held that, when the legislature amends a criminal statute to impose a less severe punishment, its failure to make the new punishment retroactive violates equal protection principles under any theory.[95] Accordingly, I would reject the defendant's claim that P.A. 12-5 violates the equal protection clause of the federal constitution.

B

I next consider the defendant's claim that imposing the death penalty on him would violate his right to equal protection of the laws under article first, § 1, of the Connecticut constitution.[96] The defendant contends that the fourth, fifth and sixth *Geisler* factors support

this claim. See *State* v. *Rizzo*, supra, 303 Conn. 136 (under *Geisler*, courts may consider "[4] related Connecticut precedents; [5] persuasive precedents of other state courts; and [6] . . . relevant public policies" [internal quotation marks omitted]).[97]

With respect to the fourth *Geisler* factor, this court's precedents, the defendant relies on this court's decisions in *State* v. *Conlon*, 65 Conn. 478, 33 A. 519 (1895), and *Tough* v. *Ives*, 162 Conn. 274, 294 A.2d 67 (1972). In *Conlon*, this court held that a statute that conferred on mayors within this state "[t]he unrestrained power of selecting the favored recipients of a license" to engage in a temporary business for the sale of goods in their respective cities; *State* v. *Conlon*, supra, 487; violated article first, § 1, of the Connecticut constitution. Id., 491. This conclusion rested largely on the fact that the purpose of the statute was "to grant exclusive privileges to such persons as [the mayors] please in the transaction of a lawful business essential to the conduct of human affairs, and in which each citizen has an equal right to engage for the support of life," with "absolutely no legal test and no indication of who may be a 'proper person.' " Id., 488; see also id. (purpose of statute was "to authorize the mayor to permit or forbid the transaction of an ordinary lawful business at his pleasure"). No such unrestrained government discretion, however, is at issue in the present case. Accordingly, I would conclude that the defendant's reliance on *Conlon* is misplaced.

The defendant relies on *Tough* v. *Ives*, supra, 162 Conn. 293, for the proposition that, under article first, § 1, of the state constitution, legislative "classifications must be based on natural and substantial differences, germane to the subject and purpose of the legislation, between those within the class included and those whom it leaves untouched." The defendant, however, provides no analysis and cites no authority to support the proposition that this standard is stricter than the standard that we apply under the federal constitution. See *Daily* v. *New Britain Machine Co.*, 200 Conn. 562, 578, 512 A.2d 893 (1986) (under federal constitution, classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation" [internal quotation marks omitted]).

With respect to the fifth *Geisler* factor, precedents of other states, the defendant relies on *People* v. *Canister*, 100 P.3d 380 (Colo. 2005), and *People* v. *Hagos*, 110 P.3d 1290 (Colo. 2005). In *People* v. *Canister*, supra, 381, the defendant, Randy Canister, was charged with offenses that made him eligible for the death penalty. During his trial, the United States Supreme Court held that state capital sentencing schemes like the one in effect in Colorado were unconstitutional. Id. Thereafter, Canister was convicted of the offenses. Id., 382. Within

days of his conviction, the Colorado legislature passed a law providing that all defendants (1) for whom the prosecution, as of the effective date of the law, had announced it was seeking the death penalty, (2) who had been convicted of the offense that made them eligible for the death penalty, and (3) who had not yet had a sentencing hearing, would be subject to a new sentencing procedure that complied with the constitution.[98] Id., 381–82. The only defendants in this category were Canister, and the defendant in *Hagos*, Abraham Hagos. Id., 382. The trial court in *Canister* concluded that the application of the newly enacted death penalty law to Canister violated the Colorado constitution's prohibition on special legislation.[99] Id. On appeal, the Supreme Court of Colorado concluded that, because "it [was] absolutely certain that no one, other than Canister and Hagos, will *ever* meet the statutory criteria set forth" in the resentencing law; (emphasis in original) id., 385; the classification created by the law was "illusory" and irrational and, therefore, violated the constitutional prohibition against special legislation. Id.; see also *People* v. *Hagos*, supra, 1291 (same).

Unlike in *Canister* and *Hagos*, however, the class of persons subject to the death penalty under P.A. 12-5 is not limited to the defendant or even to those defendants who have already been charged and convicted of capital offenses in this state. Rather, the class includes *all* persons who committed crimes subjecting them to the death penalty in this state before the effective date of P.A. 12-5, including all of those who have already been sentenced to death and those who may be charged in the future with having committed such a crime before April 25, 2012.[100] Accordingly, even if I were to assume that article first, § 1, of our state constitution operates similarly to the "special laws" provision of the Colorado constitution, unlike the law at issue in *Canister* and *Hagos*, P.A. 12-5 does not limit the application of the death penalty to a class of identifiable individuals or to a subset of all individuals who committed crimes before the effective date of P.A. 12-5. Accordingly, I would reject this claim.

Finally, with respect to the sixth *Geisler* factor, public policy considerations, the defendant states conclusorily that the lack of appellate cases involving the application of article first, § 1, of the Connecticut constitution "has been ascribed to an admirable history of legislative restraint"; see *State* v. *Conlon*, supra, 65 Conn. 491 ("[o]ur legislation affecting any important interest has been so generally confined within the clear lines of legislative power, that there has been no occasion to apply the limitations of the first section of the Bill of Rights"); and that the classification created by P.A. 12-5 is inconsistent with this history. For the reasons previously set forth in this dissenting opinion, I disagree. Accordingly, I would conclude that imposing the death sentence on the defendant would not violate article

first, § 1, of the Connecticut constitution.

## IX

The defendant next claims that imposing the death sentence on him would violate substantive due process principles. Specifically, he contends that P.A. 12-5 implicates his fundamental life interest, and the substantive due process guarantee of the fourteenth amendment "forbids the government to infringe certain fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." (Emphasis in original; internal quotation marks omitted.) *Reno* v. *Flores*, 507 U.S. 292, 302, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993). For the same reason that I concluded in part VIII A of this dissenting opinion that P.A. 12-5 is not subject to strict scrutiny under equal protection principles, but is subject to rational basis review; see footnote 93 of this dissenting opinion; I would conclude that P.A. 12-5 is not subject to strict scrutiny under substantive due process principles, but is subject to rational basis review. See *Ramos* v. *Vernon*, 254 Conn. 799, 840–41, 761 A.2d 705 (2000) (rational basis review applies to substantive due process claims when fundamental right is not at issue). I concluded in part VIII of this dissenting opinion that there is a rational basis for the prospective repeal of the death penalty. Accordingly, I would reject this claim.

## X

I next address the defendant's claim that P.A. 12-5 is an impermissible bill of attainder under article one, § 10, of the United States constitution.[101] "Bills of attainder are legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial . . . . The bill of attainder clause was intended to implement the separation of powers, acting as a general safeguard against legislative exercise of the judicial function . . . . A bill of attainder has three requirements, i.e., specification of the affected persons, punishment, and lack of a judicial trial." (Citations omitted; internal quotation marks omitted.) *Hogan* v. *Dept. of Children & Families*, 290 Conn. 545, 578–79, 964 A.2d 1213 (2009). I have concluded in part VIII of this dissenting opinion that P.A. 12-5 does not apply to named individuals or to easily ascertainable members of a group because it applies to *all* persons who committed a capital felony before the effective date of the legislation, and the defendant will not be punished without a trial. Accordingly, I would conclude that P.A. 12-5 is not a bill of attainder.

## XI

I next address the defendant's claim that P.A. 12-5 is an impermissible ex post facto law under the federal

constitution.[102] "The ex post facto prohibition forbids
. . . the [s]tates [from] enact[ing] any law [that]
imposes a punishment for an act [that] was not punish-
able at the time it was committed . . . or imposes addi-
tional punishment to that then prescribed. . . .
Through this prohibition, the [f]ramers [of the constitu-
tion] sought to assure that legislative [a]cts give fair
warning of their effect and permit individuals to rely
on their meaning until explicitly changed. . . . [T]wo
critical elements must be present for a criminal or penal
law to be ex post facto: it must be retrospective, that
is, it must apply to events occurring before its enact-
ment, and it must disadvantage the offender affected
by it." (Citation omitted; internal quotation marks omit-
ted.) *State* v. *Courchesne*, supra, 296 Conn. 727. The
defendant contends that "the legislative act of exempt-
ing prerepeal cases from its abolition of capital punish-
ment operates as 'additional punishment' and makes a
capital felony committed prior to the effective date
'aggravated in enormity or punishment.' " It should go
without saying, however, that making a crime punish-
able under the law that existed at the time it was com-
mitted does not violate the ex post facto clause.
Accordingly, I would reject this claim.

XII

Finally, I address the defendant's claim that imposing
the death penalty on him would violate the "clearly
warranted by law" clause of article first, § 9, of the
Connecticut constitution. Specifically, he claims that,
because § 53a-46b (b) (1) prohibits the imposition of
the death penalty based on an arbitrary factor, and
imposing the death penalty on him is arbitrary, it is
not warranted by law. My conclusion in part V of this
dissenting opinion that imposing the death penalty on
the defendant would not be arbitrary under § 53a-46b
(b) (1) disposes of this claim.

XIII

Because I have concluded that P.A. 12-5 is constitu-
tional, I need not resolve the question of whether the act
is severable. Nevertheless, because Justice Eveleigh's
severability analysis in his concurring opinion is seri-
ously flawed, I briefly address it.

Justice Eveleigh starts from the assumption that the
unconstitutional portion of P.A. 12-5 is the portion that
makes the abolition of the death penalty prospective
only, and concludes that that part may be severed. The
basis for Justice Eveleigh's conclusion that the enact-
ment of P.A. 12-5 rendered the death penalty unconstitu-
tional, however, is that the *legislative classification*
created by the act violates the prohibition on cruel
and unusual punishment under the federal constitution
because it results in disparate treatment of similarly
culpable defendants. If that were the case, the statute
could be rendered constitutional *either* by severing the

effective date provisions of P.A. 12-5 *or* by severing the provisions that repeal the death penalty prospectively.

The question of which portion of P.A. 12-5 to sever is a question of legislative intent. Contrary to Justice Eveleigh's conclusion, the legislative history does not unambiguously support the proposition that the legislature preferred severance of the effective date provisions. Indeed, much of the legislative history strongly supports the opposite conclusion. As I have indicated, a number of legislators stated during the debates on the legislation and on the proposed amendment that would have provided for the repeal of the act if any death sentence were invalidated as the result of its enactment that the intent of the legislature was that the death penalty would be reinstated prospectively.[103] Thus, I would conclude that the legislative history of the act is, at best, ambiguous on this point. It simply cannot be known with any level of certainty how the legislators who were adamantly against retroactive repeal, but who were willing to vote for prospective repeal in order to avoid future costs—whose votes were critical for the passage of the act—would have voted if they had known that prospective repeal was not an option. In addition, it does not logically follow from the fact that Chief State's Attorney Kevin Kane opined during hearings before the Judiciary Committee that the act was unconstitutional to the extent that it provided that the abolition of the death penalty is prospective that the legislators who voted for prospective repeal wanted the effective date provisions of the act to be invalidated.

This court previously has recognized that "[s]eparability involves essentially two considerations: the legislature must have intended separability and the statute itself must be capable of separability." *Seals* v. *Hickey*, 186 Conn. 337, 353, 441 A.2d 604 (1982). Because we simply cannot know in the present case which portion of the act the legislature would prefer to sever in the event that the classification created by P.A. 12-5 were found unconstitutional, the statute is not capable of separability. Accordingly, if the legislation were unconstitutional, this court would be required to invalidate the act in its entirety. See id., 353–54 ("where a portion of the statute is invalid, the valid part can stand only if it and the invalid part are not so mutually connected and dependent as to indicate a legislative intent that they may be inseparable"). In that case, the law preexisting the enactment of P.A. 12-5 would be revived. Id., 355 (when portion of statute is invalidated as unconstitutional and statute is not severable, law "will revert to that preexisting the enactment of [the unconstitutional statute]"); see also *Ruttenberg* v. *Dine*, 137 Conn. 17, 19, 74 A.2d 211 (1950) (stating in dicta that, when statute is invalidated as unconstitutional, preexisting statute "would remain applicable and controlling"); *B.H.* v. *State*, 645 So. 2d 987, 995 (Fla. 1994) ("when the legisla-

ture approves unconstitutional statutory language and simultaneously repeals its predecessor, then the judicial act of striking the new statutory language automatically revives the predecessor unless it, too, would be unconstitutional"), cert. denied, 515 U.S. 1132, 115 S. Ct. 2559, 132 L. Ed. 2d 812 (1995); *B.H.* v. *State*, supra, 995 ("this rule generally is applicable only where the loss of the invalid statutory language will result in a 'hiatus' in the law that would be intolerable to society"); *State* v. *Sullivan*, 90 Ohio St. 3d 502, 508–509, 739 N.E.2d 788 (2001) ("[w]here an act of the [G]eneral [A]ssembly, purporting to provide a substitute for an existing law and in terms repealing the existing law, is declared to be unconstitutional and void, the repealing clause must also be held invalid, unless it clearly appear[s] that the [G]eneral [A]ssembly would have passed the repealing clause regardless of whether it had provided a valid substitute for the act repealed" [internal quotation marks omitted]); *Jenkins* v. *Bellingham Municipal Court*, 95 Wn. 2d 574, 581, 627 P.2d 1316 (1981) ("if a statute is repealed by a subsequent enactment and the subsequent enactment is declared unconstitutional, such unconstitutionality renders the repealing act invalid" and preexisting law is revived).

Moreover, even if Justice Eveleigh were correct that the legislature preferred to sever the effective date provisions of P.A. 12-5, in light of Governor Dannel Malloy's public statement that he is in favor of abolishing the death penalty only prospectively; see footnote 20 of this opinion; I would still believe that it would be inappropriate for this court to order that remedy. The legislature should not be permitted to use this court as an instrument to deprive the governor of his constitutional veto power.

XIV

In summary, the legislature has incontrovertibly expressed an intent that the repeal of the death penalty in P.A. 12-5 applies *only* to crimes "committed on or after [the effective] date [of the act]"; P.A. 12-5, § 2; and that "[a] person shall be subjected to the penalty of death for a capital felony committed prior to the effective date [of the act] under the provisions of section 53a-54b in effect prior to the effective date of [the act] . . . ." P.A. 12-5, § 5 (a). In addition, P.A. 12-5 expressly incorporates the savings provisions set forth in §§ 1-1 (t) and 54-194; see P.A. 12-5, § 38; which operate to preserve "punishments incurred and prosecutions pending" under the law in place before the effective date of the repeal. *State* v. *Carbone*, supra, 172 Conn. 256. Accordingly, as a matter of statutory interpretation, it is beyond dispute that the repeal of the death penalty does not apply to the defendant. Indeed, the defendant makes no claim to the contrary.

With respect to the constitutionality of P.A. 12-5, the defendant has failed to establish that the legislature's

prospective repeal of the death penalty is inconsistent with contemporary standards of decency in this state or nationally. In addition, I have concluded that, because P.A. 12-5 treats all defendants who committed their crimes prior to its effective date the same, it does not create an arbitrary legislative classification for equal protection purposes, and this conclusion effectively disposes of the defendant's claim that the legislation is arbitrary in violation of § 53a-46b. Accordingly, it is clear to me that P.A. 12-5 is constitutional. In concluding otherwise, the majority has addressed issues that the defendant did not raise, has relied on extra-record materials that the parties have not had an opportunity to review or to rebut, has failed to provide the state with an opportunity to respond to its arguments and conclusions and, finally, in reaching the decision that it has today, has unconstitutionally usurped the role of the legislature. I therefore respectfully dissent.

[1] For example, in attempting to explain the "pronounced geographic disparities in the legality and use of the death penalty" among the various states, the majority cites to " 'broad scholarly literature . . . point[ing] to the fact that executions are overwhelmingly confined to the South [and states bordering the South], the very same jurisdictions that were last to abandon slavery and segregation, and that were most resistant to the federal enforcement of civil right norms.' " See footnote 86 of the majority opinion. Because the majority points to no evidence that the citizens of this state support slavery or resist civil rights, I can only conclude that the majority has cited these sources as part of its general strategy of creating an aura of disrespectability around the death penalty that is in no manner derived from the contemporary moral values of this state's legislature or its citizens.

[2] The defendant claimed that: the court was barred by General Statutes § 53a-46b (b) (1) from affirming the death sentence after the passage of P.A. 12-15 because the death penalty is now arbitrary; P.A. 12-5 represented a fundamental change in contemporary standards of decency in this state, rendering the death penalty cruel and unusual punishment under the eighth amendment to the United States constitution and article first, §§ 8 and 9, of the state constitution; P.A. 12-5 created an arbitrary basis for selecting defendants who would be subject to the death penalty in violation of the federal and state constitutions; because P.A. 12-5 bars the death penalty for persons who committed crimes identical to the defendant's after the effective date of the act, that punishment is disproportionate to crimes committed before the effective date in violation of the federal and state constitutions; the effective date provision of P.A. 12-5 violates the equal protection guarantees of the fourteenth amendment to the federal constitution and article first, §§ 1 and 20, of the state constitution; the effective date provision of P.A.12-5 violates the substantive due process guarantees of the federal and state constitutions; the death penalty is not " 'clearly warranted by law' " under article first, § 9, of the state constitution; P.A. 12-5 is a bill of attainder forbidden by article I, § 10, of the federal constitution and article first, § 13, of the state constitution; and P.A. 12-5 is ameliorative legislation that should benefit the defendant.

[3] The majority may argue that it is relying on these factors only to the extent that they shed light on the reasons for the legislature's enactment of P.A. 12-5. The question that the defendant has asked this court to consider, however, is whether a majority of legislators *actually concluded* that the death penalty is inconsistent with the contemporary societal mores of this state when they abolished the death penalty prospectively. As I discuss more fully later in this dissenting opinion, the evidence on this question is simply ambiguous, and it is at least as plausible that a majority of legislators concluded that the death penalty is unworkable as it is that they concluded that it is immoral. Thus, it is both misleading and inappropriate for the majority to devote the bulk of its opinion to critiquing our previous decisions holding that these factors do *not* support the conclusion that the death penalty is inconsistent with contemporary societal mores and effectively to overrule those cases. The fact that the *majority* now concludes that, contrary to our previous decisions, these factors support the conclusion that the

death penalty is inconsistent with societal mores certainly does not compel the conclusion that the *legislature* made that determination. To the contrary, it would be just as reasonable to conclude that the legislature considered these factors and a majority of them concluded that the death penalty is consistent with contemporary mores, just as they have always done, and just as this court has done in numerous cases, including the present one. The question of whether those decisions were correct is not before us on reconsideration.

[4] "In *State* v. *Geisler*, [supra, 222 Conn. 684–86], we enumerated the following six factors to be considered in determining [whether the state constitution provides broader protection than the federal constitution]: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." (Internal quotation marks omitted.) *State* v. *Rizzo*, supra, 303 Conn. 136.

This court has traditionally numbered the *Geisler* factors in this order. For the sake of consistency, I maintain the traditional order.

[5] The majority carefully avoids suggesting in its *Geisler* analysis that our previous cases upholding the constitutionality of the death penalty under our state constitution, including our decision a mere four years ago in *State* v. *Rizzo*, supra, 303 Conn. 71, were wrongly decided. It is clear from part II of the majority opinion, however, in which the majority applies the evolving standards of decency rubric, that the majority believes that those cases did not adequately address many of the societal factors that the majority now concludes require the invalidation of the death penalty. See part I of this dissenting opinion.

[6] The majority contends that, because this state's representatives to the federal constitutional convention argued against a bill of rights on the ground that it would imply the absence of protection for unenumerated rights, the silence of our state constitution on cruel and unusual punishment does not imply a lesser concern with that problem. As the majority recognizes, however, both the 1818 and 1965 state constitutions set forth at length and with great specificity the rights that are enjoyed by the people of this state. See Conn. Const., art. I; Conn. Const. (1818), art. I. Thus, whatever concerns the state's representatives may have had about enumerating constitutional rights during the federal constitutional convention, they clearly were not shared by the framers of the state constitution. See *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 60, 469 A.2d 1201 (1984) ("[t]he history of the adoption of our Connecticut [B]ill of [R]ights indicates that it was a response to the prevailing political sentiment of that time that the basic liberties of the people should be enshrined in a written constitution to ensure their protection from governmental infringement" [footnote omitted]).

Of course, contrary to the majority's suggestion, I do not dispute that the due process provisions of the state constitution guarantee the unenumerated right to be free from cruel and unusual punishment, which was well established under the common law in 1818. See *State* v. *Ross*, 230 Conn. 183, 246–47, 646 A.2d 1318 (1994) ("[p]rior to the adoption of the state constitution in 1818, the common law in Connecticut recognized that the state did not have unlimited authority to inflict punishment for the commission of a crime"), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). Indeed, I agree with our precedent holding that, "in determining whether unenumerated rights were incorporated into the constitution, we must focus on the framers' understanding of whether a particular right was part of the natural law, i.e., on the framers' understanding of whether the particular right was so fundamental to an ordered society that it did not require explicit enumeration." (Emphasis omitted.) *Moore* v. *Ganim*, 233 Conn. 557, 601, 660 A.2d 742 (1995). I conclude only that, if the framers of the state constitution had believed not just that, under the common law, "the state did not have unlimited authority to inflict punishment for the commission of a crime"; *State* v. *Ross*, supra, 246–47; and that this right to be free from cruel and unusual punishments was guaranteed by the constitutional due process provisions, but also that that right was uniquely important or expansive in this state, they would have manifested that belief in some way in the text of the state constitution. The eighth amendment to the federal constitution clearly provided them with a model for doing so. To conclude otherwise is to conclude that the text of the state constitution sheds *no* light on the scope of the rights that it protects. In any event, even

assuming that the common law governing cruel and unusual punishments was, in some respects, more expansive in this state than in other states before 1818, there is no evidence that the framers ever remotely contemplated that the due process provisions of the state constitution would bar the death penalty for the most heinous murders as a cruel and unusual punishment.

[7] As I discuss more fully later in this dissenting opinion, the majority carefully avoids concluding that the right to be free from cruel and unusual punishments is broader under the state constitution than under the eighth amendment. The obvious purpose of the majority's extended *Geisler* analysis, however, is to create the illusion that this state's ancient history and this court's precedents have some mystical quality that now renders the death penalty for the most heinous murders unconstitutional in this state under the state constitution, even if, under similar circumstances, it would be constitutional elsewhere under the eighth amendment.

[8] I generally agree with Justice Zarella's analysis of the text of the state constitution, his discussion of the history of the death penalty in this state and his discussion of the societal mores revealed by the legislature's passage of P.A. 12-5.

[9] Although the number of capital felonies was reduced in the 1821 revision of the statutes, treason, murder, perjury with intent "to take away the life of any person," arson endangering the life of any person, certain types of disfigurement and rape were still punishable by death. See General Statutes (1821 Rev.) tit. 20, §§ 1, 3, 5, 6, 7, 8 and 10. The preface to the 1821 revision of the General Statutes, which was authored by Zephaniah Swift, Lemuel Whitman and Thomas Day, provides that the revision was undertaken as the result of the adoption of the 1818 constitution, and its purpose was "to recommend such alterations and provisions as should be necessary and expedient to render the statutes conformable to the constitution." General Statutes (1821 Rev.) preface, pp. vii, x.

[10] In addition, as Justice Zarella has aptly pointed out in his dissenting opinion, far from supporting the majority's position, the circumstances surrounding Lung's case show that there was contemporary public support for the death penalty.

[11] It is not entirely clear to me that this attempt by the majority to insulate itself from further review by the United States Supreme Court would necessarily be successful. When a state court has "felt compelled by what it understood to be federal constitutional considerations to construe . . . its own law in the manner it did," the Supreme Court has held that it has jurisdiction to review the decision. (Internal quotation marks omitted.) *Michigan* v. *Long*, 463 U.S. 1032, 1044, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983).

[12] The majority repeatedly expresses its admiration for social "progress" and for "progressive," "forward thinking" and "forward-looking" social views. I do not in any way disparage such views, which, indeed, are held by many reasonable people and may in fact be consistent with my own personally held views. I am aware of no authority, however, for the proposition that our state constitution requires this court or the people of this state to hold such views. To the contrary, there is absolutely no reason why the people of this state may not hold and enact legislation embodying the very same views that the framers of our constitution held in 1818 and 1965.

[13] The majority suggests that it may be that "the opposition of the dissenting justices reflects their disapproval of the evolving standards of decency test itself, a legal standard according to which a penalty that once passed constitutional muster may, within a relatively brief span of time, come to be deemed cruel and unusual." To the contrary, I conclude only that, even if the evolving standards of decency test applies to a claim that the death penalty is categorically unconstitutional for all crimes, the majority has failed to properly apply that test.

[14] Justice Zarella contends that evolving standards of decency in this state should be considered under the sixth prong of *Geisler* and, pursuant to *State* v. *Ross*, 230 Conn. 183, 251, 646 A.2d 1218 (1994), those standards of decency cannot be considered in a vacuum, but must be considered in light of "our constitutional document . . . our history and . . . the teachings of the jurisprudence of our sister states as well as that of the federal courts." (Internal quotation marks omitted.) In contrast, the majority appears to conclude that, if *Geisler* does not yield an interpretation of our state constitution's due process provisions that is more protective than the eighth amendment in this context, *Geisler* falls out of the picture and federal standards delineate the scope of the state constitutional provisions. See *State* v. *Jenkins*, 298 Conn. 209, 261, 3 A.3d 806 (2010) ("we often rely on the United States Supreme Court's interpretation of the amendments to the constitution

of the United States to delineate the boundaries of the protections provided by the constitution of Connecticut" [internal quotation marks omitted]). I take no position on the *Geisler* question, but assume for purposes of this opinion only that, even if the majority is correct that contemporary standards of decency, standing alone, are dispositive of the question of whether the death penalty is constitutional in this state, the majority has failed to establish that this state has categorically rejected the death penalty.

[15] See *Fleming* v. *Zant*, 259 Ga. 687, 690, 386 S.E.2d 339 (1989) ("[t]he 'standard of decency' that is relevant to the interpretation of the prohibition against cruel and unusual punishment found in the Georgia [c]onstitution is the standard of the people of Georgia, not the national standard"); *Van Tran* v. *State*, 66 S.W.3d 790, 805 (Tenn. 2001) (in determining whether capital sentencing scheme violated Tennessee constitution, court considered societal consensus in Tennessee).

[16] As I have explained, in the present case, the defendant has relied *exclusively* on the action of our state legislature in passing P.A. 12-5 in support of his claim that the death penalty no longer comports with the contemporary societal mores of this state.

[17] By suggesting that the legislature has found that the death penalty is "unbecoming to a civilized modern state," the majority seems to suggest that the legislature believes that, even if the death penalty actually enjoy*s* public support, such support should be ignored. If the public actually supports the death penalty, however, the fact that the legislature disagrees with its constituents' moral sensibilities would not constitute evidence that the death penalty is inconsistent with contemporary societal mores. The United States Supreme Court has never suggested that a legislative determination that is *contrary* to the public will provides evidence of evolving standards of decency. Rather, that court has looked to legislative enactments on the commonsense assumption that they are consistent with contemporary societal mores. See *Atkins* v. *Virginia*, supra, 536 U.S. 315–16 ("the large number of [s]tates prohibiting the execution of mentally retarded persons [and the complete absence of states passing legislation reinstating the power to conduct such executions] provides powerful evidence that today *our society* views mentally retarded offenders as categorically less culpable than the average criminal" [emphasis added]).

The majority contends that the statement of the United States Supreme Court that "public sentiment expressed in . . . [public opinion] polls and resolutions may ultimately find expression in legislation, which is an objective indicator of contemporary values upon which we can rely"; *Penry* v. *Lynaugh*, 492 U.S. 302, 335, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), overruled on other grounds by *Atkins* v. *Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002); supports its contention that only legislation, and not public opinion, can establish societal mores. See footnote 47 of the majority opinion. I disagree. The court in *Penry* simply observed that, public opinion polls showing opposition to the execution of mentally impaired defendants did not constitute sufficient *evidence* that there was an *emerging* national consensus that was *inconsistent* with existing legislation. *Penry* v. *Lynaugh*, supra, 335 ("there is insufficient evidence of a national consensus against executing mentally retarded people convicted of capital offenses"); see also *State* v. *Ross*, supra, 230 Conn. 296 (*Berdon, J.*, dissenting) ("[a]lthough *public opinion is relevant*, it cannot appropriately be measured by abstract polls" [emphasis added]). I would agree that, in such a situation, it might be prudent for the courts to take a wait and see attitude before assuming that an emerging consensus, as indicated by public opinion polls, is stable. That does not mean that public consensus is irrelevant. In this state, the stable, centuries old societal consensus, as reflected in our statutes, has been that the death penalty is morally acceptable. Accordingly, I believe there should be a presumption that that continues to be the public consensus in the absence of evidence to the contrary. I also believe that this court should give great weight to that presumption.

[18] A number of legislators expressly recognized that there simply were not enough votes in the legislature to pass a retroactive repeal of the death penalty. See 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1306, remarks of Representative Ernest Hewett ("If you are serious about innocent people being put to death, then wait until you have the votes for a total repeal . . . . You will not have my vote, but at least you would have done it the right way."); 55 S. Proc., Pt. 3, 2012 Sess., p. 743, remarks of Senator John A. Kissel ("Every argument that you make against the death penalty equally could be applied to the [eleven] folks on death row right now. But there [are] not the votes to do that."); 55 S. Proc., supra, p. 795, remarks of Senator Leonard A.

Fasano (Senator Fasano stated that any person who wants the death penalty to "be repealed period, with nobody subject to the death penalty clause knows that that can't make it through this [c]hamber. They know that that's an impossibility.").

[19] See, e.g., 55 S. Proc., Pt. 2, 2012 Sess., p. 594, remarks of Senator Eric D. Coleman ("The other concerns that I have about the death penalty as it works in the [s]tate of Connecticut or doesn't work in the [s]tate of Connecticut is the cost of it. The public defenders indicate that they spend about $4 million a year in defense of people who are accused of capital felony offenses and I think with respect to [one case] . . . they spent nearly, in the trial alone, close to $1 million in defense of those individuals. . . . That money could certainly have been better allocated."); 55 S. Proc., Pt. 3, 2012 Sess., p. 772, remarks of Senator Carlo Leone ("Emotionally [I believe that] people [who] commit heinous crimes, crazy crimes they should be . . . executed, but we can't seem to do it. We can't seem to make it workable."); 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1292–93, remarks of Representative Auden C. Grogins ("I am personally, morally opposed to the death penalty, but today's vote is not just about whether capital punishment is morally wrong. Today's vote is about the fact that this law is broken and just does not work for the [s]tate of Connecticut. This law doesn't work for defendants and their families. This law doesn't work for victims and their families. The victims wait years for the resolution of these cases that rarely result in what they want, executions. Instead, these cases involve long and complex litigation, including years and years of postconviction appeals, and this is at the tremendous expense of the taxpayers and at the high price and emotional price of all the parties involved."); 55 H.R. Proc., supra, p. 1295, remarks of Representative John F. Hennessy (death penalty "does not work, with its endless and costly appeals"); 55 H.R. Proc., supra, p. 1313, remarks of Representative Patricia B. Miller ("Between 2010 and 2011, the [s]tate of Connecticut spent $3.8 million on defending capital cases for the Division of Public Defenders Services. That's over 7 percent of their budget. According to . . . the 2012 [budget] estimate . . . Connecticut spends . . . $5 million annually on death penalty related costs including the separate sentencing phase, postconviction appeals, and higher costs for death row facilities."); 55 H.R. Proc., supra, p. 1318, remarks of Representative Lile R. Gibbons ("[i]f we retain the death penalty, we will continue a very lengthy appeal process that is expensive for the [s]tate, does not bring closure for the families and . . . also becomes a media circus for the criminals, which in some perverse way provides entertainment for them, at best, and a change in their dreary solitary lives, at [worst]"); 55 H.R. Proc., supra, pp. 1373–74, remarks of Representative Juan R. Candelaria ("I think all crimes of murder deserve capital punishment" but delays caused by appeals remove deterrent value); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., pp. 2765–66, remarks of Kevin Barry ("[g]iven the ongoing state budget shortfalls and the fact that noneconomic concerns were not enough to achieve repeal in the past, there [are] simply insufficient grounds to conclude that the prospective repeal signals a statewide consensus that the death penalty is contrary to an evolved standard of decency as opposed to a desire to eliminate the costs of death penalty litigation").

[20] Not all of the remarks by legislators that are cited by the majority reflect opposition to the death penalty on moral grounds. For example, although Senator Edith Prague stated that the death penalty was a "moral issue" and that she intended to vote for P.A. 12-5 because she was concerned about the risk of erroneous death sentences, she expressed no concern that any of the defendants currently on death row had been erroneously sentenced. 55 S. Proc., Pt. 3, 2012 Sess., p. 781. As the majority acknowledges, Senator Prague elsewhere had expressed in no uncertain terms her support for executing defendants who had been properly sentenced to death. With respect to the remaining legislators cited by the majority, almost all of them opposed the death penalty under any circumstances and, therefore, would have voted to repeal it retroactively. Accordingly, their explanations for their votes say nothing about the motives of the legislators who were willing to vote only for prospective repeal.

The majority's reliance on Governor Dannel Malloy's statement that there was a " 'moral component' " to his opposition to the death penalty is also misplaced. In fact, Governor Malloy made it very clear before P.A. 12-5 was enacted that he was in favor of abolishing the death penalty *only* for future cases and implied that he would veto any attempt at retroactive repeal. See C. Keating, "The Gloves Come Off: Foley, Malloy Verbally Spar About Overall Truthfulness," Hartford Courant, October 6, 2010, pp. A1, A9 (quoting Malloy

as stating that he wanted to be "very, very, very clear" that he supported repeal only for future cases and implying that he would veto any attempt to repeal death penalty retroactively [internal quotation marks omitted]).

[21] The majority states that "the legislature could not have come any closer to fully abolishing capital punishment without actually doing so. We perceive no ringing legislative endorsement of the death penalty in Connecticut." These statements are off the mark for several reasons. First, I am aware of no authority for the proposition that legislation that was *almost* enacted provides better evidence of prevailing societal norms than the legislation that was actually enacted. Second, even if that were the case, I see no evidence that the legislature came close to fully abolishing the death penalty. Rather, a large majority of legislators expressed no moral qualms about retaining it for crimes committed before the effective date of P.A. 12-5. Third, I am aware of no authority for the proposition that a statute authorizing a particular punishment for a particular crime does not constitute evidence that the punishment is consistent with prevailing societal norms unless there is an additional "ringing legislative endorsement" of the punishment, as phrased by the majority, whatever that might be.

The majority also states that, if the legislature believed that the death penalty has become unworkable, it would have enacted legislation to remove the impediments to its enforcement instead of abolishing it prospectively. Neither the majority opinion nor the portion of the legislative history on which the majority relies contains any specific suggestions, however, as to how this could be accomplished.

[22] The majority denies that it would be morally incoherent for a legislator who believed that killing is wrong and who also believed that breaking a promise is wrong to conclude that, having made a promise to the families of the victims to execute the defendants who are on death row, it is better to wrongfully execute the defendants than to wrongfully break the promise. Yet the majority ultimately concludes that, having done its poor best to balance the weighty but conflicting moral principles of honoring life and honoring a promise, the legislature ultimately came up short and made a choice that is inconsistent with contemporary standards of decency. Thus, it is inescapable that it is the *majority* that has taken the position that, if a legislator believed that the death penalty violates contemporary mores, his or her vote to retain the death penalty retroactively would be morally incoherent.

[23] Cf. *Contractor's Supply of Waterbury, LLC* v. *Commissioner of Environmental Protection*, 283 Conn. 86, 93, 925 A.2d 1071 (2007) ("In determining whether the challenged classification is rationally related to a legitimate public interest . . . [t]he test . . . is whether this court can conceive of a rational basis for sustaining the legislation; we need not have evidence that the legislature actually acted [on] that basis. . . . Further, the [constitution] does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification. . . . Rational basis review is satisfied [as] long as there is a plausible policy reason for the classification . . . . [I]t is irrelevant whether the conceivable basis for the challenged distinction actually motivated the legislature. . . . To succeed, the party challenging the legislation must negative every conceivable basis which might support it . . . ." [Citation omitted; emphasis omitted; internal quotation marks omitted.]).

[24] Indeed, this court should not scour the legislative record for evidence of improper legislative *motivation* when the *meaning* of the legislation is clear. Rather, when, as in the present case, the constitutionality of a statute turns, at least in part, on the legislature's motive for enacting it, this court should generally presume that, if there was any conceivable legitimate reason for a legislator to support the statute, it is constitutional. See footnote 23 of this dissenting opinion.

The majority contends that "[u]nder the eighth amendment and the corresponding provisions of the state constitution, the issue is not whether there is any legitimate justification for a statutory classification, but, rather, what a penal statute *actually indicates* about contemporary social mores. It is no more improper for a court to consider the legislative calculations involved in the crafting of such a statute than in any other situation in which we look to legislative history to help discern the meaning of a statute." (Emphasis in original.) See footnote 62 of the majority opinion. In the present case, however, the justification for the statute and what the statute "actually indicates about contemporary social mores" are one and the same. In other words, if, as I contend, the justification for the prospective repeal of the

death penalty was that it has become unworkable, that would indicate something very different about social mores than if the justification was the belief that the death penalty is immoral. This court has repeatedly recognized that the death penalty is presumptively constitutional. *State* v. *Colon*, 272 Conn. 106, 371, 864 A.2d 666 (2004) (defendant is required to prove that death penalty statute violates eighth amendment beyond reasonable doubt), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); see also *Gregg* v. *Georgia*, supra, 428 U.S. 175 ("in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity"). Thus, when the constitutionality of the death penalty turns on its justification, and there is evidence that the legislature had a legitimate justification, the court should presume that that was the justification. The majority's reliance on *Griswold Inn, Inc.* v. *State*, 183 Conn. 552, 561–62, 441 A.2d 116 (1981), in support of its claim to the contrary is misplaced. In that case, the court held that it was not bound to accept the most constitutionally favorable interpretation of a law barring the sale of liquor in restaurants on Good Friday because, under the first amendment, a law that, on its face, is not "neutral in matters of religious theory, doctrine, and practice"; *Epperson* v *Arkansas*, 393 U.S. 97, 103–104, 89 S. Ct. 266, 21 L. Ed. 2d 228 (1968); cannot stand unless the state establishes that it has "a clearly secular legislative purpose . . . ." (Internal quotation marks omitted.) *Griswold Inn, Inc.* v. *State*, supra, 559. The majority has pointed to no comparable eighth amendment principle requiring the state to prove that a facially legitimate law imposing a particular punishment did not have an improper motivation. Rather, there is a presumption that the punishment is consistent with contemporary societal mores unless the defendant proves otherwise.

The majority complains that I am applying a "highly deferential rational basis standard" to the defendant's claim that the death penalty is cruel and unusual. To the contrary, I am applying the same evolving standards of decency rubric that the United States Supreme Court has always applied to claims that a punishment is cruel and unusual, under which legislation supplies the clearest evidence of contemporary societal mores. Unlike the majority, however, I am unwilling to simply *assume* that the legislature was motivated to enact P.A. 12-5, which expressly retains the death penalty for crimes committed before its effective date, for political reasons rather than by a sincere belief in the morality and the enduring penological value of the death penalty. The majority also states that there is "nothing improper about a legislator acting on the basis of political considerations." The majority is invalidating the death penalty, however, on the basis of its assumption that a majority of legislators believe that the death penalty violates contemporary mores and that they retained the death penalty retroactively either for purely political reasons or to wreak vengeance against particular defendants. Thus, it is the *majority* that has taken the position that, in this context, it is improper for a legislator to act on the basis of political considerations rather than on the basis of his or her moral beliefs.

[25] The majority states that "not a single legislator has publicly indicated that the decision to repeal the death penalty prospectively while retaining it for those who offended prior to April 25, 2012, embodied . . . [a] financial and pragmatic agreement" rather than a moral judgment. The majority, however, has not identified a single legislator who has publicly stated that a majority of legislators believed that the death penalty is immoral. See footnote 22 of this dissenting opinion. Indeed, numerous legislators who opposed the death penalty on moral grounds argued that those legislators who were unwilling to vote for retroactive repeal—and who, therefore, presumably did *not* have moral qualms about the death penalty—should vote for prospective repeal on practical grounds. See footnote 19 of this dissenting opinion. This suggests that these legislators were concerned that the bill would not pass without such votes.

[26] The majority's reliance on Senator John A. Kissel's prediction that this court would conclude that P.A. 12-5 is unconstitutional because its prospective repeal provision provides "the best and most recent indication of evolving standards in our society of human decency" is similarly misplaced. See 55 S. Proc., Pt. 2, 2012 Sess., p. 574. Ironically, Kissel is a strong supporter of the death penalty for heinous murders. See "Senator Kissel: State Death Penalty Repeal Bill Appears to be Dead," (May 12, 2011), available at http://ctsenaterepublicans.com/2011/05/senator-kissel-state-death-penalty-repeal-bill-appears-to-be-dead/ (last visited July 30, 2015). Moreover, although the majority states that Kissel's remarks indicated that he believed that "the vast majority of those legislators who voted for P.A. 12-5 would have supported a

full repeal," the majority does not explain how Kissel could have known that. The legislators certainly did not say so during the legislative debate on P.A. 12-5. Accordingly, I find persuasive the state's argument in its supplemental brief that these remarks most likely reflect Kissel's concern "that if this court decided not to be bound by 145 years of precedent and instead evaluated [P.A. 12-5] pursuant to the court's view of Connecticut's evolving standard of decency, there was no reliable way to predict the outcome." Indeed, if Kissel thought that a majority of legislators who intended to vote for P.A. 12-5 believed that the death penalty is immoral, it would hardly have made sense for him to argue that they should vote against P.A. 12-5 lest their vote in favor of it be interpreted as an indication of their belief that the death penalty is immoral.

In any event, even if it were true that "the vast majority of those legislators who voted for P.A. 12-5 would have supported a full repeal"—for which I see no evidence—it would still be the case that *a majority of legislators* did *not* support full repeal. Accordingly, we would still be required to answer the question of what motivated the minority of legislators who voted for P.A. 12-5 but who did not support a full repeal in order to determine the legislative consensus. If those legislators believed that the death penalty is consistent with contemporary standards of decency, then there would be no legislative consensus to the contrary.

[27] The majority points to testimony by family members of murder victims in committee hearings on P.A. 12-5 to the effect that the death penalty retraumatizes them. As the majority recognizes, however, other evidence that was presented at the hearings showed that the families of some victims support the death penalty as an appropriate punishment for certain crimes. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., pp. 2699–2700, remarks of Representative Al Adinolfi (noting that family member of victims in Cheshire case believed that death penalty is appropriate punishment for certain crimes); id., p. 2870, remarks of Kimberly Sundquist (Sundquist, whose uncle had been murdered, argued in favor of death penalty and noted that not one person who testified that "our current system is very traumatic on victims" had stated that capital punishment is immoral).

[28] The majority relies on testimony of Chief State's Attorney Kevin Kane before the Judiciary Committee, both in 2009 and in 2012, to support its conclusion that the death penalty is inconsistent with contemporary societal mores. I fail to perceive, however, how Kane's unexplained prediction that, if the legislature repealed the death penalty prospectively, "*the Connecticut Supreme Court* would decide that in effect . . . the community standard is such that [the death penalty] is now cruel and unusual punishment"; (emphasis added) Conn. Join Standing Committee Hearings, Judiciary, Pt. 8, 2009 Sess., p. 2412; sheds any light on the contemporary societal mores of this state's citizens. Indeed, Kane ultimately admitted that his statement did not reflect his personal assessment of contemporary societal mores (which, in any event, would not be binding on this court), but was merely "a prediction just like a prediction of whether or not a jury's going to find somebody guilty." Id. Accordingly, as with the testimony of Senator John A. Kissel; see footnote 26 of this dissenting opinion; I find persuasive the state's argument in its supplemental brief that Kane's testimony likely reflected his concern "that if this [c]ourt decided not to be bound by 145 years of precedent and instead evaluated [P.A. 12-5] pursuant to the [c]ourt's view of Connecticut's evolving standard of decency, there was no reliable way to predict the outcome." It is ironic indeed that the majority, in an apparent attempt to direct attention from its unsupported conclusion that the death penalty is somehow inconsistent with contemporary societal mores in this state to someone else, now uses Kane's concerns about what this court might do in the event of a prospective repeal to justify doing the very thing that he was concerned about. Moreover, when pressed for an explanation of his remark, Kane stated that he believed that prosecutors would be reluctant to seek the death penalty for crimes committed before the effective date of a prospective repeal because to treat crimes differently based on the date that they were committed would be "not fair." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2009 Sess., p. 2413. Thus, the most reasonable explanation of his remark is that he believed that this court might conclude that it is inconsistent with contemporary society mores to treat two criminals who committed the same crime differently on the basis of this arbitrary factor—an issue that the majority does not address—not that he believed the prospective repeal would reflect a categorical rejection of the death penalty as an appropriate punishment for all crimes. See also

Conn. Joint Standing Committee Hearings, Pt. 9, 2012 Sess., pp. 2601–2602, remarks of Chief State's Attorney Kane (arguing that state's attorneys would be unlikely to *charge* defendants who committed crimes before effective date of prospective repeal with capital crime). Similarly, the written testimony of the Division of Criminal Justice reveals that the division argued against prospective repeal and in favor of retaining the death penalty for all heinous murders in 2009 because it believed that "it would be untenable as a matter of constitutional law or public policy *for the state to execute someone today who could not be executed for committing the same conduct after a date in the future*." (Emphasis added.) Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2009 Sess., p. 2716. The majority conveniently fails to quote the emphasized language or to acknowledge the Division of Criminal Justice's arguments in favor of retaining the death penalty for all crimes, which clearly indicate a belief that the death penalty is not categorically unconstitutional. Finally, to the extent that the majority suggests throughout its opinion that Kane's views about P.A. 12-5 carry particular weight because he was representing the state in this case, I disagree. The fact that Kane represents the state in criminal cases does not mean that his remarks to the legislature represent the official views of the state with regard to legislation. Rather, the official views of the state as to the constitutionality of the death penalty are embodied in the language of P.A. 12-5, which expressly permits the imposition of the death penalty for those who committed their crimes before the passage of the act. Kane's remarks before the legislature also do not represent the official position of the prosecutor in the present case, who has expressly argued that P.A. 12-5 does not evince a newly emerged standard of decency that rejects the death penalty as immoral and that it is not arbitrary. The prosecutor's views on many of the other issues that the majority has addressed are unknown because the issues were not raised by the defendant and the state has not had an opportunity to brief them.

[29] The majority accuses me of ignoring "the fundamental principle that [t]he right to be free [from] cruel and unusual punishments, like the other guarantees of the Bill of Rights, may not be submitted to vote . . . . The very purpose of a [b]ill of [r]ights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. . . . *Furman* v. *Georgia*, [408 U.S. 238, 268–69, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972)] (Brennan, J., concurring)." (Internal quotation marks omitted.) See footnote 87 of the majority opinion. Of course, if a particular death penalty scheme permitted standardless sentencing or if a particular death sentence was the result of an arbitrary factor, such as the race of the defendant, majority support for the legislation or the sentence would not render them constitutional. To put it mildly, however, there is a tension between Justice Brennan's statement in his concurring opinion in *Furman* and the evolving standards of decency rubric that the United States Supreme Court has repeatedly applied to claims pursuant to the eighth amendment. In my view, the very purpose of the evolving standards of decency test was to allow the scope of the protection provided by the constitutional bar on cruel and unusual punishments to evolve *along with the societal mores of the majority of citizens*, as long as those societal standards are no less protective than the standards that existed when the constitution was adopted. See *Penry* v. *Lynaugh*, 492 U.S. 302, 335, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (declining to find imposition of death penalty on mentally impaired individuals unconstitutional because "there is insufficient evidence of a national consensus against executing mentally retarded people convicted of capital offenses"), overruled on other grounds by *Atkins* v. *Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002); see also W. Berry III, "Following the Yellow Brick Road of Evolving Standards of Decency: The Ironic Consequences of 'Death-Is-Different' Jurisprudence," 28 Pace L. Rev. 15, 25–26 (2007) (criticizing evolving standards of decency rubric because it "assumes that the meaning of cruel and unusual punishment rests on public opinion . . . not on constitutional principle"). Its purpose was not to allow a minority of citizens, legislators or judges to impose their personal standards of decency in the form of a permanent constitutional rule. Although the majority in the present case disagrees with my conclusion that standards of decency are established by the majority of citizens, it never clearly articulates the level of societal consensus that it believes is sufficient to evince established societal mores.

[30] Lacking an adequate record to review this claim, the majority relies heavily on cherry picked extra-record sources that provide slanted and untested explanations for the history of the death penalty in this state. I

recognize that this court has previously held that, on appeal to this court, a party may rely on "extra-record reference materials as evidence of contemporary societal norms to advocate for a new constitutional rule . . . ." *State* v. *Rizzo*, supra, 303 Conn. 184 n.81, citing *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, 295 Conn. 240, 310 n.56, 990 A.2d 206 (2010) (considering scientific studies in context of sixth *Geisler* factor, although not "part of the trial court record"); *Moore* v. *Moore*, 173 Conn. 120, 122, 376 A.2d 1085 (1977) (legislative facts, that is facts that "help determine the content of law and policy," are subject to judicial notice); E. Margolis, "Beyond Brandeis: Exploring the Uses of Non-Legal Materials in Appellate Briefs," 34 U.S.F.L. Rev. 197, 214 (2000) (opining that it is "appropriate . . . to introduce [nonlegal] material in support of policy arguments at the appellate stage of [litigation]"). Nothing requires this court, however, to give credence to such materials when they are slanted or contain untested factual assertions, especially when the issue is a controversial one. It is particularly inappropriate to assume the truth and accuracy of extra-record materials when the parties have not even had an opportunity to review the materials or to respond to them.

[31] See Quinnipiac University, Release Detail (March 12, 2013), question 29, available at http://www.quinnipiac.edu/institutes-and-centers/polling-institute/connecticut/release-detail?ReleaseID=1864 (last visited July 30, 2015). In addition, only 45 percent of registered voters approved of the repeal of the death penalty by the enactment of P.A. 12-5, while 51 percent of voters disapproved. Id., question 30. The same poll indicates that, as of April 25, 2012, the effective date of P.A. 12-5, 62 percent of voters favored the death penalty for murder while 30 percent of voters opposed it. Id., question 29.

In a March, 2011 poll, "10 percent [of voters] favor[ed] the death penalty for all people convicted of murder; 16 percent [said] no one should be executed and 73 percent [said] the death penalty depends on the circumstances of each case." Quinnipiac University, Release Detail (March 10, 2011), question 43, available at http://www.quinnipiac.edu/institutes-and-centers/polling-institute/connecticut/release-detail?ReleaseID=1566 (last visited July 30, 2015). Thus, 83 percent of voters favored the death penalty under some circumstances.

Contrary to the majority's statement in footnote 87 of its opinion, I have not engaged in "a stark about-face" from my position in *State* v. *Rizzo*, supra, 303 Conn. 195, in which I recognized "the weaknesses inherent in public opinion polls as objective measures of the popular psyche . . . ." Rather, I continue to believe that public opinion polls cannot trump legislation as evidence of societal mores. Because these public opinion polls evince a societal consensus in this state that is *consistent* with legislation that has been in place for centuries, however, I believe that they provide more reliable evidence of established societal mores than would polls that evinced an emerging societal trend. See footnote 33 of this dissenting opinion. In any event, these polls certainly do *not* demonstrate the *absence* of such public support, which the defendant has the burden of proving. Finally, I am compelled to observe that it is ironic indeed that these public opinion polls, on which the state expressly relied in its supplemental brief to this court and the accuracy of which the defendant did not dispute, appear to be the only form of extra-record materials that are beneath the notice of the majority.

[32] The defendant has relied only on the practices of those states that have repealed the death penalty prospectively for certain persons in support of his claim that a prospective repeal evinces a general societal consensus against the death penalty in all cases. The majority has gone far beyond that claim by considering general sentencing practices and abolition trends in all states.

[33] Perhaps in recognition of the weakness of its argument that the citizenry of this state and their representatives in the General Assembly have rejected the death penalty as immoral, the majority contends that, even if the death penalty continues to enjoy public support, this court's "own judgment will be brought to bear on the question of the acceptability of the death penalty under the [e]ighth [a]mendment." (Internal quotation marks omitted.) *Atkins* v. *Virginia*, supra, 536 U.S. 312. The majority has not cited a single case, however, in which the United States Supreme Court or any other court applying the evolving standards of decency rubric has concluded that, although an established and previously constitutional punishment for a particular crime or for a particular class of defendants continued to be consistent with contemporary societal mores, it still violated a constitutional prohibition on cruel and unusual punishments. Nor has the majority ade-

quately explained how its view that it may substitute its judgment for the judgment of the legislature and the people of this state can be reconciled with the United States Supreme Court's statement that, "[i]n determining what standards have 'evolved' . . . we have looked not to our own conceptions of decency, but to those of modern American society as a whole." *Stanford* v. *Kentucky*, supra, 492 U.S. 369.

The majority contends that the courts in *Hall* v. *Florida*, U.S. , 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014), *Solem* v. *Helm*, 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983), *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), *Robinson* v . *California*, 370 U.S. 660, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962), *Weems* v. *United States*, 217 U.S. 349, 30 S. Ct. 544, 54 L. Ed. 793 (1910), and *People* v. *Anderson*, 6 Cal. 3d 628, 493 P.2d 880, 100 Cal. Rptr. 152, cert. denied, 406 U.S. 958, 92 S. Ct. 2060, 32 L. Ed. 2d 344 (1972), found that specific punishments were unconstitutional even though they were consistent with contemporary societal mores. I disagree. In *Hall*, the United States Supreme Court considered the constitutionality of Florida's procedure for determining the intellectual ability of defendants accused of capital crimes. The court concluded that, because "the vast majority" of states had rejected Florida's procedure, and because there was a consistent trend toward recognizing a more flexible procedure, there was "strong evidence of consensus that our society does not regard [Florida's] strict [intelligence quotient] cutoff as proper or humane." *Hall* v. *Florida*, supra, 1998. In *Solem* v. *Helm*, supra, 299, although the court was not applying the evolving standards of decency test, it noted that the defendant was the only defendant in the state of South Dakota who had ever been sentenced to death without the possibility of parole for passing a bad check. Thus, it is arguable that the court found that the punishment violated contemporary standards of decency on the basis of actual sentencing practices in the state. In *Furman*, the court concluded that the death penalty statutes in many states were unconstitutional because of procedural deficiencies that permitted arbitrary sentencing, not because the death penalty was inherently inconsistent with contemporary societal mores. See *Gregg* v. *Georgia*, supra, 428 U.S. 195 ("the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary and capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance"). In *Robinson* v. *California*, supra, 666, the court concluded that a California statute that criminalized the status of being a drug addict would be in the same category as a statute that criminalized suffering from a disease, which "would doubtless be universally thought to be an infliction of cruel and unusual punishment . . . ." Thus, the court held that the state statute was inconsistent with broader societal mores. *Weems* was decided before the full development of the evolving standards of decency standard, and the standard that the court applied is unclear. See *Weems* v. *United States*, supra, 381 (fact that punishment for falsifying single item of public account and punishment for forgery or counterfeiting were same "exhibits a difference between unrestrained power and that which is exercised under the spirit of constitutional limitations formed to establish justice"). In *People* v. *Anderson*, supra, 649, the court concluded that the sentencing practices of the state belied what the California death penalty scheme and public opinion polls showed about public support of the death penalty. The majority states that my attempt to show that the courts in these cases did not rely exclusively on their own judgment in determining that a punishment is consistent with contemporary societal mores is unsuccessful and that I "simply cannot wipe away a century of eighth amendment jurisprudence." The majority does not even attempt, however, to explain why my analysis of these cases is wrong. In any event, if the majority truly believes that these cases support the notion that courts no longer are required to consider contemporary *societal* mores, but only their own judgment, it should admit forthrightly that it sees no need to consider the views of this state's citizens and the legislature on the morality of the death penalty and is relying solely on its own views.

The majority also contends that the statement of the United States Supreme Court in *Stanford* v. *Kentucky*, supra, 492 U.S. 369, that the court must look to the moral standards of society to determine what standards have evolved, has been overruled by *Roper* v. *Simmons*, supra, 543 U.S. 551. In *Roper*, however, the court concluded that "the objective indicia of consensus in this case—the rejection of the juvenile death penalty in the majority of [s]tates; the infrequency of its use even where it remains on the books; and the consistency in the trend toward abolition of the practice— provide sufficient evidence that today our society views juveniles . . . as

categorically less culpable than the average criminal." (Internal quotation marks omitted.) Id., 567. Far from concluding that this evidence of a popular consensus was extraneous to its ultimate conclusion that the juvenile death penalty is unconstitutional, the court in *Roper* stated that these "objective indicia" provided the court with "*essential* instruction." (Emphasis added.) Id., 564. To be sure, it is arguable that the court in *Roper* implied that there might be cases in which, although an established and previously constitutional punishment continued to enjoy public support, the court still could find the punishment to be disproportionate in the exercise of its independent judgment. Id. *Roper* was not such a case, however, nor has the majority cited any other case in which a court has invalidated a punishment solely on the basis of its own concepts of decency.

[34] The majority also concludes that delays in the execution of defendants who have been sentenced to death, racial disparities in the imposition of the death penalty and the danger of erroneous executions diminish the retributive value of the penalty. Although the defendant made a passing reference in his brief to the fact that several legislators who voted for P.A. 12-5 argued that, because of the long delays occasioned by appellate review of death sentences, the prisoners on death row were more likely to die of old age than to be executed, the defendant did not contend that these delays rendered the death penalty unconstitutional. Nor did he raise the issues of racial disparity; see part IV of this dissenting opinion; or the possibility of erroneous executions. As I have explained; see part I of this dissenting opinion; because the defendant did not raise these issues, the parties have not briefed them and the record is inadequate for their review, they are not properly before the court.

[35] See *State* v. *Rizzo*, supra, 303 Conn. 147–50 (defendant encountered thirteen year old victim as victim rode bicycle in front of defendant's home and asked victim if anyone knew where he was; when victim replied in negative, defendant decided to kill him; defendant then told victim that there were snakes in backyard, and asked victim if he wanted to see them; when victim agreed, defendant went to car and retrieved flashlight and three pound sledgehammer, which he concealed in his pants; after giving flashlight to victim, defendant approached victim from behind, raised sledgehammer over his head, and hit victim on side of head with flat surface of sledgehammer; victim rolled over and implored defendant to stop hitting him, but defendant hit him repeatedly in head, back and shoulders, one of which blows punched out large fragment of victim's skull, creating a gaping hole; defendant later told police that he just wanted to know what it was like to kill somebody); *State* v. *Breton*, supra, 264 Conn. 345–48 (in early morning hours, defendant went to home of former wife, " 'strapped on' " knife, let himself in with key, and went upstairs to former wife's bedroom; when former wife yelled for their son to call police, defendant sat on top of her and hit her; former wife continued to scream and, when defendant saw son appear in doorway, he took knife in hand and went to son, who said, " 'Dad, I love you,' " at which point defendant hit him, saw "something" gushing out of his neck and heard gasping and gurgling; defendant returned to former wife, grabbed her hair, hit her and again heard gurgling, and loud crash; as defendant was leaving house, he saw son lying at bottom of stairs, shaking; defendant then went back to former wife, told her that he just wanted to talk and hit her again; defendant then returned to son, said " '[t]hank you for the birthday card,' " and stabbed him in neck); *State* v. *Reynolds*, supra, 264 Conn. 18–21 (defendant, who was convicted drug dealer and member of cocaine trafficking organization, was on errand to sell cocaine when victim, who was police officer, pulled over police cruiser, exited vehicle and ordered defendant to " '[g]et up against' " cruiser; defendant put left hand on cruiser, but kept right hand in coat pocket; victim repeatedly ordered defendant to remove hand from pocket and finally took hold of defendant's right arm in attempt to force him do so; when he was unable to remove defendant's hand from pocket and released his grip on defendant, defendant took left hand off cruiser, bumped left elbow against victim's chest to ascertain whether he was wearing bulletproof vest, and, upon determining that he was, withdrew pistol from pocket with right hand and shot victim behind left ear); *State* v. *Cobb*, supra, 251 Conn. 302–304 (after asking victim for ride, defendant forced victim to drive to secluded area, forced her into back seat of car, robbed her, raped her, put glove in her mouth, covered victim's mouth and nose with several layers of tape, taped her hands together and feet together, carried her to nearby dam, pushed her off dam onto concrete apron approximately twenty-three feet below; when victim survived fall and was able to remove some bindings and to crawl out of freezing

water, injuring herself in attempt, defendant, who had been watching victim from top of dam, went down to victim and forced her, facedown, back into water and strangled or drowned her); *State* v. *Webb*, supra, 238 Conn. 397–98 (defendant abducted victim in parking garage, forced her into car, drove her four miles to public park, forcibly removed or forced victim to remove shoes, pantyhose and panties and attempted to assault victim sexually; when victim, after struggle, was able to break free and tried to escape, defendant shot her twice in back, causing hemorrhaging and excruciating pain; victim then began crawling away from defendant, screaming repeatedly for help; defendant returned to car, drove it to victim's location, exited car and shot victim once in chest, once in ear and once point blank in face, finally killing her). I cite these five cases because, in all of them, the mandatory appeal process for capital cases has been completed. The facts alleged in the other cases in which the defendants have been sentenced to death, including the present case, are also horrific, but because those facts have not been subject to final appellate review, it would be inappropriate for me to assume that they have been proved beyond a reasonable doubt or to discuss them here.

[36] The majority contends that these remarks do not establish that a majority of legislators believed that the death penalty is the appropriate punishment for all of the defendants who have been sentenced to death because all of these legislators voted against P.A. 12-5. Thus, the majority apparently believes that, although those who voted *against* P.A. 12-5 were not motivated by a desire to wreak vengeance against the Cheshire defendants but by a principled belief in the appropriateness of the death penalty for heinous murder, many of those who voted *for* P.A. 12-5 but who were unwilling to vote for retroactive repeal must have been motivated by the desire to see those particular defendants executed. Again, however, this is nothing more than an unsupported assumption. There is absolutely no reason why those legislators could not have shared the principled beliefs of the legislators who voted against P.A. 12-5.

I emphasize that I express no view as to the guilt of the defendants who have been convicted of committing the Cheshire murders and the other crimes referred to during the legislative debates on P.A. 12-5 that have not yet been subject to final review by this court, or whether those defendants were properly sentenced to death. I also express no personal view as to whether the death penalty is warranted for any crime. I conclude only that the publicly reported facts of the Cheshire case and other cases in which the defendants have been sentenced to death reasonably could provide the basis for a legislative determination that there are crimes that deserve the death penalty.

[37] See also *Baker* v. *State*, 170 Vt. 194, 228, 744 A.2d 864 (1999) ("[I]t cannot be doubted that judicial authority is not ultimate authority. It is certainly not the only repository of wisdom. When a democracy is in moral flux, courts may not have the best or the final answers. Judicial answers may be wrong. They may be counterproductive even if they are right. Courts do best by proceeding in a way that is catalytic rather than preclusive . . . ." [Internal quotation marks omitted.]).

[38] The preamble to the Connecticut constitution provides: "The People of Connecticut acknowledging with gratitude, the good providence of God, in having permitted them to enjoy a free government; do, in order more effectually to define, secure, and perpetuate the liberties, rights and privileges which they have derived from their ancestors; hereby, after a careful consideration and revision, ordain and establish the following constitution and form of civil government."

The constitution of Connecticut, article first, § 2, provides in relevant part: "All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit . . . ."

[39] As the majority observes, the United States Supreme Court has repeatedly recognized that tension between the requirement that the discretion of the sentencing authority to impose the death penalty must be limited by statute and the requirement that the sentencing authority must be afforded unlimited discretion to consider *any* mitigating factor before imposing the death penalty.

[40] Justices Norcott and McDonald state that they do not "purport to resolve conclusively these allegations" but merely "feel compelled to analyze them." Thus, they, like the majority, attempt to have their cake (make factual findings on the issue of racial disparities in the imposition of the death penalty in this state) and eat it, too (deny that they are doing any such thing). Justices Norcott and McDonald further state that they are aware of "no authority, from this court or any other, supporting [my] novel rule that

the author(s) of a concurring opinion may freely address issues that are likely to arise in future cases, but that we are categorically barred from discussing issues that will not." I am aware, however, of no case in which the concurring justices have addressed an issue that can never come before or be of any concrete interest to the court. In support of their claim that they are entitled to issue an opinion that is pure dicta and that has no possible bearing on future claims that might come before the court if the issue may be of interest to other courts or legislatures, Justices Norcott and McDonald rely on a law review article written by Robert Blomquist. See R. Blomquist, "Concurrence, Posner-Style: Ten Ways to Look at the Concurring Opinions of Judge Richard A. Posner," 71 Alb. L. Rev. 37, 46, 56–64 (2008). I see nothing in the portion of Blomquist's article on which Justices Norcott and McDonald rely, however, that would suggest that concurring justices may freely render dicta on issues that are of no current or future interest to this court.

[41] Another commentator points out that "the intellectual legitimacy of [decisions relying on legislative facts to ascertain constitutional norms] turns upon the actual truth-content of the legislative facts taken into account by the judges who propound the decision." 2 K. Broun, McCormick on Evidence (7th Ed. 2013) § 331, pp. 612–13; see also J. Jackson, "The Brandeis Brief— Too Little, Too Late: The Trial Court as a Superior Forum for Presenting Legislative Facts," 17 Am. J. Trial Advoc. 1, 2 (1993–1994) ("This [a]rticle . . . argues that the superior forum in which to present legislative evidence is not through the traditional Brandeis-type brief, but through the trial process. A Brandeis brief is a document implemented at the appellate level that seeks to persuade the court by including . . . legislative evidence in the form of economic and social surveys, copious legal citations, reports of public investigative committees, or scientific discussions by experts." [Footnote omitted.]). Jackson argues in his article that the trial court is the best forum to introduce legislative facts because "[a] trial gives the litigants as well as the fact-finders the opportunity to personally experience testimony and view the demeanor of witnesses. Furthermore, fact-finders can test evidence by observing cross-examination, another step in purifying facts. Once the flaws in a [witness'] testimony are brought to the surface, the fact-finder can skim away the dross and more effectively evaluate the refined testimony." J. Jackson, supra, 40. "The Brandeis brief cannot accomplish the same level of testing facts as can a trial, and the Brandeis brief presents, at best, an opportunity to get information into the judicial process after the fact." Id., 41.

[42] See also A. Larsen, supra, 98 Va. L. Rev. 1291 (judicial finding of legislative facts without participation of parties has "troubling effects," including "the systematic introduction of bias, the possibility of mistake, and concerns about notice and legitimacy"); id., 1294 (computerized research of legislative facts by court may cause "filter bubble," result of which is "worse than a [j]ustice purposely finding something to cite that supports what she wants to argue; it is that she will only find factual authorities to support what it is she wants to argue" [emphasis omitted]); id., 1300 ("Justices—like all of us—have a tendency to engage in 'motivated reasoning' and to look for facts that support the argument they are building, wherever those facts may come from and despite what other opposing authority is out there. This tendency may encourage the ad hoc and potentially mistaken evaluation of scientific findings—looking for what one wants to see—particularly if the studies to be used as authorities were never tested by the adversarial method or addressed by experts below." [Footnote omitted.]); B. Gorod, "The Adversarial Myth: Appellate Court Extra-Record Factfinding," 61 Duke L.J. 1, 11 (2011) ("[i]f courts will ultimately turn to nonparties to provide them with the legislative facts they need to decide the case, those [nonparties] should be brought into the process at the trial court level, so that the legislative facts they offer can be thoroughly tested"); B. Gorod, supra, 12 (courts' reliance on extra-record materials to establish legislative facts is problematic because of: "[a] the courts' reliance on unfounded assumptions, rather than tested facts; [b] the lack of established guidelines for the development and testing of legislative facts; [c] the lack of transparency about courts' rationales in judicial opinions; and [d] the entrenchment in law of factual claims that should be subject to reconsideration as the world—and one's means of understanding it—changes").

[43] Donohue's article containing the statistical information that he presented on behalf of the petitioners in the consolidated habeas proceeding has the hallmarks of an appellate brief. For example, Donohue argues that, "[d]espite the fact that [this court] had mandated the statistical study and

a motions judge had rejected the state's pretrial motion to dismiss [on racial disparity] grounds, the [habeas court in the consolidated proceeding] ruled that the Connecticut constitutional claims of race discrimination were barred"; J. Donohue, supra, 11 J. Empirical Legal Stud. 639–40; the analysis submitted by the state's expert purporting to show the absence of racial disparities was "problematic" and "flawed"; id., 640; the habeas court improperly failed to make a finding on the impact of race on capital charging; id., 683; the habeas court improperly criticized Donohue's analysis of racial discrimination in the sentencing of capital defendants, as distinct from charging decisions; id., 686; the habeas court improperly failed to recognize that "[t]reating someone differently *because* of their race is disparate treatment discrimination, regardless of whether one is aware of one's bias"; (emphasis in original) id., 688; the habeas court "struggled in dealing with statistical evidence"; id.; and the habeas court was "clearly erroneous" when it found that the high number of capital cases in the judicial district of Waterbury could be the result of "random distribution." Id., 689. Justices Norcott and McDonald apparently agree with all of these contentions. In my view, it is improper for those to sanction this attempted end run on the process of appellate review in the consolidated habeas case, without providing an opportunity for the state to respond.

[44] Just one example illustrates Donohue's point. Donohue concluded in his study that the "logit" measure revealed that "minorities who kill whites are sentenced to death at a substantially higher rate than white defendants who commit similar crimes" and that this disparity was "highly statistically significant." J. Donohue, supra, 11 J. Empirical Legal Stud. 662. In a footnote, Donohue explained that the "logit" measure was superior to other measures because, according to "[t]he distinguished quantitative methodologist and University Professor at Harvard Gary King . . . using a linear model to analyze binary dependent variables is 'conceptually incorrect' and 'can yield predicted probabilities greater than one or less than zero, heteroskedasticity, inefficient estimates, biased standard errors, and useless test statistics.'" Id., 662 n.51. Donohue then argued that his use of the "logit" measure was preferable to the methods used by the Commissioner of Correction's expert, who had "purported to show there was no evidence of racial discrimination in capital sentencing . . . ." Id., 666. Perhaps Justices Norcott and McDonald find this information useful without further elucidation, but I do not.

I recognize that Donohue's statements concerning the difficulties faced by nonexpert judges when attempting to find facts in cases involving complex scientific or mathematical issues was directed at the habeas court in the consolidated habeas proceeding. Even if Donohue were correct, however, that the consolidated habeas proceeding was doomed to failure because, even with the assistance of the parties and their experts, the racial disparity issue was simply too complex for a judge with no scientific or statistical training to understand, it would be no solution for the equally unqualified justices of this court to make factual findings on the issue. Rather, the solution would be for the habeas court to retain a special master to assist it.

[45] The fact that Donohue strongly disagreed with the claims of these scholars only supports my position that the issue is strongly contested and that, while members of this court should not be fact-finding under any circumstances, that is particularly true when they are relying on contested studies outside the record.

[46] See K. Scheidegger, supra, 10 Ohio St. J. Crim. L. 163 n.93, citing S. Klein et al., "Race and the Decision to Seek the Death Penalty in Federal Cases," Technical Report of the RAND Corporation, Infrastructure, Safety, and Environment (2006), p. xvii (effect of race on decisions to seek death penalty in federal system disappear when data is adjusted for heinousness of crime); id., 161, quoting R. Berk et al., "Statistical Difficulties in Determining the Role of Race in Capital Cases: A Re-analysis of Data from the State of Maryland," 21 J. of Quantitative Criminology 365, 386 (2005) ("[f]or both capital charges and death sentences, race either played no role or a small one that is very difficult to specify" [internal quotation marks omitted]); K. Scheidegger, supra, 158 and n.68, citing D. Baime, "Report to the New Jersey Supreme Court, Systemic Proportionality Review Project, 2000–2001 Term" (2001) (referencing series of annual reports by special master appointed by New Jersey Supreme Court that found that statistical evidence did not support claim of bias on either race of defendant or race of victim); D. Baime, "Report to the New Jersey Supreme Court, Systemic Proportionality Review Project, 2001–2002 Term" (2002), p. 3 (analysis by special master "disclose[d] no statistically reliable evidence that the race or ethnicity of the defendant affects whether . . . the case proceeds to the penalty phase

or whether . . . the death is imposed . . . [or] that the race of the victim affects whether . . . the death penalty is imposed"); see also State of New Jersey, "New Jersey Death Penalty Study Commission Report" (2007), p. 1. ("[t]he available data do not support a finding of invidious racial bias in the application of the death penalty in New Jersey").

[47] In addition to Donohue's report, Justices Norcott and McDonald rely on government data derived from both the Criminal Justice Information Services Division of the Federal Bureau of Investigation and the Uniform Crime Reporting Program of the state of Connecticut to support their analysis of the racial disparity issue. As the justices acknowledge, however, this court already has concluded that it could not rely on this data because it was preliminary. They also rely on the 2003 study by the Commission on the Death Penalty, which was created by our legislature. See Public Acts 2001, No. 01-151, § 4. That study sets forth raw statistics concerning the race of defendants and victims in death penalty cases and makes no attempt to perform any more sophisticated statistical analysis to determine whether the apparent racial disparities might be explainable by other factors. State of Connecticut, Commission on the Death Penalty, "Study Pursuant to Public Act No. 01-151 of the Imposition of the Death Penalty in Connecticut" (January 8, 2003) pp. 17–28. Indeed, the commission itself stated that "the percentages are difficult to interpret and the [c]omission does not attempt to do so . . . ." Id., p. 25. Moreover, the commission stated in the study that the report of the petitioners' expert in the consolidated habeas proceeding, which was expected to be available later that year, was "expected to provide information regarding race, ethnicity, gender, age, and socioeconomic status of defendants and victims in capital felony cases, and will be available for review by the [l]egislature at that time." Id., pp. 20–21. Accordingly, the data from these studies clearly is not sufficient for this court to draw any definitive conclusions as to the existence of racial disparities in the imposition of the death sentence in this state. Contrary to the intimation of Justices Norcott and McDonald, however, I recognize that these studies were highly suggestive of a serious problem and that there was a clear need for further study to determine the extent to which the death penalty in this state has been infected by the arbitrary factor of race, as this court expressly held in in *State* v. *Cobb*, 234 Conn. 735, 663 A.2d 948 (1995). Pursuant to *Cobb*, that further study was conducted by the experts in the consolidated habeas proceeding, in which, as Justices Norcott and McDonald acknowledge, the habeas court reached no definitive factual conclusions as to the existence of racial disparities in the imposition of the death penalty.

Justices Norcott and McDonald also state that they suspect that "the crux of [my] problem . . . is that [I] simply [fail] to understand the nature or purpose of a meta-study." They point to no "meta-study," however, and I am aware of none, concerning the studies addressing racial disparities in the imposition of the death penalty *in this state*.

[48] As noted by this court in *State* v. *Santiago*, supra, 305 Conn. 114 n.1, § 53a-54b was amended twice between the date of the defendant's offenses and the date of this court's original decision in this case. Because those amendments had no bearing on the defendant's appeal, this court referred in *Santiago* to the then current revision of the statute. Id. Since that time, § 53a-54b was further amended. See P.A. 12-5, § 1. To avoid any confusion, I refer herein to the 1999 revision of § 53a-54b, the revision that was in effect at the time of the offense in the present case.

[49] General Statutes § 1-1 (t) provides: "The repeal of an act shall not affect any punishment, penalty or forfeiture incurred before the repeal takes effect, or any suit, or prosecution, or proceeding pending at the time of the repeal, for an offense committed, or for the recovery of a penalty or forfeiture incurred under the act repealed."

[50] General Statutes § 54-194 provides: "The repeal of any statute defining or prescribing the punishment for any crime shall not affect any pending prosecution or any existing liability to prosecution and punishment therefor, unless expressly provided in the repealing statute that such repeal shall have that effect."

[51] Public Act 12-5, § 38, provides: "The provisions of subsection (t) of section 1-1 of the general statutes and section 54-194 of the general statutes shall apply and be given full force and effect with respect to a capital felony committed prior to the effective date of this section under the provisions of section 53a-54b of the general statutes in effect prior to the effective date of this section."

[52] General Statutes § 53a-46b provides in relevant part: "(a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall

be reviewed by the Supreme Court pursuant to its rules. In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subparagraph (A) of subdivision (1) of section 53a-35a.

"(b) The Supreme Court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; or (2) the evidence fails to support the finding of an aggravating factor specified in subsection (i) of section 53a-46a. . . ."

Section 53a-46b was amended by P.A. 12-5 for purposes that have no bearing on this appeal. For convenience, unless otherwise indicated, I refer in this dissenting opinion to the current revision of the statute instead of the revision that was in place when the defendant committed the capital offense.

[53] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

[54] The eighth amendment to the United States constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

[55] In *State* v. *Webb*, supra, 238 Conn. 494–505, this court focused primarily on the provision of General Statutes (Rev. to 1995) § 53a-46b (b) (3) that directed the court to affirm the sentence of death unless it determined that "the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." When the legislature originally enacted § 53a-46b in 1980; see Public Acts 1980, No. 80-332, § 2; "it was widely believed that the [eighth amendment] required proportionality review." *State* v. *Webb*, supra, 504. The United States Supreme Court has since clarified that proportionality review is a constitutionally permissible method of minimizing "the risk of wholly arbitrary, capricious, or freakish sentences"; *Pulley* v. *Harris*, 465 U.S. 37, 45, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984); but is not constitutionally required. Id., 50–51. In 1995, the legislature amended § 53a-46b to eliminate the requirement for proportionality review. See Public Acts 1995, No. 95-16, § 3 (b). It is clear, however, that the provision of § 53a-46b (b) (1) requiring the court to determine whether the death sentence was "the product of passion, prejudice or any other arbitrary factor," no less than the former statutory requirement for proportionality review, was enacted in response to United States Supreme Court decisions indicating that appellate review of a death sentence to "determine whether it was imposed under the influence of passion or prejudice"; (internal quotation marks omitted) *State* v. *Webb*, supra, 503; is a permissible method of ensuring compliance with the eighth amendment prohibition on the arbitrary and capricious imposition of the death penalty.

[56] As I have indicated, several defendants who have been sentenced to death in this state are currently participating in a proceeding on a petition for a writ of habeas corpus raising the claim of racial disparity in the imposition of the death sentence in violation of § 53a-46b (b) (1). The habeas court has rejected their claim; see *In re Death Penalty Disparity Claims*, Superior Court, judicial district of Tolland, geographical area number nineteen, Docket No. TSR-CV-05-4000632-S (2013); and that decision is currently pending on appeal to this court. See *In re Death Penalty Disparity Claims*, supra, Docket No. SC 19252.

[57] To the extent that the defendant believes that the legislature intended that § 53a-46b provides *greater* protection than that provided by the eighth amendment, I disagree. He has not expressly made any such argument in his appellate briefs and has pointed to no evidence of such an intent.

[58] Indeed, § 53a-54b contains a number of legislative distinctions that could be characterized as "arbitrary" in the sense that the defendant uses that word. For example, under § 53a-54b (5), which makes murder during the course of a kidnapping a capital felony, a person who compelled a victim to move from the living room of a residence into the kitchen before murdering the victim would be eligible for the death penalty, while a person who chased a fleeing victim from the living room into the kitchen would not be. *State* v. *Sanseverino*, 291 Conn. 574, 584, 969 A.2d 710 (2009) (defendant cannot be convicted of kidnapping if restraint of victim was incidental and necessary to commission of underlying crime). Under § 53a-54b (7), which makes the murder of two or more persons in a single transaction a capital

felony, a person who murdered a pregnant woman whose child was born alive but ultimately died as a result of the assault on the mother would be eligible for the death penalty, while a person who instantaneously killed both the mother and the fetus would not be. *State* v. *Courchesne*, supra, 296 Conn. 705. Under § 53a-54b (8), which makes the murder of a person under sixteen years of age a capital felony, a person who murdered a victim one hour before the victim's sixteenth birthday would be eligible for the death penalty, while a person who murdered the victim one hour after his sixteenth birthday would not be. See *State* v. *Higgins*, supra, 265 Conn. 65. I am aware of no authority, however, for the proposition that such legislative distinctions violate the eighth amendment.

To the extent that the defendant relies on *Fleming* v. *Zant*, 259 Ga. 687, 690, 386 S.E.2d 339 (1989) (reversing death sentence imposed on mentally disabled defendant before legislature prospectively prohibited imposition of death sentence on such disabled defendants), *Cooper* v. *State*, 540 N.E.2d 1216, 1220 (Ind. 1989) (reversing death sentence imposed on fifteen year old defendant before legislature prospectively repealed death penalty for defendants under age of sixteen years), *State* v. *Bey*, 112 N.J. 45, 98, 548 A.2d 846 (1988) (death sentence could not be imposed on defendant who was seventeen years old at time of offense when, after offense, legislature repealed death penalty for juvenile defendants), and *Van Tran* v. *State*, 66 S.W.3d 790, 811 (Tenn. 2001) (reversing death sentence that was imposed before legislature prospectively prohibited imposition of death sentence on mentally retarded defendants, and remanding for determination as to whether defendant was mentally retarded), I conclude in part VII B of this dissenting opinion that these cases do not support his claim. See also footnote 84 of this dissenting opinion.

[59] Justice Eveleigh contends in footnote 48 of his concurring opinion that, "[a]lthough *Gregg* and *Furman* focus on the need to channel the discretion of a sentence in individual cases to avoid arbitrary results, the United States Supreme Court's eighth amendment jurisprudence on arbitrariness in sentencing is not confined to arbitrariness by individual sentencing bodies." In support of this contention he cites *Woodson* v. *North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) ("Death, in its finality, differs more from life imprisonment than a [100 year] prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."). The court in *Woodson* held that the death penalty statute under review in that case was unconstitutional because it was mandatory, and "it is only reasonable to assume that many juries under mandatory statutes will continue to consider the grave consequence of a conviction in reaching a verdict. North Carolina's mandatory death penalty statute provides no standards to guide the jury in its inevitable exercise of the power to determine which first-degree murderers shall live and which shall die." Id., 303. In addition, the court in *Woodson* held that the mandatory death sentence statute prevented the *sentencing authority* from considering all the facts and circumstances of the particular offense, thereby undermining the reliability of the sentence. Id., 303–305. Thus *Woodson*, like the other cases that I have discussed, involved concerns about unprincipled and irrational decisions made by *sentencing authorities*. Justice Eveleigh has cited no authority for the proposition that, when a defendant has raised a colorable claim that a *legislative classification* treats similarly situated defendants differently, the claim implicates reliability concerns under the eighth amendment.

[60] The defendant also claims that, under P.A. 12-5, this state can no longer impose the death penalty in a consistent, reliable and nonarbitrary manner, as required by the eighth amendment. My conclusion in part VI of this dissenting opinion that the imposition of the death penalty on the defendant would not violate § 53a-46b, which implements the eighth amendment requirement for a nonarbitrary capital sentencing scheme, is dispositive of this claim.

[61] The standard for determining whether a particular punishment violates the eighth amendment is set forth in part III of this dissenting opinion. To reiterate, the United States Supreme Court relies primarily on two objective factors to guide its determination as to whether a particular punishment violated contemporary standards of decency: (1) "legislation enacted by the country's legislatures," which provides the "clearest and most reliable objective evidence of contemporary values"; (internal quotation marks omitted) *Graham* v. *Florida*, supra, 560 U.S. 62; *Atkins* v. *Virginia*, supra, 536 U.S. 312; and (2) "[a]ctual sentencing practices" in this country. *Graham*

v. *Florida*, supra, 62. After determining the contemporary societal consensus, the United States Supreme Court has then exercised its independent judgment to consider "the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment . . . . In this inquiry the [c]ourt also considers whether the challenged sentencing practice serves legitimate penological goals." (Citations omitted.) Id., 67.

[62] The defendant has cited no authority for the proposition that the courts may consider only the societal consensus in a particular state to determine the constitutionality of that state's capital sentencing scheme under the eighth amendment. Because I conclude that there is no consensus against the death penalty in this state, I need not address that question.

[63] As of the date of this opinion, Alaska, Connecticut, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, New Jersey, New Mexico, New York, North Dakota, Rhode Island, Vermont, West Virginia, Wisconsin and the District of Columbia do not have an operative capital sentencing scheme, either because the scheme has been legislatively repealed or because it has been judicially invalidated. Death Penalty Information Center, "States With and Without the Death Penalty," available at http://www.deathpenaltyinfo.org/states-and-without-death-penalty (last visited July 30, 2015).

[64] See Death Penalty Information Center, "Hawaii," (2015), available at http://www.deathpenaltyinfo.org/hawaii-0 (last visited July 30, 2015).

[65] See Death Penalty Information Center, "Illinois," (2015), available at http://www.deathpenaltyinfo.org/illinois-1 (last visited July 30, 2015).

[66] See Death Penalty Information Center, "Iowa," (2015), available at http://www.deathpenaltyinfo.org/iowa-0 (last visited July 30, 2015).

[67] See Death Penalty Information Center, "Maine," (2015), available at http://www.deathpenaltyinfo.org/maine-0 (last visited July 30, 2015).

[68] See 2013 Md. Laws c. 156.

[69] See Death Penalty Information Center, "Michigan," (2015), available at http://www.deathpenaltyinfo.org/michigan-0 (last visited July 30, 2015).

[70] See Death Penalty Information Center, "Minnesota," (2015), available at http://www.deathpenaltyinfo.org/minnesota-0 (last visited July 30, 2015).

[71] Section 2C:11-3b of the New Jersey Revised Statutes Annotated (West 2012 Cum. Pocket Part) provides: "An inmate sentenced to death prior to the date of the enactment of this act [repealing the death penalty], upon motion to the sentencing court and waiver of any further appeals related to sentencing, shall be resentenced to a term of life imprisonment during which the defendant shall not be eligible for parole. Such sentence shall be served in a maximum security prison.

"Any such motion to the sentencing court shall be made within 60 days of the enactment of this act. If the motion is not made within 60 days the inmate shall remain under the sentence of death previously imposed by the sentencing court."

The defendant apparently believes that this statute prospectively repeals the death penalty because it does not, by its own operation, convert sentences of death to life sentences, but requires defendants sentenced to death to take action. I assume for purposes of this dissenting opinion, without necessarily agreeing with the defendant, that the statute may be characterized as a prospective repeal.

[72] Chapter 141 of the New Mexico Laws (2009), 2009 N.M. Laws c. 11, § 6, provides: "The provisions of this act [repealing the death penalty] apply to crimes committed on or after July 1, 2009."

[73] See Death Penalty Information Center, "Vermont," (2015), available at http://www.deathpenaltyinfo.org/vermont-0 (last visited July 30, 2015).

[74] See Death Penalty Information Center, "Wisconsin," (2015), available at http://www.deathpenaltyinfo.org/wisconsin-0 (last visited July 30, 2015).

[75] For a list of all executions in the United States by state and by date, see Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File Executions by State," available at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited July 30, 2015).

The defendant acknowledges that, in a number of pre-*Furman* cases, various courts concluded that the death penalty may be imposed on a defendant who committed a capital felony before the effective date of abolition. See *In re Faltin*, 31 Ariz. 465, 477, 254 P. 477 (1927); *In re Stewart*, 78 Kan. 885, 886, 96 P. 45 (1908); *In re Schneck*, 78 Kan. 207, 210, 96 P. 43 (1908); *State* v. *Lewis*, 273 Mo. 518, 536–37, 201 S.W. 80 (1918). The defendant represents, however, that none of these defendants was ultimately executed. See Arizona Dept. of Corrections, "Historical Prison Register," (2015), available at http://corrections.az.gov/historical-prison-register-e-i (last visited

July 30, 2015) (William Faltin died in prison in 1953); M. Church, "Capital Punishment, 1870–1907," Kansas Memory Blog (January 24, 2008), available at http://www.kansasmemory.org/blog/post/28195390 (last visited July 30, 2015) (Kansas governors refused to execute death warrants from 1872 through 1909); H. Frazier, Death Sentences in Missouri, 1803–2005: A History and Comprehensive Registry of Legal Executions, Pardons, and Commutations (2006), pp. 170–71 (Missouri governor commuted Ora Lewis' death sentence in 1918).

[76] See Death Penalty Information Center, "Clemency," (2015), available at http://www.deathpenaltyinfo.org/clemency (last visited July 30, 2015).

[77] See Death Penalty Information Center, "Clemency," (2015), available at http://www.deathpenaltyinfo.org/clemency (last visited July 30, 2015).

[78] Moreover, there is no way of knowing whether the governors and the board of pardons commuted the death sentences because they discerned a societal consensus against postrepeal executions or because they perceived serious flaws in the repealed statutes pursuant to which the death row inmates had been sentenced.

[79] See Death Penalty Information Center, "New Mexico," (2015), available at http://www.deathpenaltyinfo.org/new-mexico-1 (last visited July 30, 2015). In addition, a third defendant who had been accused of committing a capital felony before the New Mexico legislature abolished the death penalty was tried after the effective date of the abolition. See *Astorga* v. *Candelaria*, Supreme Court of New Mexico, Docket No. 33,152 (order dated September 1, 2011). The trial ended in a jury deadlock on the death sentence, which resulted in the imposition of a life sentence. See O. Uyttebrouck, "Life in Prison," Albuquerque J., May 19, 2012, available at http://www.abqjournal.com/main/2012/05/19/news/life-in-prison.html (last visited July 30, 2015).

[80] See Death Penalty Information Center, "New Mexico," (2015), available at http://www.deathpenaltyinfo.org/new-mexico-1 (last visited July 30, 2015).

[81] See Death Penalty Information Center, "Connecticut," (2015), available at http://www.deathpenaltyinfo.org/connecticut-1 (last visited July 30, 2015).

[82] In Connecticut, only the Board of Pardons and Paroles has the authority to commute death sentences. See General Statutes § 54-130a. In Maryland, the governor has the power to change a sentence of death to a sentence of life without the possibility of parole. See 2013 Md. Laws c. 156, § 3. In New Mexico, the governor has the power to grant reprieves and pardons for all cases except treason and cases involving impeachment. See N.M. Const., art. V, § 6.

[83] According to the amicus group of legal historians and scholars, there were no inmates on death row in Iowa when the legislature repealed the death penalty.

The amicus curiae group of experts on international human rights and comparative law represents that no other country has executed a prisoner after the prospective repeal of the death penalty. Again, however, there is no way of knowing the reason for this fact. In any event, this court has held that "international norms cannot take precedence over a domestic legal climate in which capital punishment retains strong legislative and judicial support." *State* v. *Rizzo*, supra, 303 Conn. 196. Although I am unable to discern any strong societal support in favor of imposing the death penalty after a prospective repeal, I also am unable to find strong support against that practice in this country, and the practices of other countries, standing alone and unexplained, cannot constitute sufficient proof that the practice is unconstitutional.

[84] To the extent that the defendant contends that the four cases he cites in his appellate briefs support his claim that there is a national consensus against imposing the death penalty after a prospective appeal; see *Fleming* v. *Zant*, 259 Ga. 687, 690, 386 S.E.2d 339 (1989) (reversing death sentence on mentally retarded defendant that was imposed before legislature prospectively prohibited imposition of death sentence on such disabled defendants); *Cooper* v. *State*, 540 N.E.2d 1216, 1220 (Ind. 1989) (reversing death sentence on defendant who was fifteen years old at time of offense when sentence was imposed before legislature prospectively repealed death penalty for defendants under age of sixteen years); *State* v. *Bey*, 112 N.J. 45, 98, 548 A.2d 846 (1998) (death sentence could not be imposed on defendant who was seventeen years old at time of offense when, after offense, legislature repealed death penalty for juvenile defendants); and *Van Tran* v. *State*, 66 S.W.3d 790, 811 (Tenn. 2001) (reversing death sentence on mentally retarded defendant that was imposed before legislature prospectively prohibited imposition of death sentence on such disabled defendants); I am not persuaded. In each of those cases, the court was confronted with a legislative

determination that imposing the death penalty on defendants with a particular characteristic that reduced their moral culpability was categorically inappropriate. See *Fleming* v. *Zant*, supra, 690 ("the objective evidence indicates that a consensus against execution of the mentally retarded does exist among Georgians" and, therefore, "under the Georgia [c]onstitution, the execution of the mentally retarded constitutes cruel and unusual punishment"); *Cooper* v. *State*, supra, 1220 (Indiana legislature made "policy decision that no one should be executed for a crime committed at age [fifteen]"); *Van Tran* v. *State*, supra, 805 ("the execution of mentally retarded individuals violates evolving standards of decency that mark the progress of a maturing society both nationally and in the [s]tate of Tennessee"). In *State* v. *Bey*, supra, 98, the New Jersey Supreme Court concluded that "the [l]egislature never had intended to subject juvenile offenders to capital punishment, and did intend that its ameliorative amendment would apply retroactively to [the] defendant's case." Although the court also conclusorily stated that "notions of fundamental fairness" would require retroactive application of the statute even if the legislature had no such intent; id., 104; it did not explain why. Presumably, however, the court believed that the legislature had determined that the imposition of the death penalty on juveniles violated contemporary standards of decency. As I discuss in part III of this opinion, our legislature has made no determination that the death penalty is immoral.

[85] See Arizona Dept. of Corrections, "Arizona Death Penalty History," (2013), available at https://corrections.az.gov/public-resources/death-row/Arizona-death-penalty-history (last visited July 30, 2015) (Arizona repealed death penalty in 1916; after reinstatement in 1918, multiple executions took place); Death Penalty Information Center, "Colorado," (2015), available at http://www.deathpenaltyinfo.org/colorado-1 (last visited July 30, 2015) (Colorado abolished death penalty in 1897 and reinstated it in 1901); D. Wilson, Office of Colorado State Public Defender, "Cataloge of Colorado Executions," (2009), available at http://pdweb.coloradodefenders.us/index.php?option=com content&view=article&id=152&Itemid=108 (last visited July 30, 2015) (listing executions in Colorado before repeal and after reinstatement); Death Penalty Information Center, "Delaware," (2015), available at http://www.deathpenaltyinfo.org/delaware-1 (last visited July 30, 2015) (Delaware repealed death penalty in 1958; after reinstatement in 1961, multiple executions took place); Death Penalty Information Center, "Iowa," (2015), available at http://www.deathpenaltyinfo.org/iowa-0 (last visited July 30, 2015) (Iowa repealed death penalty in 1872; after reinstatement in 1878, multiple executions took place; death penalty once again repealed in 1965); Death Penalty Information Center, "Kansas," (2015), available at http://www.deathpenaltyinfo.org/kansas-1 (last visited July 30, 2015) (Kansas repealed death penalty in 1907 and reinstated it in 1935; death penalty struck down by United States Supreme Court, death penalty statute enacted again in 1994); Death Penalty Information Center, "Maine," (2015), available at http://www.deathpenaltyinfo.org/maine-0 (last visited July 30, 2015) (Maine abolished death penalty in 1876 and reinstated it in 1883; abolished again in 1887); ProCon.org, "Death Penalty: Maine-Abolishment of the Death Penalty," (2015), available at http://deathpenalty.procon.org/view.resource.php?resourceID=4925 (last visited July 30, 2015) (referring to "botched executions" in Maine after 1883 reinstatement); E. Guillot, "Abolition and Restoration of the Death Penalty in Missouri," 284 Annals of Am. Acad. of Pol. & Soc. Sci. 105 (November 1952) (Missouri repealed death penalty in 1917 and reinstated it in 1919); Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," pp. 174–77, available at http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf (last visited July 30, 2015) (listing dates of Missouri executions); 1969 N.M. Laws 415 (abolishing death penalty for certain offenses); 1979 N.M. Laws 522–29 (reinstating death penalty for capital offenses); Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," supra, pp. 221–23 (listing dates of New Mexico executions); Death Penalty Information Center, "New York," (2015), available at http://www.deathpenaltyinfo.org/new-york-1 (last visited July 30, 2015) (New York limited death penalty in 1967, abolished by United States Supreme Court in 1972; since reinstating it in 1995, no executions took place; abolished again in 2007); Death Penalty Information Center, "Oregon," (2015), available at http://www.deathpenaltyinfo.org/oregon-1 (last visited July 30, 2015) (Oregon repealed death penalty in 1914, reinstated in it 1920, repealed it again in 1964, and reinstated it again in 1978); Death Penalty Information Center, "Executions in the U.S. 1608–2002: The ESPY File, Executions by State," supra, pp. 271–74 (listing dates of Oregon executions); Death Penalty Infor-

mation Center, "South Dakota," (2015), available at http://www.deathpenal
tyinfo.org/south-dakota-0 (last visited July 30, 2015) (South Dakota repealed
death penalty in 1915; after reinstating it in 1939, one prisoner was executed;
after abolished by United States Supreme Court, reinstated in 1984, and one
person has been executed since); Tennessee Dept. of Correction, "Tennessee
Executions," (2015), available at http://www.tennessee.gov/correction/
article/tdoc-tennessee-executions (last visited July 30, 2015) (Tennessee
repealed death penalty in 1913; after reinstating it in 1915, multiple prisoners
were executed); Death Penalty Information Center, "Washington," (2015),
available at http://www.deathpenaltyinfo.org/washington-1 (last visited July
30, 2015) (Washington repealed death penalty in 1913 and reinstated it in
1919; abolished again in 1975, reinstated in 1981); Washington State Dept.
of Corrections, "Persons Executed Since 1904 in Washington State," (2015),
available at http://www.doc.wa.gov/offenderinfo/capitalpunishment/exe
cutedlist.asp (last visited July 30, 2015) (listing dates of Washington exe-
cutions).

[86] The amicus group of legal historians and scholars points out that, in a
number of states where the death penalty was temporarily repealed, the
death sentences of inmates on death row were commuted at the time of
the initial repeal or the repeal was retroactive. While it seems clear that the
reinstatement of the death penalty for defendants whose death sentences
had previously been commuted by executive action or operation of law
would be unlawful as beyond the pale of decency and entirely inconsistent
with the fair and orderly administration of justice, among other reasons, in
states where there was no commutation and where the repeal was prospec-
tive, defendants who had been sentenced to death before repeal could
have no reasonable expectation that their death sentences would not be
carried out.

[87] In the cases relied on by Justice Eveleigh, the defendants challenging
the prospective repeals were in different classes for equal protection pur-
poses, i.e., those who committed crimes before repeal and those who com-
mitted crimes after repeal, and in the same class for eighth amendment
purposes, i.e., defendants whose reduced culpability makes the death penalty
inappropriate. Under such circumstances, eighth amendment concerns
trump equal protection principles. In the present case, the same analysis
applies, with the difference that, for eighth amendment purposes, *all defen-
dants are in the class for whom the death penalty constitutionally may
be imposed*. Accordingly, equal protection principles, not eighth amendment
principles, apply.

[88] Justice Eveleigh's contention that "no lawmaker articulated a legitimate
or moral rationale for conditioning death upon the date of the offense" is
simply incorrect. The legislative history of P.A. 12-5 is replete with evidence
that many of the legislators who voted for prospective repeal had concluded
that the death penalty has simply become unworkable, which is clearly a
legitimate rationale. See footnote 19 of this dissenting opinion.

[89] The equal protection clause of the fourteenth amendment to the United
States constitution provides in relevant part: "No State shall . . . deny to
any person within its jurisdiction the equal protection of the laws." U.S.
Const., amend. XIV, § 1.

[90] In *Dortch*, the court did not specify whether the defendant raised his
claim under the federal constitution, under the state constitution or under
both. Presumably, however, he did not raise the claim solely under the
state constitution.

[91] The defendant in the present case contends that *Dortch* is distinguishable
because it involved "a mere procedural change in our state's capital punish-
ment scheme," while the question in the present case is whether the defen-
dant "is similarly situated to defendants who are ineligible for the death
penalty because of the fortuitous date of their offense." If the "mere proce-
dural change" had applied to the defendant in *Dortch*, however, he might
have been sentenced to life in prison instead of to death, and he was deprived
of that beneficial opportunity merely because of the "fortuitous" date of
his offense. Accordingly, I would reject this claim.

The defendant also points out that the defendant in *Dortch* ultimately
was not executed because the state Pardons Board commuted his sentence.
See G. Demeusy, "Chair Claims 13th Victim As W.J. Lorain is Executed:
Sentence of [George M. Dortch, Jr.] Commuted: Pardons Board Gives Him
Life," Hartford Courant, July 12, 1955, p. 1. The defendant contends that
this fact reveals "a societal judgment that it would be inappropriate to
execute someone who has been arbitrarily denied the benefit of a potentially
lifesaving law based solely on an arbitrary effective date." The reasons for

the commutation of the sentence of the defendant in *Dortch*, however, are unclear. Although the attorney for the defendant in that case argued before the Pardons Board that the defendant should have been given the benefit of the new statute, he also made other arguments in support of commutation. G. Demeusy, supra, p. 5. In any event, the actions of the Pardons Board in 1955 reveal little about contemporary societal norms. Finally, the fact that the legislature has delegated to the Board of Pardons and Parole the authority to commute the defendant's death sentence if it finds that that sentence would be unduly harsh in light of the enactment of P.A. 12-5 does not mean that this court has the authority to ignore the clear legislative intent that the act not be applied retroactively.

[92] In *Dobbert* v. *Florida*, supra, 432 U.S. 288, the defendant committed certain capital offenses in violation of Florida's capital sentencing scheme. After he committed the offenses, but before he was tried and sentenced, the United States Supreme Court held in *Furman* v. *Georgia*, supra, 408 U.S. 239–40, that capital sentencing schemes like Florida's were unconstitutional. *Dobbert* v. *Florida*, supra, 288. Thereafter, the Florida Supreme Court resentenced all prisoners who had been sentenced to death before the decision in *Furman* to life imprisonment. Id., 301; see also *Donaldson* v. *Sack*, 265 So. 2d 499, 505 and n.10 (Fla. 1972) (Florida court commuted death sentences pursuant to statute providing that, if death penalty should be held unconstitutional, "the court having jurisdiction over a person previously sentenced to death for a capital felony shall cause such person to be brought before the court, and the court shall sentence such person to life imprisonment with no eligibility for parole" [internal quotation marks omitted]). The Florida legislature enacted a new capital sentencing scheme, under which the defendant was tried, convicted and sentenced to death. *Dobbert* v. *Florida*, supra, 287. The defendant in *Dobbert* contended on appeal to the United States Supreme Court that, because the Florida Supreme Court had resentenced all prisoners who had already been sentenced to death when the unconstitutional statute was invalidated to life imprisonment, the imposition of the death sentence on him pursuant to the new statute denied him the equal protection of the laws. Id., 301. The United States Supreme Court concluded that the defendant was "simply not similarly situated" to those defendants whose sentences had been commuted, because "[h]e was neither tried nor sentenced prior to *Furman*, as were they . . . ." Id. Thus, the court held that, because of the date of his sentencing, the defendant was not similarly situated to other defendants who had committed offenses while the invalidated statute was in effect.

*Dobbert* is not inconsistent with the holding of this court in *Dortch* that defendants who commit crimes during the period that a particular capital sentencing scheme is in effect are similarly situated to each other but not to defendants who commit crimes under a subsequently enacted prospective scheme. See *Dortch* v. *State*, supra, 142 Conn. 30. *Dortch*, like the present case, involved legislative line drawing between two constitutionally permissible approaches, while *Dobbert* involved the judicial invalidation of a statute as unconstitutional and the subsequent enactment of a constitutional statute. In the latter situation, any statutory savings provision would not apply (because it obviously could not preserve the application of an unconstitutional statute and, in any event, the unconstitutional statute was not rendered inoperative by legislative repeal), and the court in *Dobbert* merely concluded that neither the equal protection clause nor the ex post facto clause barred the application of a later enacted, constitutional statute to a defendant who committed a crime while the unconstitutional statute was in force, in accordance with the presumptive desire of the legislature, as long as the new law was not more onerous than the old one and the defendant was on notice at the time of the crime that his conduct would subject him to the penalty imposed. *Dobbert* v. *Florida*, supra, 432 U.S. 296–97. Thus, the United States Supreme Court was not troubled by the fact that defendants who committed similarly egregious crimes during the period that a particular death penalty statute was in force, but who were not similarly situated under state law because of the fortuity that their sentences were imposed on different dates, were treated very differently. I can perceive no reason why the court would be more troubled by different treatment of defendants based on differences in the laws in effect on the dates that they committed their crimes.

[93] The defendant contends that, because the imposition of the death penalty on him implicates his fundamental right to life, the statutory classification created by P.A. 12-5 is subject to strict scrutiny. This court repeatedly has rejected similar claims. For example, the defendant in *State* v. *Wright*,

246 Conn. 132, 140–41, 716 A.2d 870 (1998), argued that "the right to be free from deprivations of liberty as a result of arbitrary sentences is fundamental, and therefore the statutory provision at issue may be upheld only if the [g]overnment has a compelling interest in the classification in question." (Internal quotation marks omitted.) This court observed that "[t]he Supreme Court in *Chapman* [v. *United States*, 500 U.S. 453, 465, 111 S. Ct. 1919, 114 L. Ed. 2d 524 (1991)] rejected that claim . . . stating: [W]e have never subjected the criminal process to this sort of truncated analysis, and we decline to do so now. Every person has a fundamental right to liberty in the sense that the [g]overnment may not punish him unless and until it proves his guilt beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees. . . . But a person who has been so convicted is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual . . . and so long as the penalty is not based on an arbitrary distinction . . . . As an interpretation of the federal constitution by the United States Supreme Court, this holding necessarily governs the defendant's federal constitutional claim. We therefore conclude that rational basis analysis governs the defendant's claim." (Footnote omitted; internal quotation marks omitted.) *State* v. *Wright*, supra, 140–41; see also *State* v. *Higgins*, supra, 265 Conn. 66 (legislature's choice of punishment for criminal offense is not subject to strict scrutiny merely because it implicates defendant's fundamental liberty interest). This reasoning applies equally to the defendant's claim in the present case. See *Styron* v. *Johnson*, 262 F.3d 438, 452 (5th Cir. 2001) ("[E]qual protection clauses do not require a higher level of scrutiny for legislative classifications that may result in the death penalty. Thus, [the petitioner's] claims are to be assessed under a rational basis test." [Internal quotation marks omitted.]), cert. denied sub nom. *Styron* v. *Cockrell*, 534 U.S. 1163, 122 S. Ct. 1175, 152 L. Ed. 2d 118 (2002); *Henderson* v. *State*, 962 S.W.2d 544, 561 (Tex. Crim. App. 1997) (rejecting defendant's claim that court must apply strict scrutiny to legislative classification governing eligibility for death penalty and applying rational basis test to statute); *Gray* v. *Commonwealth*, 274 Va. 290, 307, 645 S.E.2d 448 (2007) (applying rational basis review to equal protection claim when defendant "was unable to cite, nor do we find, any capital murder case from any court that applied strict scrutiny review to an equal protection claim made by a convicted capital murder defendant facing a death sentence"), cert. denied, 552 U.S. 1151, 128 S. Ct. 1111, 169 L. Ed. 2d 826 (2008).

[94] I recognize that there may be capital offenses that were committed before the effective date of P.A. 12-5 that have not yet been discovered or prosecuted. If so, the persons who committed those offenses could be subject to a capital sentencing scheme that the legislature has deemed problematic. If such offenses were committed, however, their number is presumably very small.

[95] The defendant cites *Saylor* v. *Indiana*, 808 N.E.2d 646 (Ind. 2004), for the proposition that ameliorative changes to capital sentencing laws must be applied retroactively. In *Saylor*, the defendant was tried, convicted and sentenced to death in 1992 under a state law that authorized the trial judge to override a jury recommendation against the death penalty. Id., 650–51. The jury rendered a unanimous recommendation against the death penalty, the trial judge overrode that recommendation, and the defendant's death sentence was affirmed on appeal to the Supreme Court of Indiana. Id., 648. Thereafter, the United States Supreme Court, in *Apprendi* v. *New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), held that a jury must find any fact necessary to impose a death sentence. *Saylor* v. *Indiana*, supra, 648. The Indiana legislature then amended the death penalty statute to remove the judicial override provision for future cases. The defendant sought a rehearing, claiming that the new statute required the reversal of his death sentence. Id. The Supreme Court of Indiana declined to decide whether the new statute applied retroactively to cases on collateral review under *Teague* v. *Lane*, 489 U.S. 288, 311, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989), which held that a newly announced constitutional rule involving "watershed rules of criminal procedure" implicating the fundamental fairness of a trial applied retroactively to cases on collateral review. *Saylor* v. *Indiana*, supra, 649. Instead, it held pursuant to an Indiana rule of appellate procedure that allows reviewing courts to revise a sentence if the sentence was "inappropriate" that the defendant's death sentence was inappropriate because, "[e]ven if the [s]ixth [a]mendment does not bar [the defendant's] execution . . . as a matter of Indiana state law [the defendant], if tried today, could not be sentenced to death without a jury recommendation that

death be imposed." Id., 650. This conclusion, however, was largely driven by the fact that the sentence was imposed pursuant to a statute that was later held to be *unconstitutional*. Thus, even if this court had the same authority as the Indiana court to determine whether sentences are "inappropriate," which we do not, *Saylor* does not support the proposition that, when a defendant has been sentenced to death under a death penalty statute that would be *constitutional* under current law and the statute is later amended or repealed, equal protection principles require that the amendment or repeal must apply retroactively.

*Hamm* v. *Rock Hill*, 379 U.S. 306, 85 S. Ct. 384, 13 L. Ed. 2d 300 (1964), also provides no support for the defendant's position. In that case, the United States Supreme Court held that, "[f]uture state prosecutions [for peaceful attempts to be served in places of public accommodation] being unconstitutional [under the supremacy clause of the United States constitution after the enactment of the federal Civil Rights Act of 1964, 42 U.S.C. § 1981 et seq.] and there being no saving[s] clause in [that act] itself, convictions for pre-enactment violations would be equally unconstitutional and abatement necessarily follows." Id., 315. Thus, the court held that, because Congress had no intent to allow prosecutions for violations of state laws that conflicted with the Civil Rights Act of 1964 prior to the enactment of that act, such prosecutions were unconstitutional under the *supremacy clause*. *Hamm* does not support the proposition that a state legislature's refusal to repeal the state's own criminal law retroactively violates the equal protection clause when the law prior to the repeal was constitutional. Indeed, in *Bell* v. *Maryland*, 378 U.S. 226, 242, 84 S. Ct. 1814, 12 L. Ed. 2d 822 (1964), the United States Supreme Court remanded a case to state court for a determination as to whether a state savings clause operated to protect convictions that had been obtained under a trespassing law that was later repealed by the state legislature, without reaching the question of whether the convictions violated the equal protection clause because the state trespassing law discriminated against the defendants on the basis of their race. As the defendant acknowledges, the Court of Appeals of Maryland concluded that Maryland's statutory savings provisions applied to the repeal of the trespassing law and affirmed the convictions under review in *Bell*, but subsequently granted a rehearing and reversed the convictions, presumably as the result of the United States Supreme Court's intervening decision in *Hamm*, which was issued on December 14, 1964. *Hamm* v. *Rock Hill*, supra, 306; *Bell* v. *State*, 236 Md. 356, 369, 204 A.2d 54 (1964) (concluding in decision issued on October, 22, 1964, that savings provision applied to repeal of trespassing law and prosecutions were not barred by Civil Rights Act of 1964 because federal act was not retroactive); *Bell* v. *State*, supra, 356 (rehearing was granted on December 7, 1964, and convictions were reversed on April 9, 1965).

[96] Article first, § 1, of the Connecticut constitution provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

[97] The defendant states conclusorily that, under the second *Geisler* factor, the text of article first, § 1, of the state constitution supports his claim, but does not explain why. See *State* v. *Rizzo*, supra, 303 Conn. 134 (second *Geisler* factor is text of operative constitutional provisions). Accordingly, I decline to consider this claim. See *State* v. *T.R.D.*, 286 Conn. 191, 213–14 n.18, 942 A.2d 1000 (2008) (claim not considered because it was inadequately briefed). The defendant makes no claim that the first or third *Geisler* factors support his claim. See *State* v. *Rizzo*, supra, 136 (*Geisler* factors include "[1] persuasive relevant federal precedents . . . [and] [3] historical insights into the intent of our constitutional forebears" [internal quotation marks omitted]).

[98] Thus, the resentencing law in *Canister* did not apply to defendants who had committed a capital felony before the effective date of the statute and who had not yet been apprehended or charged as of that date, or to defendants who had already been sentenced to death under the invalidated death penalty statute.

[99] The relevant constitutional provision provided: "[T]he general assembly shall not pass local or special laws in any of the following enumerated cases . . . regulating the practice in the courts of justice . . . [or] summoning or impaneling grand or petit juries. . . . In all other cases, where a general law can be made applicable, no special law shall be enacted." (Internal quotation marks omitted.) *People* v. *Canister*, supra, 110 P.3d 382.

[100] See *State* v. *Carbone*, supra, 172 Conn. 255–56 (when criminal statute

was repealed after defendants violated it but before they were charged, "defendants were liable to prosecution [under the repealed statute] at the date of the repeal [and] § 54-194 preserves that liability").

[101] Article one, § 10, of the constitution of the United States provides in relevant part: "No State shall . . . pass any Bill of Attainder . . . ."

[102] Article one, § 10, of the constitution of the United States provides in relevant part: "No State shall . . . pass any . . . ex post facto Law . . . ."

[103] See 55 H.R. Proc., supra, p. 1064, remarks of Representative Sawyer ("When we look at the courts and the expectations that we have of them, it is to evaluate a question of law. We . . . particularly get rankled if we think that they are making law. . . . That's why this amendment is very important because it's very clear to the courts when they make their determination what will happen."); 55 S. Proc., Pt. 3, 2012 Sess., p. 667, remarks of Senator Coleman ("[E]ven assuming that [the proposed legislature would be found unconstitutional] . . . I don't know what else would happen except that the people that are on death row would remain on death row and the bill as amended, if it were to become law, would be voided. And consequently . . . I just don't think that it's something that's necessary to adopt."); see also 55 S. Proc., Pt. 3, 2012 Sess., p. 668, remarks of Senator Fasano ("I guess I look at [the amendment] as a spare tire in your trunk. You may not need it. But if it is unconstitutional, you have it. And you've protected the intent of the [l]egislature, which is not, clearly not to let the [eleven prisoners] currently on death row to get a different sentence.").

––––––––––––––––––––––––––––––